**THE TRIAL LAW FIRM, LLC**
The Pittsburgher
428 Forbes Avenue, Suite 1700
Pittsburgh Pennsylvania, 15219

Mart Harris, Esquire
412.588.0030 | MH@TLawF.com
Pa. Id. No. 319504

Nelson Berardinelli, Esquire
412.588.0930 | NB@TLawF.com
Pa. Id. No. 310581


**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**WILLIAMSPORT DIVISION**

| | |
|---|---|
| **KAYLA WILLIAMS,** | Case No. 4:20-cv-00298-MWB |
| Plaintiff, | |
| **vs.** | **FIRST AMENDED COMPLAINT IN CIVIL ACTION** |
| **PENNSYLVANIA STATE UNIVERSITY;** and, **BRENDAN PRAWDZIK** in his individual capacity; and, **LAUREN LANGFORD** in her individual capacity; and, **KAREN FELDBAUM** in her individual capacity; and, **YVONNE GAUDELIUS** in her individual capacity, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

NOW COMES the Plaintiff, Kayla Williams, by and through her attorneys, The Trial Law Firm, LLC, Mart Harris, Esquire, and Nelson Berardinelli, Esquire, and pursuant to Fed.R.Civ.P. 15(a)(1)(B), (by way of Fed.R.Civ.P. 7(b)(1)(B) and 83(a)(1)), files the within First Amended Complaint in Civil Action against the Defendants as follows:

**Parties**

1.    The Plaintiff is Kayla Williams ("Ms. Williams"). Ms. Williams is an adult female individual who resides in Allegheny County Pennsylvania.

Williams v. Penn State University et al. Amended Complaint - 1

2.    The First Defendant is Pennsylvania State University ("Penn State"). Penn State is a public university affiliated with the Commonwealth of Pennsylvania.

3.    The Second Defendant is Brendan Prawdzik ("Mr. Prawdzik"). Mr. Prawdzik is an adult individual who maintains an office in Centre County Pennsylvania, as a Professor of English at Penn State.

4.    The Third Defendant is Lauren Langford ("Ms. Langford"). Ms. Langford is an adult individual who maintains an office in Centre County Pennsylvania, as an Assistant Director of Penn State in the Office of Student Conduct.

5.    The Fourth Defendant is Karen Feldbaum ("Ms. Feldbaum"). Ms. Feldbaum is an adult individual who maintains an office in Centre County Pennsylvania and is employed by Penn State as Senior Director of Office of Student Conduct.

6.    The Fifth Defendant is Yvonne Gaudelius ("Ms. Gaudelius"). Ms. Gaudelius is an adult individual who maintains an office in Centre County Pennsylvania and is employed by Penn State as Associate Vice President and Senior Associate Dean for Undergraduate Education.

**Personal Jurisdiction and Venue**

7.    Personal jurisdiction over Ms. Williams exists, as she avails herself of the jurisdiction of this Court.

8.    Personal jurisdiction over the Defendants exists because they have a regular place of business in the Middle District of Pennsylvania.

9.    The events and omissions which give rise to the claims asserted herein occurred in the Middle District of Pennsylvania in or around University Park, Pennsylvania. Therefore, pursuant to 28 U.S.C. § 1391(b), the District Court situated in Williamsport Pennsylvania is the proper venue for this case.

Williams v. Penn State University et al. Amended Complaint - 2

**Subject Matter Jurisdiction**

10.    This Civil Action is brought pursuant to multiple federal statutes, including but not limited to 42 U.S.C. § 1983. Therefore, the United States District Courts have Subject Matter Jurisdiction over this dispute.  The Court also has supplemental jurisdiction over Ms. Williams' state law claims pursuant to 42 U.S.C. § 1367.

11.    Penn State is a land grant University affiliated with the Commonwealth of Pennsylvania, and is therefore considered a governmental entity subject to 42 U.S.C. § 1983.

12.    Mr. Prawdzik is a person as identified by the anti-Retaliation provisions of Title VI.

13.    Ms. Williams began her freshman year at Penn State in the Fall 2016 semester. She expected and anticipated to graduate from Penn State with a Bachelor's Degree after approximately four (4) years.

**Facts- Ms. Williams is "Train" Raped**

14.    After her first semester at Penn State, the only time she spent at the University that was not marred by rape and racism, on or about January 15, 2017, Ms. Williams was raped by two male Penn State students.

15.    When Ms. Williams awoke, naked and confused, she began to get dressed while trying to piece together the incidents of the previous evening. The only thing she could remember was faces walking around a dark room, someone on top of her, and her saying to that someone "[w]hat are you doing? Get off me." In response to her demand, she was told, "[r]elax, you'll be OK."

16.    One of her rapists then entered the room, and Ms. Williams asked him "[w]hat happened? Who was in here?" The rapist replied, "I don't know, I was downstairs in the kitchen." Ms. Williams retorted, "[y]ou have to know.

Williams v. Penn State University et al. Amended Complaint - 3

Who was in here?" The rapist falsely insisted he did not know who entered
the room with her the previous night.

17.   Ms. Williams ran downstairs, and screamed "[w]ho was in that
room?" The only person left in the house was asleep on the couch, and he
jumped out of his sleep. Upon information and belief, the person sleeping on
the couch was not involved in the rapes but was involved in a group text
message session with the two rapists, which included coded references to
train raping Ms. Williams, including but not limited to "the conductor is
back" and "code is a toilet flush." Upon information and belief, when Ms.
Williams began screaming, one of the rapists fled the house. This rapist
later withdrew from Penn State while under investigation for his rape of Ms.
Williams, prior to facing a Title IX Decision Panel, thereby, avoiding
University adjudication.

18.   Upon information and belief, Penn State knew or should have
known that the individual who was asleep on the couch stated that one of the
rapists came downstairs alone after being in the room with Ms. Williams, and
stated that they "put [Ms. Williams] upstairs to sleep it off." Then, one of
the rapists "got a fresh bottle of liquor" and returned to the room where
Ms. Williams was sent to "sleep it off."

19.   Ms. Williams stated her intention to call the police.

20.   One of the rapists (the one who was subjected to a Title IX
Hearing Panel, eventually, as discussed in detail *infra*) pleaded with Ms.
Williams to not call the police and offered to drive her back to her dorm.

21.   Ms. Williams, disinclined to acquiesce to his request, did in
fact call the police.

22.   The police arrived, and spoke with Ms. Williams. The police then
spoke to the rapist.

23.   After speaking to the rapist, the police informed Ms. Williams that the rapist stated "everything was consensual." This statement by the police was Ms. Williams' first confirmation of both: 1) the fact that she was indeed raped; and, 2) more than one person raped her. Shocked, Ms. Williams exclaimed, "I didn't even know that [rapist] was involved. And there was no consent to anything!"

24.   The police officer determined that Ms. Williams was currently under the influence of alcohol, and that she needed to go to the hospital. An ambulance arrived and transported Ms. Williams to the hospital.

25.   While waiting in the hospital waiting room, alone, Ms. Williams became emotional. A nurse eventually performed a rape kit, which was physically and emotionally painful for Ms. Williams. It was also determined that Ms. Williams' blood alcohol content was 0.192 at approximately 9:00 a.m. Eventually, Ms. Williams went home.

26.   Upon information and belief, including but not specifically limited to the fact that Penn State receives notifications from local police departments when one or more of its students are involved with suspected criminal behavior, one or more Penn State Title IX mandatory reporters became aware that two of its students were under investigation for rape of one of its other students (Ms. Williams) in or around January 2017.

27.   Upon information and belief, including but not specifically limited to the fact that Ms. Williams was not contacted by the Title IX office before she personally approached them, despite learning that that two of its students were under investigation for rape of one of its other students (Ms. Williams) in or around January 2017, Penn State violated Title IX and its own policies and procedures because the mandatory reporter(s) who learned of Ms. Williams' rape and the subsequent police investigation in or

around January 2017 did not alert Penn State's Title IX Coordinator of same, or otherwise make contact with Ms. Williams.

28.   Over the next few weeks, Ms. Williams had multiple meetings with the police and with the district attorney. In the first meeting, Ms. Williams was informed by the police that they had confirmed that two men were involved in the rape, and that "they were stupid and snitched on each other."

29.   Upon information and belief, including but not limited to the fact that Penn State receives notifications from local police departments when one or more of its students are involved with suspected criminal behavior, Penn State was aware of these findings that "they were stupid and snitched on each other" prior to the Title IX Hearing at issue in this case.

30.   Approximately one week later, Ms. Williams was in class, and another student did a presentation on being raped at Penn State as a freshman. That night, though she was not mentally able to do a presentation on her own rape, Ms. Williams determined to do a presentation on the rape culture at Penn State for her own project; she hoped to leverage her rape culture presentation to help her recover emotionally from her experience. The theme of her project was "you just have to keep going." While unable to heal herself, it was cathartic to hopefully be able to help other people.

31.   Ms. Williams continued to suffer mentally from being raped. Later in the semester, upon information and belief, for about a week, she depersonalized from herself. This was a terrifying experience that she could not understand. Ms. Williams lost all sense of who she was and spent hours in front of the mirror trying to "get [her]self back."

**Facts- Penn State is (Finally) Forced to Start its Title IX Investigation**

32.   In the Fall 2017 semester, Ms. Williams learned that Penn State had not begun an investigation into her rape, so she personally reached out

Williams v. Penn State University et al. Amended Complaint - 6

to the Title IX office on or about October 11, 2017, and her case was assigned to Christopher Harris ("Mr. Harris").

33.   To this day, when Ms. Williams sees a person who looks like one of her rapists, she still freezes in place, her body still gets extremely hot, and she still panics and seeks shelter. Seeing that rapist and/or people who look like that rapist caused her to miss many classes due to anxiety. Sometimes, Ms. Williams was mentally unable to leave her dorm, for fear that that rapist or someone who looks like him would cross her path.

34.   During Spring Break 2018, Ms. Williams was informed by the police that the district attorney did not think they could win in court (despite numerous confessions and a rape kit being positive for bilateral vaginal erythema) and therefore, her rapists would not be prosecuted. Ms. Williams was devastated and could not stop crying.

35.   Even after making her report to PSU's Title IX Office in or around October 2017, over six months elapsed before Penn State decided to have a conduct conversation meeting with Ms. Williams' rapist.

**Facts- Ms. Williams Publicly Calls Out Penn State For Its Title IX Failures**

36.   On or about April 5, 2018, Ms. Williams, frustrated with the pace of Penn State's response and investigation, took to Twitter.

37.   Specifically, Ms. Williams stated, "[w]hile we're on the topic, let's also talk about how Penn State hides and undermines just how bad rape on this campus actually is and how much rapists aren't condoned (sic) no matter the amount of evidence!!!!"

38.   Ms. Williams' social media postings garnered significant negative attention for Penn State. Numerous individuals responded to Ms. Williams directly offering her support.

39.   Specifically, "AnkMan" stated, "I know how rapists are let off easy. My gf was sexually assaulted almost a year ago (will be next week)

and… the school gave him a slap on the damn wrist…PSU doesn't take this shit seriously and its (sic) concerning."

40.   Upon information and belief, the exchange in the previous three paragraphs was "liked" 807 times, and "retweeted" 247 times.

41.   Ms. Williams also stated, "[h]is name is [rapist] and he's one of the rapists that still walks freely on campus bc (sic) PSU keeps dragging out the investigation after a year plus!!!...".

42.   Upon information and belief, this message was "liked" approximated 1,600 times and "retweeted" approximately 1,400 times.

43.   Numerous people specifically replied, publicly, to Ms. Williams. For instance, "kay", on or about April 6, 2018 stated, "...basically if you are an athlete you can get accused of rape and literally nothing happen, (sic) penn state (sic) got. (sic) A (sic) bad name for me now smh (sic)."

44.   Ms. Williams' social media postings garnered significant negative attention for Penn State. Numerous individuals responded to Ms. Williams directly offering her support.

45.   Upon information and belief, in total, these "tweets" containing the eight previous paragraphs were "liked" approximately 29,700 times, and "retweeted" approximately 18,600 times.

46.   Ms. Williams' Twitter thread about Penn State's delay in investigating her case, and their general poor handling of rape cases went "viral" and upon information and belief, was viewed or shared or interacted with close to a million times. Even Penn State faculty as well as the student newspaper reached out to Ms. Williams offering to help.

47.   Very shortly after Ms. Williams' Twitter feed went viral, on or about April 19, 2018, Ms. Feldbaum contacted Ms. Williams, indicating that a conduct conversation meeting was performed that day, and that one of her

rapists was being charged by Penn State. The other rapist resigned from Penn State rather than face discipline.

**Facts- The Title IX Hearing**

48. Prior to the hearing (which occurred on or about May 18, 2018), Ms. Williams was only given approximately five (5) hours to review the Title IX investigation packet in preparation for the hearing. Penn State forbid Ms. Williams from printing, saving, or downloading the Title IX investigation packet for analysis and review.

49. Upon information and belief, the version of the investigative packet made available to Ms. Williams prior to the hearing was, at some point, heavily edited by Penn State (several dozen pages were added to the packet at some point after the hearing).

50. Immediately prior to the hearing, wherein Ms. Williams was en route, her vehicle broke down. As such, Ms. Williams called and requested a continuance, but was discouraged against re-scheduling the hearing, including but not limited to since, according to Ms. Feldbaum, rescheduling so that Ms. Williams could appear in person rather than over the phone would "give [the rapist] the upper hand."

51. In the hearing, Ms. Williams attempted to introduce evidence, but was forbidden from presenting same because, according to the Decision Panel ("DP"), no new evidence was permitted at the hearing.

52. When Ms. Williams attempted to provide testimony, she was forbidden multiple times by the DP to limit her testimony to "yes" and "no" answers, at the request of the rapist and/or his lawyer. Ms. Williams was not informed that her rapist had the advice of a lawyer.

53. In the hearing, Ms. Williams was irrelevantly asked by the DP "[h]ave you ever drank that much before?" Upon information and belief, this

Williams v. Penn State University et al. Amended Complaint - 9

1  question was designed to blame Ms. Williams for drinking alcohol as the

2  reason that she was raped.

3      54.    In the hearing, the DP refused to consider Ms. Williams' rape

4  kit evidence because the panel members did not understand the rape kit

5  terminology. The hearing was not otherwise continued in order for the DP to

6  learn said terminology or consult an expert to determine, for instance, the

7  meaning of the word "erythema."

8      55.    In the hearing, the rapist refused to answer any question,

9  beyond saying "no comment" including but not limited to questions regarding

10 the meaning behind his text messages of "the conductor is back" and "code is

11 a toilet flush" to other men in the house.

12 **Facts- The Title IX Decision and Appeals**

13     56.    That day, DP determined that the rapist was "not responsible."

14 The basis for the decision that he was not responsible is that:

15         The DP examined the investigative packet very carefully, along
           with any other information made available to it. Several
16         witnesses indicated that Ms. Williams had been drinking
           considerably the night of the incident. Detective Clause noted
17         that the complainant was "visibly intoxicated" the morning the
           police arrived at [rapist]'s apartment. Based on these accounts,
18         the DP concluded that by the time she arrived at [rapist]'s
           apartment, the complainant was very intoxicated, possibly to the
19         point of incapacitation. The DP also observed that, with the
           exception of [REDACTED], none of the people in [rapist]'s
20         apartment had been with the complainant earlier in the evening.
           Consequently, the DP could not conclude that [rapist] could have
21         known how much Ms. Williams had drunk. While in [rapist]'s
           apartment, the complainant, while very intoxicated, is reported
22         not to require assistance while walking, did not seem to have
           difficulty holding a conversation, and was texting while in
23         [rapist]'s bedroom. Hence, the DP could not conclude that there
           was a preponderance of evidence that [rapist] reasonably should
24         have known that Ms. Williams was incapacitated. Similarly, the
           DP could not determine that there was a preponderance of
25         evidence that [rapist] did not have consent for sexual
           intercourse.
26
27     57.    The DP also noted, "the [DP] suggests to the Office of Student

28 Conduct that [rapist] might be charged with Code of Conduct violation 02.15-

Sexual Exploitation." Upon information and belief, Penn State did not properly investigate this recommendation from the DP.

58.   Despite the DP's findings, the investigative packet contained evidence that [the rapist] had to pour her alcohol "…because [Ms. Williams] was too drunk to pour it herself and was about to throw up."

59.   Despite the DP's findings, the investigative packet contained evidence that at approximately 9:00 a.m. the next morning, her Blood Alcohol Content was 0.192.

60.   Despite the DP's findings, the investigative packet contained evidence that the police found multiple use condoms laying around the room where the rape occurred.

61.   Despite the DP's findings, the investigative packet contained evidence that Ms. Williams was advised by the female friend who dropped her off at her dorm after the S.M.A.R.T. social that she was so intoxicated that she "should lock her door and go to sleep", and that when this friend was asked by Mr. Harris why she told Ms. Williams to lock her door and go to sleep, she said that it was because she "could tell how intoxicated [Ms. Williams] was."

62.   Despite the DP's findings, the investigative packet contained evidence that Ms. Williams was asked by one of the female students whose apartment the S.M.A.R.T. social was to stay at the apartment because she was so intoxicated and, that she "wasn't sure if [Ms. Williams] could make it home and was worried for her safety."

63.   Ms. Williams, on multiple occasions after the May 18, 2018 hearing, requested information about the outcome of her rapist's case (including but not limited to her appeal), and was denied information by Penn State, including but not limited to being denied such information by

Ms. Feldbaum, who refused to substantively answer many of Ms. Williams'
questions.

64.   Penn State continued to deny Ms. Williams' requests on multiple
occasions. Penn State did not respond to Ms. Williams directly, but Ms.
Feldbaum eventually informed Ms. Williams that Ms. Williams' questions were
more appropriate for the DP.

65.   Ms. Williams then asked to speak with the DP, and was denied
that request.

**Facts- Mr. Prawdzik and ENGLISH 202A**

66.   On or about August 26, 2019, Ms. Williams began classes in Penn
State's English Course Number 202A, taught by Mr. Prawdzik.

67.   In part due to being a rape survivor, Ms. Williams utilized Penn
State's mental health treatment services to treat for emotional distress
related to the rape, and Penn State's response thereto.

68.   During this time, Ms. Williams specifically suffered from
depression and anxiety, and occasionally suffered from an inability to
function, including but not limited to, going to class.

69.   As a Black woman, Ms. Williams chose racism as her topic for a
semester long English project.

70.   When Mr. Prawdzik learned of Ms. Williams' topic choice, he held
her back after class and tried to convince Ms. William's that minorities are
partly at fault for the systematic racism that they experience.

71.   Ms. Williams specifically disagreed with Mr. Prawdzik and he
engaged her in a debate for approximately one hour, before Ms. Williams
stated "you are not changing my mind" and left the meeting.

72.   Upon information and belief, Mr. Prawdzik did not meet with
other students who did not pick racism regarding their respective chosen

Williams v. Penn State University et al. Amended Complaint - 12

topic for this assignment, and/or were not Black, in order to try to convince them to change their topics.

73.   Ms. Williams was appalled, humiliated, and ultimately refused to change the topic of this assignment.

74.   Ms. Williams' experience with professors who she suspected to be racially biased, including but not limited to Mr. Prawdzik, contributed to her anxiety and caused her to become extremely anxious about attending English class, and she missed a number of classes due to her anxiety.

75.   Ms. Williams thereafter missed some of Mr. Prawdzik's English classes.

76.   On or about October 11, 2019, Ms. Williams emailed Mr. Prawdzik informing him that she had missed class due to health reasons, and that she would supply excuses.

77.   On or about October 14, 2019, Mr. Prawdzik approached Ms. Williams, in front of the entire class, and loudly requested her health care information and medical excuses and stated he would be checking to make sure her documentation was "legit."

78.   Ms. Williams, who wanted to maintain her private medical information separate and apart from her classmates, requested that Mr. Prawdzik communicate with her privately about these issues, preferably, via email; since she initiated this private topic via private communication methods, she expected his response to also be private, not in front of the whole class.

79.   Mr. Prawdzik walked away from Ms. Williams and about five minutes later he returned to Ms. Williams and loudly asked if she "want[ed] to talk about this inside of class or outside of class."

80.   Ms. Williams was confused, and responded "I guess outside."

Williams v. Penn State University et al. Amended Complaint - 13

81.   Mr. Prawdzik stormed out of the room, and Ms. Williams, still confused, followed him into the hallway.

82.   Ms. Williams asked Mr. Prawdzik (paraphrased) "what did I do? What are you mad about? All I asked is if we could continue communicating about my private matters through email, like I already initiated through email."

83.   Mr. Prawdzik replied (paraphrased) "you have been a class disruption" and told her that she "would not be in the class anymore."

84.   Earlier in the semester, Mr. Prawdzik emailed Ms. Williams, stating that she was "doing good" and "making good progress" in the class, with no mention of being a class disruption.

85.   At the conclusion of the conversation, Ms. Williams went back into the classroom, and asked why she had to leave since she didn't do anything wrong.

86.   Mr. Prawdzik then said he was calling the police.

87.   Mr. Prawdzik then picked up the classroom's telephone receiver.

88.   Ms. Williams then said Mr. Prawdzik was acting in a racist fashion, and that she would notify the Education Equity Office (of Penn State) about his inappropriate actions, and then she left.

89.   Mr. Prawdzik called out after her "good!"

90.   Later that day, Ms. Williams wrote a report in Dr. Whitehurst's assistant's office about Mr. Prawdzik's racial discrimination and then submitted it online to Penn State (which eventually ended up with the Affirmative Action office).

91.   Mr. Prawdzik falsely asserted to the Affirmative Action Office that Ms. Williams had missed more classes than she actually did, and then stated that because she reported him to the Affirmative Action office, that he would not grade her work, he would not give her an alternative to

Williams v. Penn State University et al. Amended Complaint - 14

complete the course, that she would receive an "F" in his class, and that the grade was final.

92.    Upon information and belief, the Affirmative Action Office instructed Mr. Prawdzik to allow Ms. Williams to complete the course, and upon Mr. Prawdzik's refusal, Penn State did not take appropriate further action to effectively remediate Mr. Prawdzik's admitted, open, and obvious retaliation.

93.    While waiting for a meeting at the Office of Student Conduct, a front office worker, Hilda Sparrow sat down next to Ms. Williams.

94.    Ms. Sparrow placed her hand on Ms. Williams' leg, and, unsolicited, stated, "Kayla… You're a smart, pretty girl. I think your majors are perfect for you." Ms. Sparrow then paused, and continued, "Why don't you just forget about what happened to you?"

95.    Ms. Williams felt as if Ms. Sparrow was warning Ms. Williams that as long as Ms. Williams insisted on answers to her questions regarding the Title IX hearings and complaining about racism, that Ms. Williams would have problems at school, and that her issues would stop as soon as Ms. Williams stopped talking about Title IX and racism.

96.    Ms. Williams replied, "[f]orget? I hate even walking into the OSC office because of everything that has occurred and it just mentally messes with me."

97.    Ms. Sparrow responded, "I know, I see it in your face every time you walk in there."

98.    Ms. Williams still has an "F" on her transcript, and Penn State has not acted to remove the "F" grade in a manner that does not bring financial and academic harm to Ms. Williams (via Penn State offering a late add/drop and then re-taking the class, which would be indicated on her

Williams v. Penn State University et al. Amended Complaint - 15

transcript permanently while also requiring Ms. Williams to pay for the course again).

**Facts- Ms. Yarwood and PSYCH 425**

99.   On or about January 13, 2020 Ms. Williams started classes in Penn State's Psychology Course Number 425 taught by Ms. Yarwood.

100.   This class focused on "Human Emotions." Ms. Williams was excited for this class, because since her rape, her emotional state was broken.

101.   Ms. Williams took two quizzes on or about January 29, 2020.

102.   Quizzes are graded by a computer, wherein Ms. Yarwood entered the correct answers into a computer program, which then compared the answers supplied by Ms. Yarwood to the answers submitted by the student to produce a grade.

103.   Upon information and belief, Ms. Yarwood mistakenly entered an answer incorrectly on each of these quizzes, which resulted in the class getting those answers marked incorrect and losing points for same.

104.   On one of the quiz questions (on both quizzes), Ms. Williams answered a particular multiple-choice question wrong.

105.   Ms. Williams asked her friends to compare answers so she could study for future exams, and discovered that her classmates (names withheld for privacy purposes but available in discovery pursuant to a protective and confidentiality order), two white students, answered the same multiple choice answer as Ms. Williams did, but those white students had been awarded the points as if they answered the question correctly.

106.   Ms. Williams contacted Ms. Yarwood via e-mail about the discrepancy in grading.

107.   Ms. Yarwood responded by explaining why she was wrong.

108.   Ms. Williams responded that it was unfair that she would not get the credit when other students were given credit for the same wrong answer to the same question.

109.   Ms. Williams then met with Ms. Yarwood about the quizzes.

110.   Ms. Williams said (paraphrased) "I understand why it is wrong, but it is unfair and biased to let certain students get credit for the wrong answer and not others."

111.   Ms. Yarwood responded that the credit had been removed from the white students, and she also told Ms. Williams that she could ask her friends for that confirmation email indicating that the white students' credit had been removed.

112.   Ms. Williams asked the white students if the credit was removed.

113.   They replied that the credit was initially removed, but then, subsequently given back, resulting in their receiving credit for getting the wrong answer.

114.   Ms. Williams confirmed that she was still not given credit for the same answer, even though it is believed to have been given to the white classmates (names withheld for privacy purposes but available in discovery pursuant to a protective and confidentiality order).

115.   Following the next class, Ms. Williams approached Ms. Yarwood after class to discuss the quiz grading discrepancy and a white student in front of Ms. Williams asked Ms. Yarwood why their grade was inflated.

116.   The white student said that their "backpack Number 2" assignment had been made into extra credit.

117.   Upon hearing same, Ms. Williams exclaimed "my backpack Number 2 assignment was not extra credit."

118.   Ms. Yarwood immediately replied "I just changed it."

Williams v. Penn State University et al. Amended Complaint - 17

119. Ms. Williams just before class checked her grades, and the backpack Number 2 assignment was not extra credit at that time. Ms. Williams checked again after Ms. Yarwood indicated that she "just changed it" and despite Ms. Yarwood's statement, the assignment was not listed as extra credit for Ms. Williams.

120. Ms. Williams then emailed Ms. Yarwood regarding the quizzes and the backpack Number 2 assignment.

   a. Ms. Williams asked, "[y]ou stated during our meeting that you took the points back that were freely given to some but not others on quiz 1, but I have since discovered, with proof, that you actually gave everyone an additional 0.5 points on quiz 1, but not me. Can you explain that?"

   b. Ms. Williams stated, "I should have been in the group that got the additional points for quiz 1. You are refusing to give me the same extra points that you gave others. Can you explain to me the reason behind this?"

   c. Ms. Williams stated, "[c]an you explain to me how/why I have proof that PB#2 showing up as extra credit in the grade book for the class, but not me? (I have proof.. before you changed it after I overheard the girl bring it up to you after class)."

   d. Ms. Williams stated, "[c]an you inform me how/why the class received an additional 0.5 on quiz 2 also, but I did not? (I have proof)."

121. Ms. Yarwood responded that "I discussed your concerns about bias and unfairness with [the head of psychology department]. I will not be responding to [your questions regarding bias and unfairness]," and that she "could do a grade appeal at the end of the semester."

Williams v. Penn State University et al. Amended Complaint - 18

122.   Throughout the rest of the class, Ms. Yarwood would use examples in class about injustice, angry emotions and stare at Ms. Williams and smirk as she detailed these examples.

123.   On or about January 20, 2020, Ms. Williams contracted severe bronchitis, and was incapacitated by same for approximately one week. Ms. Williams went to the hospital, and had a University wide doctor's note excusing her from all University activities.

124.   Due to this note, Ms. Yarwood allowed Ms. Williams to make up an assignment. Ms. Williams wrote down the grading guidelines on the assignment through the Backpack system, and followed them, as she had done on her previous assignments.

125.   Ms. Yarwood did not use the same grading guidelines as published by Backpack that she used with all the other students in the class, and instead created a special grading system that was harsher, and upon information and belief, only used for Ms. Williams' assignment.

126.   Ms. Williams emailed Ms. Yarwood, "[y]ou created an entirely stricter rubric than the PB websites use to grade assignments and that no other student has been graded off of. Please give me back the points you unfairly [docked]."

127.   Ms. Yarwood responded that she was not giving Ms. Williams any points back, was not answering any questions about the assignment, and to take any further concerns to the head of the psychology department.

128.   Ms. Yarwood continued to smirk at Ms. Williams during class at the same time as discussion emotional topics. Ms. Williams eventually broke down and stated, "[y]ou can keep smirking and messing with me if you want. You can answer my questions in court." Ms. Williams then left class and dropped the course.

Williams v. Penn State University et al. Amended Complaint - 19

129.   After dropping the course, Ms. Williams emailed Ms. Yarwood and the head of the Psychology department and asked for the rubric used to grade her makeup work that Ms. Yarwood made up just for Ms. Williams, that was harsher than the grading of the rest of the class. Ms. Williams received no response, until she emailed twice more. The psychology department head finally responded that no one would be sending Ms. Williams the grading rubric.

**Facts – Ms. Williams is Suspended by Penn State**

130.   On or about January 21, 2020, Ms. Williams was suffering from viral bronchitis and went to the Penn State student health service.

131.   On or about January 22, 2020, Ms. Williams was called to a Penn State-scheduled conduct conversation meeting regarding her alleged harassment of a former roommate, and an alleged assault against a "ride-share" driver for January 25, 2020.

132.   Ms. Williams, suffering from bronchitis, did not learn of the meeting until after the time for same had passed.

133.   Ms. Williams did have a University medical excuse for all University activities, which included the date and time of her meeting for the conduct conversation meeting.

134.   As an accused student, Ms. Williams had the right to participate in the conduct conversation meeting prior to a finding of probable cause being levied against her.

135.   Though accused students are warned that failure to attend the conduct conversation meeting would result in the process continuing without the input of the accused student, Ms. Williams was medically excused from this meeting. Based on this medical excuse, Ms. Williams requested that her conduct conversation meeting be rescheduled.

136.   On several occasions, including but not limited to on or about February 13, 2020, Ms. Williams was denied a conduct conversation meeting despite her medical excuse covering the date of the previously scheduled and medically excused conduct conversation meeting by Ms. Langford.

137.   On several occasions, including but not limited to on or about February 13, 16, 17, 20, and 21, 2020, Ms. Williams was denied the specific information that was alleged to be a violation of student conduct, and ultimately did not have five-days-notice of the specific information from incident reports which formed the basis for her misconduct charges, in violation of Penn State policies and procedures (in part because Ms. Williams was denied her conduct conversation meeting).

138.   Ms. Williams, shocked that Penn State would ignore a medical excuse, reiterated that she did not get the benefit of a conduct conversation meeting and per Penn State's policies and procedures, missed same due to a medical reason and reported the Office of Student Conduct to the Affirmative Action office as a result.

139.   Penn State allowed Ms. Williams to contest the charges, but repeatedly refused to allow Ms. Williams to engage in a conduct conversation meeting as was her right under the policies and procedures of Penn State.

140.   On February 19, 2020, Ms. Williams filed a lawsuit against Penn State University for violations of, *inter alia,* due process, Title VI, and, Title IX.

141.   On February 20, 2020, Penn State was served with the lawsuit.

142.   On February 20, 2020, numerous news articles were published regarding the lawsuit Ms. Williams filed against Penn State.

143.   On February 21, 2020, Penn State held a hearing to determine whether Ms. Williams was responsible for harassment of her former roommate, and/or assaulting a "ride share" driver.

Williams v. Penn State University et al. Amended Complaint - 21

144.   The morning of the hearing, in direct violation of Penn State policies and procedures which guarantee two-days-notice of any witness statements to be used in the hearing, the Office of Student Conduct provided a written statement from one of the accusing witnesses to Ms. Williams and the DP.

145.   In the hearing, Ms. Williams was the only witness to appear; neither the roommate who alleged that Ms. Williams harassed her, nor the "ride-share" driver who alleged that Ms. Williams assaulted him appeared at the hearing to provide testimony or answer questions, depriving Ms. Williams the ability to ask them questions; but Penn State found those non-present and unchallenged paper witnesses to be credible.

146.   Ms. Williams' advisor was forbidden by the DP to speak at all with Ms. Williams during the hearing (unless there was a break in the proceedings, though no such breaks were scheduled or otherwise occurred during the hearing).

147.   In the hearing, Ms. Williams was admonished for her presentation because according to the DP, "this [hearing] is only about two" charges, and Ms. Williams, who had repeatedly asked which parts of the incident report the basis for the charges were, had to do a line by line rebuttal.

148.   The DP forced Ms. Williams to discuss (in the nature of speculation) as to why various persons took various actions or had various understandings, despite that Ms. Williams would have no way of knowing that information, then used Ms. Williams' incoherency during part of her hearing, which was based in part on not knowing how to answer those questions that were improperly directed at her forcing her into speculation about topics for which she had no personal knowledge such as absent witnesses' state of mind.

149.  Ms. Williams protested the conduct of the hearing as a violation of the Penn State policies and procedures on the basis of never having had the opportunity to engage in a conduct conversation meeting despite her medical excuse.

150.  Ms. Williams protested perceived bias against her during the hearing (based on how she was treated as a victim in her Title IX case in 2018 as previously described) and informed the DP that she had filed a federal lawsuit against Penn State because of her ongoing problems with getting anyone in the administration to take her concerns seriously.

151.  Later that same day, Ms. Williams was informed by Lauren Langford that the DP concluded to suspend Ms. Williams.

152.  On or about February 28, 2020, the DP released its rationale for its decision to suspend Ms. Williams.

153.  The DP made a specific finding that the former roommate who did not attend the hearing, and thus, could not be questioned, "appeared to be traumatized" and was more credible than Ms. Williams.

154.  The DP made a specific finding that the "ride share" driver who also did not attend the hearing, and thus, could not be questioned, "appeared to be traumatized" and was more credible than Ms. Williams.

155.  The DP made a specific finding that the former roommate who did not attend the hearing's mother, who also did not attend the hearing (or even provide a witness statement), and thus, could not be questioned, "would not have flown here from Colorado" unless her daughter was telling the truth.

156.  The DP made specific findings unrelated to the issues before them, including but not limited to:

      a. Ms. Williams' challenge as to the authenticity and completeness
         of evidence presented in a court proceeding;

Williams v. Penn State University et al. Amended Complaint - 23

      b. A mistake about the contents of the packet provided to her when she arrived at the hearing (including the just that morning addition which violated the two days' notice rule);

      c. An incident about dirty dishes; and,

      d. Whether or not Ms. Williams and her roommates had a chore schedule.

157. The DP made a specific finding that since Ms. Williams "conceded that [the ride share driver] wanted to cancel the ride" because he had to wait for her outside of Wal-Mart, that he could not have been aggressive with Ms. Williams. Not only is this a failure of logic, but not what was actually said in the hearing, wherein Ms. Williams never "conceded" same.

158. Ms. Williams appealed the DP's decision on the (in part) bases of:

      a. Deprivation of "stated procedures of PSU when, [Ms. Williams] was charged without the opportunity to have a conduct conversation with a case manager, when [Ms. Williams] had a University Wide Excuse from all activities for health reasons and was unable to attend the meeting with the case manager";

      b. Deprivation of "stated procedures of PSU, when despite [Ms. Williams'] University Wide Excuse from all activities for health reasons, the Office of Student Conduct refused to allow [Ms. Williams] to meet with the case manager, only permitted me to contest [Ms. Williams'] charges and have a hearing";

      c. Deprivation of "stated procedures of PSU, when due to their failure to attend the hearing, [Ms. Williams] was unable to ask questions of Amanda Beck, Dennis Shea, and John Petriluch, who were witnesses in the hearing through their written testimony.";

Williams v. Penn State University et al. Amended Complaint - 24

d. Deprivation of "stated procedures of PSU, when John Petriluch's statement was included in the information packet for the hearing board on the morning of the hearing, and [Ms. Williams] did not have at least two days to review it.";

e. Deprivation of "[Ms. Williams'] rights, because [Ms. Williams] was unable to cross examine Amanda Beck's written statement, whom the board determined, despite her absence at the hearing and the lack of cross examination, to be credible.";

f. Deprivation of "[Ms. Williams'] rights, because [Ms. Williams] was unable to cross examine the Uber Driver's written statement, whom the board determined, despite his absence at the hearing and the lack of cross examination, to be credible.";

g. Deprivation of "[Ms. Williams'] rights, because [Ms. Williams] was unable to cross examine Dennis Shea's written statement, whom the board determined, despite his absence at the hearing and the lack of cross examination, to be credible.";

h. Evaluation of "various irrelevant incidents outside of the charges, which denied [Ms. Williams] the investigative and procedural protections of PSU policies related to the conduct process.";

i. "The Board made findings that are completely unsupported by the evidence."; and,

j. "The sanction of suspension is not justified by the nature of the violation."

159.   In preparing for the appeal, Penn State refused to give Ms. Williams a copy of the hearing recording.

160.   In preparing for the appeal, Penn State refused to allow Ms. Williams to record the recording of the hearing.

Williams v. Penn State University et al. Amended Complaint - 25

161. On March 19, 2020, Penn State, through Ms. Gaudelius, denied her appeal, and suspended Ms. Williams.

162. These causes of action follow:

### COUNT I

### Title VI – Retaliation

#### *Against Mr. Prawdzik and Penn State*

163. All other paragraphs are incorporated.

164. Penn State receives federal funding and is therefore a covered entity under Title VI and prohibited from engaging in retaliation on the basis of protected activity on the basis of race.

165. Mr. Prawdzik is a "person" within the meaning of the anti-retaliation provisions of Title VI.

166. On or about October 14, 2019, Ms. Williams engaged in Protected Activity when she, *inter alia,* reported Mr. Prawdzik, to the Penn State Affirmative Action office, accusing him of racial bias.

167. On or about December 19, 2019 Mr. Prawdzik stated that, *inter alia*, Ms. Williams would receive an "F" in his course, and he would not evaluate any of her work, specifically because she reported him to Penn State's Affirmative Action Office accusing him of racial bias.

168. Penn State was aware of Mr. Prawdzik's statement, yet failed to remediate his retaliatory intent or the effect of his retaliatory actions, whereby, Ms. Williams' transcript continues to reflect that she failed her English class with Mr. Prawdzik.

169. Ms. Williams was injured and suffered damages which were directly and proximately caused by Mr. Prawdzik's and Penn State's acts and omissions as described in this Count.

### COUNT II (in the alternative to Count III)

### Procedural Due Process (Deviation from Procedure)

*Against Penn State, and Ms. Langford, Ms. Feldbaum, Ms. Gaudelius*

170.  All other paragraphs are incorporated, except those contained in Count III.

171.  The Fourteenth Amendment provides that no person shall be deprived of life liberty or property without due process of law.

172.  This guarantee encompasses both a substantive and procedural component.

173.  The procedural due process clause protects individual liberty against, *inter alia*, certain government actions taken upon unfair deviation from the mechanism to prevent due process violations.

174.  Ms. Williams has a protected property interest in continuing her degree studies at Penn State.

175.  Penn State established and published student discipline policies and procedures including but not limited to the a pre-deprivation conduct conversation meeting, during which an accused student meets with an Office of Student Conduct case manager to discuss the alleged actions which are being considered to be potential violations of student conduct and for the accused student to give her side of the story, prior to the Office of Student Conduct deciding to charge that student with misconduct.

176.  Penn State, through its employees Ms. Langford (the student conduct case manager), and Ms. Feldbaum (one of Ms. Langford's supervisor at Penn State) acting under the color of state law via their authority derived from their positions at Penn State, unfairly deviated from its own policy when, despite Ms. Williams possessing a valid University wide medical excuse which covered the day of her scheduled conduct conversation meeting and making numerous requests for Ms. Langford to reschedule the meeting, followed by Ms. Feldbaum telling Ms. Williams her conduct conversation meeting would not be rescheduled, these defendants, skipped a step in Penn

State's own discipline process and deprived Ms. Williams of her right to provide information to the Office of Student conduct and obtain information from the Office of Student Conduct regarding the specifics of the alleged actions and how they potentially violate Student Conduct through that meeting, prior to Ms. Williams being charged.

177.   Ms. Langford's and Ms. Feldbaum's unfair deviation from this policy was protested by Ms. Williams before, during, and (in an appeal) after her misconduct hearing, including but not limited to Ms. Williams, on numerous occasions, stating that because she did not have a conduct conversation meeting, she was unaware of what specific actions were being considered to be violations of the Code of Conduct.

178.   Penn State affirmed Ms. Langford's initial unfair deviation from this policy when, prior to the hearing, one of her supervisors, Ms. Feldbaum, with specific knowledge of Ms. Langford's deviation from Penn State's policy with regard to pre-deprivation conduct conversation meetings, refused to reschedule the conduct conversation meeting.

179.   Penn State again affirmed the unfair deviation from this policy when, during the hearing, the DP, with specific knowledge of Ms. Langford's and Ms. Feldbaum's deviation from Penn State's policy with regard to pre-deprivation conduct conversation meetings, continued the hearing despite the lack of a conduct conference meeting.

180.   Penn State, through Ms. Gaudelius, ultimately affirmed the deviation by denying Ms. Williams' appeal and suspending Ms. Williams, without permitting her to have a pre-deprivation conduct conversation meeting.

181.   As a direct and proximate result of these deviations from Penn State's policy, Ms. Williams was denied the due process protections of Penn State's policies and procedures, specifically including but not limited to

Williams v. Penn State University et al. Amended Complaint - 28

the opportunity to tell her side of the story and offer evidence to the Office of Student Conduct outside of the adversarial process of a conduct hearing and before she was charged with misconduct.

182.  Upon information and belief, Penn State also established and published student discipline policies and procedures providing an accused student with five-days-notice of the specific actions which violated the student conduct code.

183.  Penn State unfairly deviated from its own policy when, despite the fact that Ms. Williams requested from Ms. Langford, the specific information from the incident reports which were being considered potential violations of the conduct code, Ms. Williams was denied the specific information that was alleged to be a violation of student conduct, including but not limited to on February 13, 16, 17, 20, and 21, 2020, by Ms. Langford, and affirmed by Ms. Feldbaum.

184.  As a direct and proximate result of Ms. Langford's deviations and Ms. Feldbaum's affirmation of deviations, Ms. Williams did not have five-days-notice of the specific information from incident reports which formed the basis for her misconduct charges, in violation of Penn State policies and procedures (in part because Ms. Williams was denied her conduct conversation meeting).

185.  As a direct and proximate result of Penn State's deviation from the five-days-notice policy, Ms. Williams was unaware of which parts of the incident reports (one of which she only received that morning) depriving her of proper notice and opportunity to prepare a response to the charges, and required her to, in the hearing, respond line by line to the incident reports (for which she was admonished by the DP for going beyond "only the two" charges.

186.   Penn State affirmed the unfair deviation from this policy when, during the hearing, the DP, with specific knowledge of Ms. Langford's and Ms. Feldbaum's deviation from Penn State's policy with regard to five-days-notice of the specific information forming the basis for misconduct charges, continued the hearing despite the lack of required notice.

187.   Penn State, through Ms. Gaudelius, ultimately affirmed the deviation by denying Ms. Williams' appeal and suspending Ms. Williams, where she was forced to defend herself at a hearing without the required five-days-notice of the specific actions providing the bases for her charges.

188.   Upon information and belief, Penn State also established and published student discipline policies and procedures providing the opportunity for an accused student to consult with their advisor quietly or in writing during a session, or outside during breaks.

189.   Penn State unfairly deviated from this policy and procedure when in Ms. Williams' hearing, her advisor was forbidden from quietly speaking to her at all during the hearing, and only being permitted to do so during breaks.

190.   This unfair deviation from policy directly and proximately caused Ms. Williams to be denied her right to speak with her advisor during the hearing, depriving her of her due process rights under Penn State's policy.

191.   Penn State, through Ms. Gaudelius, ultimately affirmed the deviation by denying Ms. Williams' appeal and suspending Ms. Williams, where she was prevented from quietly communicating with her advisor during the hearing.

192.   Upon information and belief, Penn State also established and published student discipline policies and procedures providing the

opportunity for a student accused of misconduct to question her accusers in a misconduct hearing.

193.   Penn State unfairly deviated from its own policy when, despite the fact that no accusers testified against Ms. Williams before the hearing panel, the hearing proceeded without their testimony preventing Ms. Williams the opportunity to cross examine them.

194.   This unfair deviation from policy directly and proximately caused Ms. Williams to be unable to challenge the credibility of the witnesses used against her and, nonetheless, the hearing panel made credibility assessments of accusing witnesses who were not present before it or otherwise subject to cross examination in any way, and found those non-present and unchallenged accusers to be credible, and suspended Ms. Williams purportedly on the basis of those credibility determinations.

195.   Penn State, through Ms. Gaudelius, ultimately affirmed the deviation by denying Ms. Williams' appeal and suspended Ms. Williams without permitting Ms. Williams the opportunity to in any way question the accusing witnesses against her.

196.   Upon information and belief, Penn State also established and published student discipline policies and procedures providing two-days-notice of any witness statements to be used in a conduct hearing.

197.   Penn State unfairly deviated from its own policy when, despite the fact that an accusing witness's statement was only provided the morning of the hearing, it was used against Ms. Williams in the hearing to find her responsible for misconduct.

198.   This unfair deviation from policy directly and proximately caused Ms. Williams to be deprived of a meaningful opportunity to review the witness statement, prepare for the hearing, and/or utilize her advisor.

199.   Penn State, through Ms. Gaudelius, ultimately affirmed the deviation by denying Ms. Williams' appeal and suspended Ms. Williams without permitting Ms. Williams the required two days' notice of an accusing witness' written statement being presented in the hearing.

200.   Upon information and belief, Ms. Williams' suspension, even if based on procedures that did not violate due process as discussed *supra*, was outside the range of punishments applicable to the actions with which Ms. Williams was accused and thereby also violated her due process rights.

201.   Ms. Williams was injured and suffered damages via a two-semester suspension which were directly and proximately caused by Penn State's acts and omissions as described in this Count.

**COUNT III (In the alternative to Count II)**

**Constitutionally Deficient Policies**

***Against Penn State***

202.   All other paragraphs are incorporated, except those contained in Count II.

203.   The Fourteenth Amendment provides that no person shall be deprived of life liberty or property without due process of law.

204.   This guarantee encompasses both a substantive and procedural component.

205.   The procedural due process clause protects individual liberty against, *inter alia*, certain government actions taken without a sufficient mechanism in connection to that deprivation that satisfies the requirements of due process.

206.   Ms. Williams has a protected property interest in continuing her degree studies at Penn State.

207.   Penn State through one or more of its decisionmakers, established and published student discipline policies and procedures which

deficiently permit a hearing panel to make credibility assessments of accusing witnesses who are not present before it or otherwise subject to questioned by the accused student in any way.

208.   The hearing panel made credibility assessments of accusing witnesses who were not present before the panel for testimony or questioning by the accused student, Ms. Williams.

209.   The deficient policies allowing a hearing panel to make credibility assessments of accusing witnesses who do not appear before it, and who cannot be questioned or cross examined, directly and proximately prevented Ms. Williams from challenging her non-present accusers' credibility; nonetheless, the hearing panel found non-present non-challenged witnesses as credible, leading to Ms. Williams' two semester suspension.

210.   Penn State, through one or more of its decisionmakers, also established and published student discipline policies and procedures which deficiently failed to establish a proper procedure to account for reasonable excuses for an accused student's missing a scheduled conduct conversation meeting including, *inter alia*, the rescheduling of an accused student's conduct conversation meeting in light of a university excused medical issue.

211.   As a direct and proximate result of Penn State's deficient policy and procedure, i.e., failing to establish a proper procedure to account for reasonable excuses for an accused student missing a scheduled conduct conversation meeting, Ms. Williams' conduct conversation meeting was skipped by the University thereby depriving Ms. Williams of the procedural opportunity to tell her side of the story and offer evidence to the Office of Student Conduct outside of the adversarial process of a conduct hearing and before being charged with misconduct in the first instance.

212.   Ms. Williams was injured and suffered damages which were directly and proximately caused by Penn State's acts and omissions as described in this Count.

COUNT IV

Title VI Discrimination

*Against Penn State*

213.   All other paragraphs are incorporated.

214.   No person in the United States shall, on the ground of race…be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

215.   Penn State receives federal funding and is therefore a covered entity under Title VI.

216.   Ms. Yarwood, as a Penn State Professor was acting in the course and scope of her employment when she graded quizzes and homework.

217.   On or about January 29, 2020, Ms. Yarwood refused to correct a mistakenly graded psychology quiz of Ms. Williams.

218.   Causation can be inferred that said refusal was racially discriminatory under "any program or activity" receiving Federal financial assistance, on the bases of Ms. Yarwood correcting the mistake for similarly situated non-Black students, and lying to Ms. Williams about having fixed the mistake (awarding points to similarly situated white students for missing the same questions as Ms. Williams), thereby denying the benefits of, and subjecting Ms. Williams to discrimination.

219.   On or about January 29, 2020, Ms. Yarwood refused to correct a second mistakenly graded psychology quiz of Ms. Williams.

220.   Causation can be inferred that said refusal was racially discriminatory under "any program or activity" receiving Federal financial

assistance, on the bases of Ms. Yarwood correcting the mistake for similarly situated non-Black students, and lying to Ms. Williams about having fixed the mistake (awarding points to similarly situated white students for missing the same questions as Ms. Williams), thereby denying the benefits of, and subjecting Ms. Williams to discrimination.

221. Ms. Yarwood deflated the value of Ms. Williams' psychology homework by refusing to designate that assignment as extra credit, and also by using a stricter rubric with another one of Ms. Williams' homework assignments, which, upon information and belief, was not the same rubric Ms. Yarwood used to evaluate the similarly situated non-Black classmates of Ms. Williams.

222. Causation can be inferred that said refusal was racially discriminatory under "any program or activity" receiving Federal financial assistance, on the bases of Ms. Yarwood designating similarly situated non-Black students' homework as extra credit for them, but not for Ms. Williams, and lying to Ms. Williams about the adjustment of Ms. Williams' homework to score it as extra credit, as she had done with similarly situated non-Black students' same homework assignment.

223. Penn State was aware of Ms. Yarwood's discriminatory grading yet failed to remediate her discriminatory intent or the effect of her discriminatory actions, and Ms. Williams, with no other recourse, had no other reasonable option but to drop the course.

224. Ms. Williams was injured and suffered damages which were directly and proximately caused by Penn State's acts or omissions as described in this Count.

**COUNT V (In the alternative to Counts VI and VIII)**

**Negligent Hiring/Appointment of Title IX Hearing Panel**

***Against Penn State***

Williams v. Penn State University et al. Amended Complaint - 35

225. All other paragraphs are incorporated except those in Counts VI and VIII.

226. Penn State has a duty, for the benefit of its community members including but not limited to Ms. Williams, to hire or otherwise appoint competent Title IX Decision Panel members such competency to include knowledge of basic medical terminology from rape kits and to conduct hearings without victim shaming rape victims while properly evaluating all available evidence.

227. Penn State breached its duty when it hired or appointed a hearing panel that did not know, *inter alia,* to not victim shame Ms. Williams, and it also did not have the ability to understand the terminology used in rape kits.

228. It is reasonably foreseeable to Penn State that a hearing panel which, *inter alia,* does not know to not victim shame rape victims, and did not have the ability to understand the terminology used in rape kits, and did not know how to properly evaluate all the evidence presented to it,

229. As a direct and proximate result of this breach Penn State ignored evidence that a rapist had sex with Ms. Williams when she was too drunk to consent to sex, directly and proximately causing injury and damages to Ms. Williams.

**COUNT VI (in the alternative to Counts V and VIII)**

**Negligent Training of Title IX Hearing Panel**

***Against Penn State***

230. All other paragraphs, exclusive of those contained in Count V and VIII, are incorporated.

231. Penn State has a duty for the benefit of its community members including but not limited to its student Ms. Williams, to train those

individuals with whom Penn State hires or otherwise appoints to sit on Title
IX rape hearing panels to evaluate evidence in the hearing.

232.   Penn State breached its duty by failing to train its entire
hearing panel pool to, *inter alia,* not victim shame rape victims, and to
understand the terminology used in rape kits or to properly evaluate all
available evidence.

233.   The inability of a hearing panel to understand or evaluate the
evidence presented in a rape case is a reasonably foreseeable consequence of
failing to train the panel members to perform those functions.

234.   This breach directly and proximately resulted in Penn State
ignoring evidence that a rapist had sex with Ms. Williams when she was too
drunk to consent to sex, directly and proximately causing injury and damages
to Ms. Williams.

235.   Penn State breached its duty to train when it failed to ensure
that its Title IX hearing panel was trained:

    a. To know not to victim shame;

    b. How to evaluate myriad evidence of the rapist's likely knowledge
        of Ms. Williams' intoxication including but not limited to:

        i. statements that the rapist made, being evidence that he
            knew how drunk Ms. Williams was, including but not limited
            to that the rapist "had to pour Ms. Williams more alcohol
            because she was too drunk to do it herself";

        ii. The rapist's refusal to answer any questions about that
            evening; and,

        iii. Statements that Ms. Williams was drunk enough the next
            morning that she needed be taken to a hospital in an
            ambulance where she had a 0.192 Blood Alcohol Content.

236.   As a direct and proximate result of Penn State's breach of its duty to train its hearing panel, Ms. Williams' hearing panel ignored evidence that, *inter alia*, a rapist had sex with Ms. Williams when she was too drunk to consent to sex, directly and proximately causing injury and damages to Ms. Williams.

237.   As a direct and proximate result of this breach, Ms. Williams was deprived her right to a rape free educational environment when her rapist was allowed to remain in school despite the mountain of evidence against him that was not evaluated by the hearing panel, causing her injury and damages including but not limited to emotional distress.

**COUNT VII**

**Retaliation- First Amendment (via 42 U.S.C. § 1983), Title VI, and Title IX**

*Against Penn State and Ms. Gaudelius*

238.   All other paragraphs are incorporated.

239.   The First Amendment to the United States Constitution protects a citizen's right to free speech and expression.

240.   The First Amendment rights include not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.

241.   Title VI and Title IX forbids retaliation for Protected Activity under those statutes.

242.   Ms. Williams engaged in Protected Activity under the First Amendment, Title VI, and Title IX when, on February 19, 2020, she filed a lawsuit against Penn State at 4:20-cv-298 in the United States District Court for the Middle District of Pennsylvania accusing Penn State of Title VI and Title IX violations.

243.   Upon information and belief, including but not limited to the fact that this lawsuit garnered immediate media attention to include the

Williams v. Penn State University et al. Amended Complaint - 38

Penn State student newspaper, as well as the fact that Penn State was served with the lawsuit on February 20, 2020, Penn State was aware of Ms. Williams' Protected Activity no later than February 20, 2020.

244.   On February 21, 2020 Penn State suspended Ms. Williams.

245.   Penn State suspended Ms. Williams in retaliation for engaging in Protected Activity under the First Amendment, Title VI, and Title IX (i.e., by suing Penn State).

246.   Causation can be inferred on the non-exclusive basis of the timing between Ms. Williams' Protected Activity under the First Amendment, Title VI, and Title IX of suing Penn State and Penn State's action to deter Ms. Williams and others from engaging in similar protected activity being unduly suggestive of causation, wherein, the day after being served with Ms. Williams' lawsuit, Penn State held a sham hearing which did not include any accusing witnesses or testimony, though said accusing witnesses were found to be credible, Penn State, in an effort to communicate to Ms. Williams, as well as its student body and the public at large that suing Penn State would not be tolerated, suspended Ms. Williams.

247.   Ms. Williams engaged in further Protected Activity under the First Amendment, Title VI, and Title IX when, on March 11, 2020, when she filed an appeal of her suspension which accused Penn State of retaliation for her lawsuit and for questioning their Title IX investigation.

248.   On March 18, 2020, Ms. Williams' appeal was denied by Ms. Gaudelius in retaliation for Ms. Williams' protected activity discussed in this Count.

249.   Causation can be inferred on the non-exclusive basis of the temporal proximity between Ms. Williams' Protected Activity on March 11, 2020 and the decision to uphold her suspension on March 18, 2020, as well as

the decision upholding her suspension by, *inter alia,* blatantly ignoring the two-day notice requirement of witness statements being used in a hearing.

250.  Ms. Williams was injured and suffered damages which were directly and proximately caused by Penn State's retaliatory actions as described in this Count.

**COUNT VIII (In the alternative to Counts V and VI)**

**Retaliation- First Amendment (via 42 U.S.C. § 1983) and Title IX**

*Against Penn State*

251.  All other paragraphs are incorporated except those in Counts V and VI.

252.  Ms. Williams engaged in Protected Activity under the First Amendment and Title IX on and around April 5, 2018 when she engaged in public speech via Twitter, identifying Penn State, and criticizing their handling of her rape case under Title IX.

253.  Upon information and belief, including but not limited to the large number of public interactions with Ms. Williams' Twitter post regarding her Twitter comments regarding Penn State and criticizing their handling of her rape case under Title IX, including faculty members of Penn State, Penn State was aware of Ms. Williams' speech identifying Penn State, and criticizing their handling of her rape case under Title IX.

254.  Upon information and belief, including but not limited to that the Title IX panel ignored numerous pieces of evidence, including but not limited to confessions, medical evidence, text messages, and one rapist's refusal to answer questions beyond "no comment", Penn State, in an effort to communicate to Ms. Williams, as well as its student body and the public at large that criticism of Penn State and its Title IX investigations would not be tolerated, found against Ms. Williams and for her rapist.

255.   Ms. Williams appealed the Title IX decision in favor of her rapist, and such appeal was denied by Penn State because Ms. Williams engaged in said protected activity on Twitter.

256.   Causation can be inferred on the non-exclusive basis of the timing between Ms. Williams' Protected Activity under the First Amendment to publicly speak on Twitter and Penn State's action to deter Ms. Williams and others from speaking negatively about Penn State's handling of Title IX cases being unduly suggestive of causation, wherein, after approximately seven months without investigatory activity but approximately one month after Ms. Williams' Protected Activity, Penn State held a sham Title IX hearing, wherein it victim blamed Ms. Williams, ignored crucial evidence of Ms. Williams' rapist's guilt, and found the rapist to be not responsible for his actions, and then, denied Ms. Williams' appeal and requests for information about the case in order to uphold the result of said sham hearing.

WHEREFORE, Plaintiff Kayla Williams respectfully requests Judgment in her favor and against the Defendants, and for damages to be assessed against the Defendants to the fullest extent allowed by law, to include but not be limited to, compensatory damages (both economic and non-economic), punitive damages as permitted by law, attorney fees, costs of suit, and applicable interest payments on the Judgment, along with any and all other relief permitted by applicable law. Plaintiff also requests equitable and injunctive relief to direct Penn State to remove the "F" grade from her transcripts as well as any reference to her being suspended for the Spring and Summer 2020 semesters.

Respectfully submitted on April 27, 2020 by:

**THE TRIAL LAW FIRM, LLC**

*/s/*Mart Harris
Mart Harris, Esquire

Williams v. Penn State University et al. Amended Complaint - 41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pa. Id. No. 319504

*/s/*Nelson Berardinelli
Nelson Berardinelli, Esquire
Pa. Id. No. 310581

*Trial Lawyers for Kayla Williams*

Williams v. Penn State University et al. Amended Complaint - 42

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAMSPORT DIVISION

| | |
|---|---|
| **KAYLA WILLIAMS,**<br><br>          Plaintiff,<br><br>                    **vs.**<br><br>**PENNSYLVANIA STATE UNIVERSITY,** and **BRENDAN PRAWDZIK** in his individual capacity, and **MICHELLE YARWOOD** in her individual capacity<br><br>          Defendants. | Case No. 4:20-cv-00298-MWB<br><br>**CERTIFICATE OF COMPLIANCE FOR AMENDED COMPLAINT IN CIVIL ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CERTIFICATE

The undersigned hereby certifies that the within complies with the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* regarding confidential information and documents.

Respectfully submitted on April 27, 2020 by:

                              **THE TRIAL LAW FIRM, LLC**

                              */s/*Mart Harris
                              Mart Harris, Esquire
                              Pa. Id. No. 319504

                              */s/*Nelson Berardinelli
                              Nelson Berardinelli, Esquire
                              Pa. Id. No. 310581

                              *Trial Lawyers for Kayla Williams*

Williams v. Penn State University et al. Amended Complaint - 43