## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAYLA WILLIAMS,

        Plaintiff,

    v.

PENNSYLVANIA STATE
UNIVERSITY, KAREN FELDBAUM
(*in her official and individual capacity*),
LAUREN LANGFORD, and YVONNE
GAUDELIUS,

        Defendants.

No. 4:20-CV-00298

(Judge Brann)

## MEMORANDUM OPINION

### SEPTEMBER 4, 2020

## I.    BACKGROUND

On April 27, 2020, Plaintiff Kayla Williams filed an eight-count First

Amended Complaint against Defendants Pennsylvania State University ("Penn

State"), Brandon Prawdzik, Lauren Langford, Karen Feldbaum, and Yvonne

Gaudelius.[1]  This First Amended Complaint came after Williams had already had

the chance to review Defendants' initial motion to dismiss.[2]

In her first claim, Williams asserts that Penn State retaliated against her after

she made accusations and reports of racial bias.[3]  In her second claim, Williams

---

[1]    *See* Doc. 18.
[2]    *See* Docs. 11, 14, 18.
[3]    *See* Doc. 18 at ¶¶ 163-169.  The Court dismisses Count I as asserted against Brendan
Prawdzik, because Williams has dismissed Prawdzik from her action.

asserts that Penn State and the individual Defendants deviated from their own policies, causing a procedural due process violation.[4]  In her third claim, which she pleads in the alternative to her second claim, Williams asserts that Penn State's policies and procedures are themselves constitutionally deficient.[5]  In her fourth claim, which Defendants do not move to dismiss, Williams asserts that Penn State discriminated against her through one Defendant's "discriminatory grading."[6]

In her fifth claim, which she pleads in the alternative to her sixth and eighth claims, Williams asserts that Penn State was negligent in its hiring and appointment of her Title IX hearing panel.[7]  In her sixth claim, which she pleads in the alternative to her fifth and eighth claims, Williams asserts that Penn State was negligent in its training of her Title IX hearing panel.[8]  In her seventh claim, which Defendants do not move to dismiss, Williams asserts that she was retaliated against for filing this lawsuit.[9]  And, finally, in her eighth claim, which Williams pleads in the alternative to her fifth and sixth claims, and which Defendants do not move to dismiss, Williams asserted that she was retaliated against for making comments on Twitter.[10]

---

[4]   *See* Doc. 18 at ¶¶ 170-201.
[5]   *See* Doc. 18 at ¶¶ 202-212.
[6]   *See* Doc. 18 at ¶¶ 213-224.
[7]   *See* Doc. 18 at ¶¶ 225-229.
[8]   *See* Doc. 18 at ¶¶ 230-237.
[9]   *See* Doc. 18 at ¶¶ 238-250.
[10]   *See* Doc. 18 at ¶¶ 251-256.

On May 11, 2020, Defendants filed a second motion to dismiss – this time, a partial motion to dismiss, made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[11]  On June 9, 2020, Williams dismissed Defendant Prawdzik from her action (thus yielding the above caption).[12]

Defendants' second motion to dismiss is ripe for disposition.  The Court grants this motion in part and denies it in part.  As the Court will discuss below, Williams' Counts V and VI are dismissed with prejudice.

## II.   DISCUSSION

### A.   Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted."  After the Roberts Court's decisions in *Bell Atlantic Corporation v. Twombly* and *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[13]

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[14]  "Although the plausibility standard does not impose a

---

[11]   *See* Doc. 22.
[12]   *See* Doc. 28.
[13]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[14]   *Iqbal*, 556 U.S. at 678.

probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[15]  Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[16]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[17]  No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[18]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[19]  However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[20]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[21]

As a matter of procedure, the United States Court of Appeals for the Third

---

[15]  *Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).
[16]  *Twombly*, 550 U.S. at 556.
[17]  *Iqbal*, 556 U.S. at 679.
[18]  *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).
[19]  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).
[20]  *Iqbal*, 556 U.S. at 678 (internal citations omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").
[21]  *Iqbal*, 556 U.S. at 678.

Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[22]

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself."[23] Typically, to consider materials outside the complaint, a motion to dismiss must be converted to a motion for summary judgment.[24] However, "[c]onsideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion."[25] It is permissible to consider full text of documents partially quoted in the complaint.[26] It is also permissible to consider documents relied upon by plaintiff in drafting the complaint and integral to the complaint.[27] "However, before materials outside the record may become the basis for a dismissal, several conditions must be met."[28] "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the

---

[22]  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

[23]  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[24]  *See id.* and Fed. R. Civ. P. 12(d).

[25]  *Faulkner*, 463 F.3d at 134.

[26]  *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996).

[27]  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

[28]  *Faulkner*, 463 F.3d at 134.

document."[29]  It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.[30]  In this matter, I find that these conditions have been met.  I will consequently consider Defendants' attachments.

### B.   Facts Alleged in the First Amended Complaint

The facts alleged in the First Amended Complaint that are relevant to Defendants' partial motion to dismiss are as follows.[31]  As I related above, I must accept all these facts as true for the purposes of Defendants' motion.

### 1.   The Inciting Rape, Initiation of Penn State's Investigation, and Conduct Conversation Meeting

Williams began her freshman year at Penn State in the fall of 2016.  She expected to graduate with a bachelor's degree after approximately four years.[32]  After her first semester at Penn State, on or about January 15, 2017, Williams was raped by two male Penn State students.[33]  One of the students later withdrew from Penn State while he was under investigation for the rape.[34]  The other student was ultimately charged by Penn State.[35]

In the fall of 2017, Williams learned that Penn State had not begun an investigation into her rape.  She then personally reached out to Penn State's Title

---

[29]  *Id.  See also, e.g., Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

[30]  *Faulkner*, 463 F.3d at 134.

[31]  The Court has omitted a host of facts that only support Williams' claims that Defendants are not seeking to dismiss.  These facts are not relevant to Defendants' motion.

[32]  Doc. 18 at ¶ 13.

[33]  Doc. 18 at ¶ 14.

[34]  Doc. 18 at ¶ 17.

[35]  Doc. 18 at ¶ 47.

IX office on or about October 11, 2017.  Her case was assigned to Christopher

Harris.[36]

On or about April 15, 2018, Karen Feldbaum, Penn State's Senior Director

of Office of Student Conduct,[37] contacted Williams and indicated that a conduct

conversation meeting had been performed that day.[38]

### 2.    The Title IX Hearing

The Title IX hearing relating to the January 15, 2017 rape occurred on or

about May 18, 2018.[39]  Williams was given about five hours to review the Title IX

investigation packet in preparation for the hearing.[40]  Penn State forbade Williams

from printing, saving, or downloading this packet for analysis and review.[41]  The

version of the investigation packet that Penn State allowed Williams to review

prior to the hearing was, sometime later on, heavily edited by Penn State—several

dozen pages were added to the packet at some point after the hearing.[42]

Immediately prior to the hearing, when Williams was en route, her vehicle

broke down.  Williams called and requested a continuance.  She was discouraged

against re-scheduling the hearing, for reasons including, according to Feldbaum,

---

[36]   Doc. 18 at ¶ 32.
[37]   Doc. 18 at ¶ 5.
[38]   Doc. 18 at ¶ 47.  The Amended Complaint lacks precision on what exactly a "conduct conversation meeting" is.  They appear to be meetings that Penn State holds after an accusation of a violation of Penn State's code of conduct.  Accused students have the right to participate in these meetings.  *See* Doc. 18 at ¶ 134.
[39]   Doc. 18 at ¶ 48.
[40]   *Id.*
[41]   *Id.*
[42]   Doc. 18 at ¶ 49.

that re-scheduling in order for Williams to appear in person rather than over the phone would "give [the rapist] the upper hand."[43]

In the hearing, the Title IX Decision Panel ("DP") forbade Williams from introducing evidence, stating that no new evidence was permitted.[44]  The DP also refused to consider "rape kit evidence" that Williams submitted, because the panel members did not understand the kit's terminology.  The DP did not continue the hearing in order to learn said terminology or consult an expert.[45]  The DP limited Williams' answers to "yes" and "no," and asked Williams, "[h]ave you ever drank that much before?"[46]  The charged student refused to give a substantive response to any question and would only answer "no comment."[47]

### 3.    The Title IX Decision and Appeals

The day of the hearing, the DP determined that the charged student was "not responsible."  The DP's reasoning included that "the DP could not conclude that there was a preponderance of evidence that [the charged student] reasonably should have known that Ms. Williams was incapacitated.  Similarly, the DP could not determine that there was a preponderance of evidence that [the charged student] did not have consent for sexual intercourse."[48]  The DP also noted that

---

43  Doc. 18 at ¶ 50.
44  Doc. 18 at ¶ 51.
45  Doc. 18 at ¶ 54.
46  Doc. 18 at ¶¶ 52-53.
47  Doc. 18 at ¶ 55.
48  Doc. 18 at ¶ 56.

"[the DP] suggests to the Office of Student Conduct that [the charged student] might be charged with Code of Conduct violation 02.15-Sexual Exploitation."[49] Penn State did not follow up on this suggestion and consider additional charges.[50]

The DP's findings and determination came despite the presence of evidence in the investigation packet that indicated the following:[51]

- The charged student had to pour Williams alcohol because Williams "was too drunk to pour it herself and was about to throw up."

- At approximately 9:00 a.m. the next morning, Williams' blood alcohol content was 0.192.

- The police found multiple used condoms laying around the room where the rape occurred.

- Williams was advised by the female friend who had dropped her off at the dorm after a social event that she was so intoxicated that she "should lock her door and go to sleep." When this friend was asked by Harris why she told Williams to lock her door and go to sleep, she said that it was because she "could tell how intoxicated [Williams] was."

- Williams was asked by one of the female students whose apartment the social event was at to stay at the apartment because Williams was so intoxicated that the female student "wasn't sure if [Williams] could make it home and was worried for her safety."

Williams made multiple requests for information on the case and to speak with the DP. Penn State and Feldbaum denied those requests.[52]

---

[49] Doc. 18 at ¶ 57.
[50] *Id.*
[51] *See* Doc. 18 at ¶¶ 58-62.
[52] *See* Doc. 18 at ¶¶ 63-65.

### 4.    Williams' Selection of Research Topics in Dr. Prawdzik's English Class

In the fall of 2019, Williams was a student in Dr. Brendan Prawdzik's English 202a class.[53]  Williams selected the topic of "racism" for a research assignment.[54]  Dr. Prawdzik then "tried to convince [Williams] that minorities are partly at fault for the systematic racism that they experience."[55]  Williams refused to change her assignment topic.[56]  Dr. Prawdzik did not try to convince other black students or students who picked racism as a research topic to change their topics.[57]

### 5.    Dr. Prawdzik's Request for Documentation for Williams' Absences

Williams sought mental health services from Penn State to treat depression and anxiety.[58]  Williams missed a number of Dr. Prawdzik's English classes as a result.[59]  Williams notified Dr. Prawdzik via email that her absences were "due to health reasons, and that she would supply excuses."[60]  When Williams returned, Dr. Prawdzik "loudly requested" the documentation from her in the presence of other students.[61]  Dr. Prawdzik "stormed out" of the classroom after discussion of where they could continue their conversation; Williams followed and asked

---

[53]   Doc. 18 at ¶ 66.
[54]   Doc. 18 at ¶ 69.
[55]   Doc. 18 at ¶ 70.
[56]   Doc. 18 at ¶ 73.
[57]   *See* Doc. 18 at 72.
[58]   *See* Doc. 18 at ¶¶ 67-68.
[59]   Doc. 18 at ¶¶ 68, 74, 75.
[60]   Doc. 18 at ¶ 76.
[61]   Doc. 18 at ¶ 77.

(paraphrased): "What did I do?  What are you mad about?  All I asked is if we could continue communicating about my private matters through email, like I already initiated through email."[62]  Dr. Prawdzik told Williams that "you have been a class disruption" and that she "would not be in the class anymore."[63]  This was inconsistent with previous positive feedback that Dr. Prawdzik had provided.[64]

After Williams returned to the classroom and "asked why she had to leave since she didn't do anything wrong," Dr. Prawdzik said he was calling the police and picked up the classroom phone.[65]  Williams stated that Dr. Prawdzik "was acting in a racist fashion" and she would notify Penn State's Education Equity Office of his "inappropriate actions," and left.[66]

That day, Williams "wrote a report in Dr. Whitehurst's assistant's office about [Dr.] Prawdzik's racial discrimination."  That report "ultimately ended up with [Penn State's] Affirmative Action office."[67]  Dr. Prawdzik then asserted to the Affirmative Action office that "Williams had missed more classes than she actually did."[68]  Per Dr. Prawdzik, "because [Williams] reported him to the Affirmative Action office," "he would not grade her work," "he would not give her an alternative to complete the course," and "she would receive an 'F' in his class,"

---

[62]  *See* Doc. 18 at ¶¶ 78-82.
[63]  Doc. 18 at ¶ 83.
[64]  Doc. 18 at ¶ 84.
[65]  Doc. 18 at ¶¶ 85-87.
[66]  Doc. 18 at ¶ 88.
[67]  Doc. 18 at ¶ 90.
[68]  Doc. 18 at ¶ 91.

with "the grade [being] final."[69]  The Affirmative Action office "instructed [Dr.] Prawdzik to allow [Williams] to complete the course."  Dr. Prawdzik refused, and Penn State took no further action.[70]  Williams' transcript shows an "F" for Dr. Prawdzik's English class.[71]

### 6. Williams' Charged Code of Conduct Violations, Relevant Portion of the Code of Conduct, and Disciplinary Proceeding

#### a. Overview of Williams' Charged Code of Conduct Violations and Resulting Sanction

After Penn State received notice of Williams' alleged harassment of a former roommate and assault of a ride-share driver, which led to notice of charges against her and a hearing, Williams was suspended from Penn State.  Williams appealed that outcome and resulting sanction.  Her appeal was denied.[72]

#### b. Referenced Portions of Penn State's Code of Conduct

Certain of Williams' claims take issue with Penn State's "policies and procedures" relating to Penn State's commission of the disciplinary process against her.  Per Federal Rule of Evidence 201, the Court is taking judicial notice of Penn State's Code of Conduct (the "Code") and other related policies and procedures, which are publicly available on Penn State's website.[73]

---

[69]  Doc. 18 at ¶ 91.
[70]  Doc. 18 at ¶ 92.
[71]  Doc. 18 at ¶ 98.
[72]  *See* Doc. 18 at ¶¶ 131, 139, 143, 151-52, 158, 161.
[73]  *See Anspach ex rel. Anspach v. City of Phila.*, 503 F.3d 256, 273 n.11 (3d Cir. 2007).

Section VI of the Code details the "Conduct Procedures" that Penn State follows after it receives a reported violation of the Code.[74]  Relevant sections are below.[75]

> 3. The University will typically contact students via their official University email account. Students are expected to regularly check their University email account as well as spam folder.
>
> 4. The Respondent will have the opportunity to meet with a case manager during a conduct conversation.
>
> 5. If a Respondent, with notice, does not participate in the conduct conversation, the meeting will take place in their absence, and all available information will be reviewed by the case manager.
>
> 6. Respondents may be accompanied by an advisor. . . . The advisor, upon a party's request may (1) accompany the party in any meeting/proceeding, (2) advise the party in the preparation and presentation of sharing of information, and (3) advise the party in the preparation of any appeals or sanction reviews.  The advisor shall not perform any function in the process other than advising the party and may not make a presentation or represent the party.  The parties must ask and respond to questions on their own behalf, without interruptions or presentations by their advisor.  The advisee may consult with their advisor quietly or in writing during a session, or outside during breaks, but the advisor may not speak on behalf of the advisee or directly participate otherwise in the proceeding. . . .
>
> * * *
>
> 8.  [A] case manager may recommend charge(s) and sanction(s) to the Respondent.  Charge(s) shall be provided to the Respondent in written form.  The decision to charge is based on a low standard of evidence and does not indicate if a Respondent

---

[74]  *See* Doc. 26-1 Ex. B at § VI.
[75]  Doc. 26-1 Ex. B at § VI(A).

will be found responsible in a hearing, should the Respondent contest the charge(s).

"Case manager" is defined as "any University official who is authorized by the Senior Director of the Office of Student Conduct to meet with students regarding alleged violations of the Code of Conduct, to recommend charge(s) and sanction(s), to serve as University presenters in hearings, and to monitor and mandate the completion of assigned sanctions.  This includes staff in the Offices of Student Conduct and Resident Life, and others designated by the Senior Director."[76]  At all relevant times during Williams' disciplinary case, Defendant Lauren Langford served as the Assistant Director of the Office of Student Conduct; therefore, Langford is a "case manager" per the Code.[77]

After notice of recommended charges and sanctions, the respondent in a case has three business days to decide whether to accept or contest.[78]  If the respondent chooses to contest, the matter will be referred to a hearing not sooner than five business days after notification of the charges.[79]  The respondent may submit a response to the charges in advance of the hearing; the response will be considered by the hearing authority.[80]

---

[76]   Doc. 26-1 Ex. B at § II(4).
[77]   *See* Doc. 18 at ¶ 176.
[78]   *See* Doc. 26-1 Ex. B at § VI(A)(9).
[79]   *See* Doc. 26-1 Ex. B at § VI(A)(12).
[80]   *See* Doc. 26-1 Ex. B at § VI(B)(4).

With regard to witnesses, the Code provides:[81]

> All witnesses will be considered University witnesses. Names of witnesses may be provided by the Respondent and others who may have been involved with the case. Prior to the hearing, it is important that the case manager understand the role of each witness in the case. To assist this process, those who have not met with the investigator or case manager will be requested to provide a brief statement outlining the relevant information they will share at least two (2) business days in advance of the hearing. Note, witness participation in this process is voluntary.

The respondent is allowed to ask questions of all witnesses who choose to participate at the hearing.[82] The conduct hearing does not follow "[f]ormal rules of process, procedure, and/or technical rules of evidence."[83]

After receipt of the evidence, the hearing authority will determine whether the respondent is responsible for a violation of the Code using the preponderance of the evidence standard.[84] If there is a determination of responsibility, the hearing authority will determine the appropriate sanction(s).[85] The hearing authority will typically submit the outcome to the case manager within five business days of the hearing, and the case manager then notifies the student of the outcome in writing.[86]

A respondent may appeal a case resulting in a sanction of suspension within five business days of receiving official notification of the outcome.[87] A respondent

---

[81] *See* Doc. 26-1 Ex. B at § VI(B)(12).
[82] *See* Doc. 26-1 Ex. B at § VI(B)(11).
[83] *See* Doc. 26-1 Ex. B at § VI(B)(16).
[84] *See* Doc. 26-1 Ex. B at § VI(B)(17).
[85] *See* Doc. 26-1 Ex. B at § VI(B)(18).
[86] *See* Doc. 26-1 Ex. B at § VI(B)(20).
[87] *See* Doc. 26-1 Ex. B at § VI(D)(1).

may request an appeal on one or more of the following grounds.[88]  "If an appeal is denied, there will be no opportunity for further review."[89]

1. The Respondent has been deprived of their rights and/or stated procedures were not followed that affected the outcome;

2. New evidence is presented, that was not available during the time of the original outcome, relevant to establishing whether it is more likely than not that the Respondent is responsible for the Code violation(s); and/or

3. The sanction(s) imposed was (were) outside the University's sanction range for such violations and/or not justified by the nature of the violation.

### c. Williams' Disciplinary Proceeding, Sanction, and Appeal

On January 20, 2020, Williams contracted severe bronchitis and was "incapacitated" for about a week.  Her doctor provided her with a "University wide doctor's note excusing her from all University activities."[90]  On January 22, 2020, Penn State scheduled a conduct conversation meeting for January 25, 2020 to discuss the noted allegations that Williams had harassed a former roommate and assaulted a ride-share driver.[91]  Williams became aware of the scheduled conduct conversation after the fact due to her illness.[92]

---

[88]  *See* Doc. 26-1 Ex. B at § VI(D)(3).
[89]  *See* Doc. 26-1 Ex. B at § VI(D)(10).
[90]  Doc. 18 at ¶ 123.
[91]  Doc. 18 at ¶ 131.
[92]  Doc. 18 at ¶ 132.

Based on her medical excuse, Williams requested that her conduct conversation meeting be rescheduled.[93]  Williams' request was denied.[94]  Penn State also denied Williams' repeated requests, on at least five occasions, for "specific information that was alleged to be a violation of student conduct."[95] Williams ultimately did not have five days' notice of the "specific information from incident reports which formed the basis for her misconduct charges," "in part because Williams was denied her conduct conversation meeting."  Williams alleges that this constituted a violation of the Code.[96]  Williams reported this perceived deviation to Penn State's Affirmative Action office.[97]  Penn State allowed Williams to contest the charges, but repeatedly refused to allow Williams to engage in a conduct conversation meeting.[98]

In accordance with the Code, on February 21, 2020, a panel (the "Conduct Panel") held a contested hearing on the charges against Williams.  Williams was present.[99]  On the morning of the hearing, the Office of Student Conduct provided Williams with a written witness statement of one of the accusing witnesses.[100]

---

[93]  Doc. 18 at ¶ 135.
[94]  Doc. 18 at ¶ 136.
[95]  Doc. 18 at ¶ 137.
[96]  Doc. 18 at ¶ 137.
[97]  Doc. 18 at ¶ 138.
[98]  Doc. 18 at ¶ 139.
[99]  Doc. 18 at ¶¶ 143, 145.
[100]  Doc. 18 at ¶ 144.

None of the witnesses attended the hearing in person, aside from Williams.[101]  Despite their absence, Penn State found the previously provided written statements of the accusing witnesses to be credible.[102]  Williams' advisor was forbidden by the DP to speak with Williams during the hearing except during breaks (none of which occurred).[103]

After the hearing, on February 28, 2020, Langford informed Williams that the Conduct Panel had found Williams responsible for violating the Code and imposed a sanction of suspension.[104]  Williams appealed the Conduct Panel's decision.  In part, Williams argued that the Code was not followed because: (1) Williams did not have a conduct conversation with a case manager; (2) the Office of Student Conduct did not allow Williams to schedule a meeting with the case manager; (3) Williams could not examine or cross-examine the witnesses because they did not appear at the hearing; (4) Williams was not given two days in advance of the hearing to review a witness's statement; and (5) the findings were not supported by the evidence.[105]  Williams also argued that Penn State did not provide her a copy of the hearing recording or permit her to make a copy in preparation for her appeal.[106]  Penn State (via Defendant Yvonne Gaudelius) denied Williams'

---

[101]  Doc. 18 at ¶ 145.
[102]  Doc. 18 at ¶ 145, 153-154.
[103]  Doc. 18 at ¶ 146.
[104]  Doc. 18 at ¶¶ 151-152.
[105]  Doc. 18 at ¶ 158.
[106]  Doc. 18 at ¶¶ 159-160.

appeal on March 19, 2020 and suspended her.[107]  Williams was suspended for Penn

State's Spring 2020 and Summer 2020 semesters.[108]

### C.    Analysis

#### 1.    Counts II and III

Williams claims that Penn State "unfairly deviated from its own policy,"

constituting a procedural due process violation.[109]  In support, Williams points to

Penn State not re-scheduling the conduct conversation meeting so that Williams

could attend.[110]  Williams also points to multiple examples of Penn State's

"affirm[ing]" the "initial unfair deviation from this policy."[111]  Further, Williams

points to Penn State not providing her with notice of "the specific actions which

violated the student conduct code,"[112] Penn State denying Williams "her right to

speak with her advisor during the hearing,"[113] Penn State not allowing Williams to

cross-examine witnesses,[114] and Penn State not permitting Williams "the required

two days' notice of an accusing witness' written statement being presented in the

hearing."[115]

---

[107]  Doc. 18 at ¶ 161.
[108]  *See* Doc. 18 at 41.
[109]  *See* Doc. 18 at ¶ 176.
[110]  *See* Doc. 18 at ¶ 176.
[111]  *See* Doc. 18 at ¶¶ 178-180.
[112]  *See* Doc. 18 at ¶ 182.
[113]  Doc. 18 at ¶ 190.
[114]  Doc. 18 at ¶ 193.
[115]  Doc. 18 at ¶ 199.

In the alternative to her second claim, Williams claims that Penn State's policies and procedures were constitutionally deficient on their face.  In support, Williams points first to the policies "allowing a hearing panel to make credibility assessments of accusing witnesses who do not appear before it, and who cannot be questioned or cross examined,"[116] and second to the policies "failing to establish a proper procedure to account for reasonable excuses for an accused student missing a scheduled conduct conversation meeting."[117]

Williams has launched a host of arrows at her target here.  One of these arrows hits home: Williams' critique of Penn State's failure to provide her the chance to cross-examine witnesses.  "In the university disciplinary context, the right to counsel, the right to confront witnesses, and the right to cross-examine witnesses generally have not been deemed necessary elements of due process of law."[118]  But Williams' First Amended Complaint makes clear that this was a case where "there [was] really only one consideration for the decisionmaker: credibility."[119]  Indeed, Williams points out that the DP's "rationale for its decision to suspend" was founded on the DP's "specific finding[s]" of witnesses' credibility—witnesses who submitted written statements, who did not attend the hearing, and who Williams could not cross examine.[120]  "A case that resolves itself

---

[116]  Doc. 18 at ¶ 209.

[117]  Doc. 18 at ¶ 211.

[118]  *Id.* at *10.

[119]  *Doe v. Pennsylvania State Univ.*, 336 F. Supp. 3d 441, 450 (M.D. Pa. 2018) (Brann, J.).

[120]  *See* Doc. 18 at ¶¶ 152-155.

into a problem of credibility cannot itself be resolved without a mutual test of credibility, at least not where the stakes are this high," and Williams is facing a lengthy suspension.[121]

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint."  "By and large, public education in our Nation is committed to the control of state and local authorities."[122]  And, to be clear, by and large, Williams' critiques of Penn State's disciplinary process do not find purchase with the Court.[123]  However, the absence of the opportunity to cross-examine in this case—this case that hinged on witness credibility, and which yielded a lengthy suspension—does not pass Constitutional muster.  Therefore, Williams' Counts II and III may proceed to discovery.

---

[121] *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 404 (6th Cir. 2017); *see also Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir. 1972) ("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."); *Doe v. Pennsylvania State University*, 276 F.Supp.3d 300, 310 (M.D. Pa. 2017) (noting that the panel's "erroneous rejection" of questions submitted for cross-examination "constitute[d] a significant and unfair deviation from" existing procedures); *see generally Goss v. Lopez*, 419 U.S. 565, 584 (1975) (noting that "[l]onger suspensions"—those beyond ten days—"or expulsions for the remainder of the school term, or permanently, may require more formal procedures.").

[122] *Goss*, 419 U.S. at 578 (1975).

[123] For example, Williams received notice of the charges against her. *See* Doc. 18 at ¶ 139.  And about a month passed between Williams' learning of the conduct conversation meeting and the disciplinary hearing – allowing Williams time to prepare.  *See* Doc. 18 at ¶¶ 130-132, 143.  Further, Williams received "an explanation of the evidence the authorities have and an opportunity to present [her] side of the story."  *See* Doc. 18 at ¶¶ 144, 147-148.  She appeared at the hearing, made a substantial presentation, and gave a "line by line rebuttal" of the incident report that undergirded the charges.  *See* Doc. 18 at ¶¶ 145-148.

### 2.    Counts V and VI

Defendants argue that Williams' fifth and sixth claims are each deficient because Williams has not pled the existence of a particular duty owed to her.[124] Williams posits two potential duties: either Penn State's "creat[ion of] a rape hearing process" constituted an affirmative act that brought with it a duty,[125] or Penn State's "special relationship" with Williams triggered a duty.[126]

Williams' first position is off-base.  Penn State needed to form a Title IX hearing panel in order to comply with Title IX.[127]  However, Title IX, "a general nondiscrimination mandate," "does not establish any statutory standard that may substitute for the general common law standard."[128]  Indeed, "[u]nlike a regulatory standard that sets forth a specific requirement or best practice relevant to the fact pattern of a given case—such as avoiding leaving foreign substances on a medical implant—the 'standard' set by Title IX is simply to avoid sex discrimination in educational programs or activities."[129]  Therefore, Williams' supposed premise – that a violation of Title IX's standards constitutes a violation of a duty for negligence purposes – is misplaced.

---

[124]  *See* Doc. 26 at 33-34; Doc. 31 at 11-14.

[125]  *See* Doc. 29 at 14-16.

[126]  *See* Doc. 29 at 17-18.

[127]  *Jackson v. Trustees of Univ. of Pennsylvania*, No. CV 17-4645, 2019 WL 309729, at *9 (E.D. Pa. Jan. 23, 2019), is distinguishable on its facts.  In that case, the defendant had "fail[ed] to point to any cases in support of its arguments at this early stage of the case." Here, Defendants have submitted numerous cases in support of their arguments.

[128]  *Ross v. Univ. of Tulsa*, No. 14-CV-484-TCK-PJC, 2015 WL 4064754, at *3 (N.D. Okla. July 2, 2015).

[129]  *Id.*

Williams' second position is also off-base.  Williams being a student at Penn State does not create the requisite "special relationship."[130]

Williams' Counts V and VI are dismissed with prejudice.[131]

## III.   CONCLUSION

Defendants' Partial Motion to Dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part.  Plaintiffs' Counts II and III may proceed to discovery. Plaintiffs' Counts V and VI are dismissed with prejudice.  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[130]   *See McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 245 (3d Cir. 2010); *see also Kling v. Univ. of Pittsburgh Med. Ctr.*, No. 2:18-CV-01368, 2020 WL 2832008, at *4 (W.D. Pa. May 8, 2020).

[131]   In her opposition brief, Williams requests leave to amend in two separate footnotes.  *See* Doc. 29 at 9 n.1, 17 n.3.  However, dismissal of Williams' claims with prejudice is warranted because Williams "has already had the opportunity to re-plead."  *Sundberg v. DiRocco*, No. 4:17-CV-00063, 2017 WL 3394314, at *17 (M.D. Pa. Aug. 8, 2017) (Brann, J.).