**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KAYLA WILLIAMS, : | |
| Plaintiff, : | |
| : | No. 4:20-cv-00298 |
| v. : | |
| : | (Hon. Brann) |
| THE PENNSYLVANIA STATE : | |
| UNIVERSITY; LAUREN LANGFORD, in : | Electronically Filed |
| her individual capacity; KAREN : | |
| FELDBAUM, in her individual capacity; : | |
| and YVONNE GAUDELIUS, in her : | |
| individual capacity, : | |
| Defendants. : | |
| : | |

**Defendants' Amended Answer with Affirmative Defenses to
Plaintiff's First Amended Complaint**

Defendants The Pennsylvania State University (the "University"), Lauren Langford, Karen Feldbaum, and Yvonne Gaudelius (collectively the "Individual Defendants," and with the University, "Defendants"), by and through their undersigned counsel, for their Amended Answer and Affirmative Defenses to the First Amended Complaint of Plaintiff Kayla Williams ("Plaintiff" or "Ms. Williams") (Doc. 18), hereby state as follows:

**Parties**

1.     Admitted, upon information and belief.

2.     The University admits that it is a defendant in the instant lawsuit but denies as stated that it is a "public university." By way of further answer, the

University is a state-related institution of higher education and instrumentality of the Commonwealth organized and existing under the Not for Profit Corporation Laws of Pennsylvania.

3.     Admitted in part, denied in part.  It is denied that Dr. Brendan Prawdzik is a defendant because Ms. Williams dismissed Dr. Prawdzik from this action on June 9, 2020 (Doc. 28).  By way of further response, it is admitted that Dr. Prawdzik is an adult individual who holds the title of Assistant Teaching Professor of English at the University and that he maintains an office in Centre County, Pennsylvania.

4.     Denied as stated.  By way of further response, it is admitted that Ms. Langford is a defendant in the instant lawsuit and that she is an adult individual who held the title of Assistant Director, Office of Student Conduct at the University at all times relevant to this matter, and that she has an office in Centre County, Pennsylvania.  Ms. Langford has since changed positions and is presently an Academic Advisor for the Electrical Engineering program at the University.

5.     Denied as stated.  By way of further response, it is admitted that Ms. Feldbaum is a defendant in the instant lawsuit, that she is an adult individual who held the title of Interim Senior Director, Office of Student Conduct at the University at all times relevant to this matter, and that she has an office in Centre

County, Pennsylvania. Ms. Feldbaum is presently a Senior Associate Director with the Office of Student Conduct at the University.

6.     Admitted that Ms. Gaudelius is a defendant in the instant lawsuit, that she held the title as stated in Paragraph 6 of the First Amended Complaint at all times relevant to this matter, and that she has an office in Centre County, Pennsylvania. Dean Gaudelius is presently the Vice President and Dean for Undergraduate Education at the University.

### Personal Jurisdiction and Venue

7.     The averments in this paragraph state legal conclusions to which no response is required.

8.     The averments in this paragraph state legal conclusions to which no response is required.

9.     The averments in this paragraph state legal conclusions to which no response is required.

### Subject Matter Jurisdiction

10.     The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied. By way of further response, Ms. Williams' "state law claims", as set forth in Counts V and VI of the First Amended Complaint, were dismissed with prejudice by this Court in its September 4, 2020 Order. (Doc. 33.)

11.    Admitted in part, denied in part.  It is admitted only that the University is a land-grant and state-related institution.  The remaining averments in this paragraph state legal conclusions to which no response is required.

12.    The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  By way of further answer, in response to the Defendants' Brief in Support of their Partial Motion to Dismiss Plaintiff's First Amended Complaint filed on May 26, 2020 (Doc. 26), where it was argued by Defendants that Ms. Williams could not articulate a viable Title VI retaliation claim against Dr. Prawdzik as a matter of law because Title VI does not allow claims against individuals, Ms. Williams dismissed Dr. Prawdzik from this action on June 9, 2020 (Doc. 28).

13.    Admitted only that Ms. Williams began as a freshman at the University in the Fall 2016.  By way of further response, the Defendants lack information sufficient to form a belief as to the truth of what Ms. Williams "expected and anticipated", and the remaining averments of this paragraph are denied accordingly.

## Facts

14.    Denied.

15.    Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 15, including what Ms. Williams felt and

remembered the morning of January 15, 2017, and deny the averments of this paragraph accordingly.

16.     Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 16, including what Ms. Williams did and said the morning of January 15, 2017, and deny the averments of this paragraph accordingly.

17.     Admitted only that the referenced individual withdrew from the University on or around May 29, 2018.  Defendants lack information sufficient to form a belief as to the truth of the remaining averments of Paragraph 17, including what Ms. Williams did and said the morning of January 15, 2017, and deny the remaining averments of this paragraph accordingly.  Except as so admitted, denied.

18.     Denied.

19.     Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 19, including what Ms. Williams did and said the morning of January 15, 2017.

20.     Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 20, including what Ms. Williams did and said (and heard) the morning of January 15, 2017.

21.     Admitted only, upon information and belief, that Ms. Williams called 911 the morning of January 15, 2017.

22.     Admitted in part, denied in part.  It is admitted only upon information and belief that Ferguson Township Police arrived at the apartment of one of the accused individuals the morning of January 15, 2017, and spoke to Ms. Williams and one of the accused individuals separately.

23.     Admitted in part, denied in part.  It is admitted only, upon information and belief, that the two accused individuals told police that they had had consensual sexual intercourse with Ms. Williams and that police informed Ms. Williams of same.  The Defendants lack information sufficient to admit or deny what Ms. Williams said or felt in response to this information from the police, and those averments are denied accordingly.

24.     Admitted in part, denied in part.  It is admitted upon information and belief that an ambulance transported Ms. Williams to Mount Nittany Medical Center.  The Defendants lack information sufficient to admit or deny what determinations were made by the police officer, who is unaffiliated with Defendants.

25.     Admitted in part, denied in part.  It is admitted that medical records supplied to the University by Ms. Williams reflect that hospital personnel conducted a forensic examination to collect evidence and that Ms. Williams' blood alcohol content was 0.192% at the time of testing on January 15, 2017.  Further answering, to the extent the allegations of this paragraph refer to the hospital

medical records, those are writings that speak for themselves and any

characterization thereof is denied.  Defendants lack sufficient information to admit

or deny the remaining allegations of this paragraph, including but not limited those

allegations relating to Ms. William's mental state at the time, which are

accordingly denied.

26.      Admitted only that the Office of Sexual Misconduct Prevention &

Response received a report relating to the alleged incident in January 2017, where

thereafter a representative from the office emailed Ms. Williams resource

information on or around January 21st and emailed again on January 23rd, but

Ms. Williams did not respond to the January 23rd email.  The remaining averments

in this paragraph state legal conclusions to which no response is required, and are

accordingly denied.  Except as so admitted, denied.

27.      Denied.   By way of further response, see Answer to Paragraph 26.

Moreover, on March 13, 2017 the representative from the Office of Sexual

Misconduct Prevention & Response again emailed Ms. Williams, notifying her that

the office was closing the matter, but would maintain the record, because Ms.

Williams had not responded to her prior email message from January 23rd.  The

representative noted "I also want you to know that if you wish to file a formal

complaint, at a later time, you may certainly do so and we will proceed with the

process."

28.     Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 28, and they are denied accordingly.

29.     Denied.

30.     Defendants lack sufficient information to admit or deny the allegations of Paragraph 30, including but not limited to those allegations relating to what Ms. Williams "determined" and "hoped", and the averments of this Paragraph are accordingly denied.  It is expressly denied that there is a so-called "rape culture" at the University.

31.     After reasonable investigation, Defendants lack sufficient information to admit or deny the allegations of this paragraph, and they are accordingly denied.

32.     Admitted in part, denied in part.  It is admitted only that on or around October 11, 2017 Ms. Williams notified the Title IX office that she wanted to move forward with a formal investigation, that the investigator for Ms. Williams' complaint was Mr. Christopher Harris who was assigned on October 12th, and that Mr. Harris first interviewed Ms. Williams on October 20, 2017.  Except as so admitted, denied.

33.     Defendants lack sufficient information to admit or deny the allegations of this paragraph, and they are accordingly denied.

34.     Defendants lack sufficient information to admit or deny the allegations of this paragraph, and they are accordingly denied.

35.     Admitted in part, denied in part.  It is admitted only that Ms. Williams notified the University's Title IX Office on or around October 11, 2017 that she wanted to move forward with a formal investigation.  Except as so admitted, denied.  To the contrary, on October 23, 2017, Mr. Harris emailed a notice of investigation to one of the students Ms. Williams accused of sexual assault.  On November 6, 2017, Mr. Harris met with that student.  Mr. Harris was unable to contact the second individual that Ms. Williams accused because the University did not have accurate contact information for that student who was not enrolled.  Ultimately, that second student contacted Mr. Harris, and, on March 15, 2018, Mr. Harris met with him.

36.     Admitted in part, denied in part.  It is admitted only that Ms. Williams posted numerous tweets on or around April 5, 2018.  By way of further response, upon information and belief, Ms. Williams had tweeted about the alleged events before April 2018, including as early as in or around January 2018, where she tweeted the first and last name of one of her alleged assailants.  Further answering, the referenced tweets are writings which speak for themselves and any characterization thereof is denied.

37.     Admitted in part, denied in part.  It is admitted only that "Kayla @ xkayagoof" "tweeted" the statement set forth in Paragraph 37.  By way of further response, the content of Ms. Williams' tweet is expressly denied.

38.     Admitted in part, denied in part.  It is admitted that numerous Twitter users "retweeted," "liked," or commented on Ms. Williams' tweets from on or around April 5, 2018.  It is specifically denied that the University "garnered significant negative attention" due to Ms. Williams' "social media postings."

39.     Admitted only that Ms. Williams appears to have captured a comment from someone using the name "AnkMan" and shared it.  Defendants lack information sufficient to respond as to the origin or authenticity of that comment; by way of further response, to the extent this is an authentic comment, the content of that comment is denied.

40.     Defendants lack sufficient information to admit or deny the allegations of this paragraph, which are accordingly denied.

41.     Admitted in part, denied in part.  It is admitted only that "Kayla @ xkayagoof" "tweeted" the statement set forth in Paragraph 41, which is an incomplete quote of the full tweet, which also includes a photograph of one of Ms. Williams' alleged assailants.  By way of further response, it is expressly denied that the University "dragged out" its investigation into Ms. Williams' allegations.

42.     Defendants lack sufficient information to admit or deny the allegations of this paragraph, which are accordingly denied.

43.     Defendants lack sufficient information to admit or deny the allegations of this paragraph stating that such a reply was posted.  To the extent any such comment was posted and it is directed to Defendant Penn State, the content of any such comment is denied.

44.     It is denied that Ms. Williams' social media postings resulted in "significant negative attention" for the University.  For all other averments in this paragraph, Defendants lack sufficient information to admit or deny the allegations of this paragraph, which are accordingly denied.

45.     Defendants lack sufficient information to admit or deny the allegations of this paragraph, which are accordingly denied.

46.     Denied.

47.     Admitted only that Ms. Feldbaum contacted Ms. Williams to advise that one of the students alleged to have sexually assaulted Ms. Williams was being charged with violations of the University's Student Code of Conduct.  It is denied that the other student "resigned" from Penn State; by way of further response, this individual withdrew from the University on or around May 29, 2018, and he was not enrolled at the University at that time.  Defendants are without information sufficient to admit or deny this other student's motivations for withdrawing, but he did indicate that he was taking a conduct withdrawal because of illness in his

family, and not because he was responsible for the alleged misconduct. Except as so admitted, denied.

48.     Admitted that the Title IX hearing occurred on May 18, 2018, and consistent with University policy Ms. Williams was provided access to the investigative packet by the Office of Student Conduct on May 11, 2018, starting around 8:15 a.m. and was given an extension until 5:00 p.m. that same day. Further answering, as part of the Title IX process, Ms. Williams reviewed the investigative packet information before it was transferred to the Office of Student Conduct, including but not limited to on January 9, 2018.

49.     Denied as stated. Further answering, with regard to additions to the investigative packet, on or around March 15, 2018 Investigator Harris interviewed one of the accused students who Mr. Harris had been previously unable to reach. The information was provided to Ms. Williams and the respondent, and the investigative report was updated accordingly. The updated investigative report was received by the Office of Student Conduct on April 4, 2018, and as stated in paragraph 48, Ms. Williams reviewed the investigative packet on May 11, 2018.

50.     Denied.

51.     Denied as stated. Ms. Williams attempted on multiple occasions to introduce irrelevant information outside the investigative packet, and the

introduction of this evidence was appropriately denied pursuant to the University's

Code of Conduct & Student and Student Organization Conduct Procedures.

52.     Denied as stated.  During the hearing, Ms. Williams attempted to

interject "testimony" multiple times when it was not her turn in the proceeding to

present.  By way of further response, Ms. Williams was well aware that both

parties had the right to an advisor at the hearing, who could be a lawyer.  Denied

that the "lawyer" was providing any "legal advice" or "legal instruction" during

the hearing.

53.     Admitted only that a question of this nature, which was relevant to

issues of intoxication/incapacitation, was asked during the hearing.  The remaining

averments of this paragraph are denied.

54.     Denied.  By way of further response, Ms. Williams submitted to the

Panel a number of questions which she proposed for the Panel to ask *the

respondent*.  One of Ms. Williams' suggested questions for the respondent was:

"Why was the Erythma [sic] (vaginal wall damaged) which occurs when a the [sic]

person being assaulted is not aroused?"  The Panel asked the respondent whether

he had the medical expertise to answer that question, and he responded that he did

not.  In its discretion, the Panel determined to not permit Ms. Williams' question *to

the respondent* on this topic.  However, this information was in Ms. Williams'

medical records which were considered by the Panel.

55.     Denied as stated.  The respondent responded that he must apologize in advance for his inability to respond to questions, but upon the advice of his counsel, he would not be answering questions given the pending criminal investigation against him.

56.     Admitted in part, denied in part.  It is admitted that the Panel found the respondent not responsible and that the basis for the Panel arriving at this conclusion is memorialized in the May 18, 2018 Title IX Decision Panel Chair Report.  The Title IX Decision Panel Chair Report is a written document that speaks for itself, and all characterizations of its terms are denied.

57.     Admitted in part, denied in part.  It is admitted only that the May 18, 2018 Title IX Decision Panel Chair Report includes the language quoted in Paragraph 57.  The Title IX Decision Panel Chair Report is a written document that speaks for itself, and all characterizations of its terms are denied.  By way of further response, it is also denied that the University failed to properly investigate the panel's recommendation.

58.     Denied.  The actual quote from the investigative packet reads:  "The detective stated that during his interview of [redacted], he told the detective that [redacted] 'might have handed it to her because she [Ms. Williams] was took [sic] drunk and going to throw up.'"  By way of further response, the investigative

packet is a writing that speak for itself, and all characterizations of the terms of those documents and selective or incorrect quotations are denied.

59.     Admitted in part, denied in part.  It is admitted only upon information and belief that medical records supplied to the Panel indicated that Ms. Williams' blood alcohol content was 0.192% at the time of the blood testing on January 15, 2017.  The phrase "despite the DP's findings" is confusing, not a factual averment, and is denied.

60.     Admitted in part, denied in part.  Admitted only that the investigative packet included information that the Ferguson Township Police recovered two condoms from the apartment in question.  The phrase "despite the DP's findings" is confusing, not a factual averment, and is denied.

61.     Admitted in part, denied in part.  It is admitted only that the investigative packet contains responses to questions Investigator Harris asked to a female witness about the night in question.  Defendants deny, however, that the allegations set forth in Paragraph 61 accurately quote or relay the questioning and answering sequence with regard to the referenced witness as it is noted in the investigative packet.  Further answering, the investigative packet contains written documents that speak for themselves, and all characterizations of the terms of those documents are denied.  Finally, the phrase "despite the DP's findings" is confusing, not a factual averment, and is denied.

62.     Denied.  By way of further response, the averments in this paragraph do not accurately reflect the investigation packet.  Further, the investigative packet contains written documents that speak for themselves, and all characterizations of the terms of those documents are denied.  Finally, the phrase "despite the DP's findings" is confusing, not a factual averment, and is denied.

63.     Denied as stated, to the extent the averments of this paragraph state or otherwise imply that Ms. Feldbaum or the Office of Student Conduct were not responsive to Ms. Williams.  To the contrary, over the course of May and June 2018, Ms. Feldbaum was in communication with Ms. Williams multiple times. The remaining averments of this paragraph are too vague to admit or deny, including the allegation that Ms. Feldbaum "refused to substantively answer many of Ms. Williams' questions," and those allegations are denied accordingly.

64.     Denied.

65.     Denied as stated.  It is only admitted that at some point there were communications about to whether the Panel would find it valuable to speak with Ms. Williams.  The determination was that this would not be valuable.

66.     Admitted that Ms. Williams commenced classes in the referenced course, although she missed the first week of class.

67.     Admitted, upon information and belief, that Ms. Williams received health care services from the University.  To the extent it is alleged, it is expressly denied that the University caused any of Ms. Williams' claimed emotional distress.

68.     After reasonable investigation, Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 68, which are accordingly denied.

69.     Denied as stated.  By way of further response, Ms. Williams and Dr. Prawdzik jointly settled on racism as the topic for Ms. Williams' project, and Ms. Williams specifically thanked Dr. Prawdzik for his assistance figuring out a "set research question" in an email dated September 9, 2019.

70.     Denied.

71.     Denied.

72.     Admitted only that Dr. Prawdzik did not meet with **any** students, including Ms. Williams, to try to convince them to change their topics.

73.     Denied.  By way of further response, on September 9, 2019, Dr. Prawdzik wrote in response to Ms. Williams' topic selection:  "Hi Kayla, I'm glad that you feel good about your research topic!  It's clearly one that will sustain your interest and produce meaningful insight."

74.     Denied as stated.  By way of further response, it is expressly denied that Dr. Prawdzik is "racially biased".  It is admitted only that Ms. Williams missed a number of classes.  All other averments of this paragraph are denied.

75.     Admitted.

76.     Denied as stated.  To the extent the averments of this paragraph refer to email correspondence that is a writing that speaks for itself any characterization thereof is denied.

77.     Denied.

78.     Denied.

79.     Denied as stated.  Dr. Prawdzik quietly asked for documentation supporting Ms. Williams' excessive absences.  Ms. Williams, attracting the attention of the class, loudly retorted something to the effect of [paraphrasing] "why are you airing my personal stuff!"  Dr. Prawdzik, referring to Ms. Williams' yelling in class and the fact that she had been unprepared for class, responded something to the effect of [paraphrasing] "listen, do you want to discuss this here, or in the hall?"

80.     Denied as stated.

81.     Denied as stated.  Admitted only that Dr. Prawdzik and Ms. Williams had a conversation in the hallway.

82.     Denied.

83.     Denied.

84.     Denied as stated.  Admitted only that Dr. Prawdzik attempted to be encouraging to Ms. Williams early in the semester, even as she was missing many classes, submitting work late, and was frequently stating confusion about each assignment.

85.     Denied as stated.  To the contrary, Ms. Williams went back into the classroom, screaming [paraphrasing]:  "Do you see what he did to me?  Did you see how he treated me?  Give me your phone #!! I need your phone #".  At that time, one student spoke up regarding Ms. Williams' outburst [paraphrasing]:  "please stop, you are making me nervous".

86.     Admitted.

87.     Admitted.

88.     Admitted that Ms. Williams made statements to this effect, and then left the classroom.

89.     Denied as stated.  Dr. Prawdzik responded [paraphrasing]:  "Good, I look forward to talking with them."

90.     It is admitted only that Ms. Williams submitted an Affirmative Action Office complaint against Dr. Prawdzik.  It is denied that Dr. Prawdzik "racially discriminated" against Ms. Williams.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied as stated.  Further answering, upon information and belief, while Ms. Sparrow recalls that she initiated a conversation with Ms. Williams in the hallway outside the Office of Student Conduct, Ms. Sparrow recalls the interaction differently than what is alleged in paragraph 94.  Upon information and belief, Ms. Sparrow never touched Ms. Williams and never "sat down next" to her; Ms. Sparrow recalls only telling Ms. Williams "Kayla, you are a smart girl."  It is denied, upon information and belief, that Ms. Sparrow ever commented about the conduct at issue or the Title IX process or made the other statements attributed to her.

95.     Denied.

96.     Denied as stated.  Upon information and belief, Ms. Sparrow does not recall Ms. Williams making the specific statements alleged in paragraph 96, but does recall Ms. Williams communicating that she hated coming into the Office of Student Conduct.

97.     Denied.

98.     Admitted only that Ms. Williams has an "F" for Dr. Prawdzik's class. All other allegations of this paragraph are expressly denied.

99.     Admitted that Ms. Williams was enrolled in Dr. Yarwood's psychology course number 425, "Human Emotion".

100.    Admitted in part, denied in part.  It is admitted only that the subject of the course was Human Emotion.  Defendants lack sufficient information to admit or deny the remaining allegations of this paragraph, which are accordingly denied.

101.    Admitted that Ms. Williams submitted Quiz #1 and Quiz #2 on January 29, 2020.

102.    Admitted that quizzes in the referenced course were generally graded by Canvas.

103.    Admitted in part, denied in part.  It is admitted that on Quiz #1 in this course, a single question (worth 0.5 points) was coded incorrectly when the quiz was initially administered on or around January 21-22, 2020, so that some students believed they got the question correct when they did not, and other students believed they got the question incorrect when they did not.  It is denied the entire "class" was impacted by this coding error, because for each quiz each student is randomly given 10 questions from a question bank, so some of the students who timely took the quiz did not receive the question with the associated coding error, while others did.  The impacted students' grades were manually adjusted once the coding error was identified.  Ms. Williams missed Quiz #1 and had to make it up later.  By the time Ms. Williams took the quiz on January 29th (about 7 days after

it was initially administered), the coding error had been corrected.  Ms. Williams'

quiz grade was not impacted by the coding error on Quiz #1 because the coding

error was corrected before Ms. Williams took the quiz.  On January 31, 2020, the

Teaching Assistant sent an email to certain impacted students to notify them of the

coding error and explain that their score for Quiz #1 had been reduced by 0.5 point.

By way of further response, two questions in the question bank for Quiz #2

contained coding errors.  By virtue of the random assignment of questions from the

question bank, Ms. Williams' version of Quiz #2 did not contain the two questions

with coding errors. Ms. Williams' Quiz #2 grade was not impacted by the coding

errors on Quiz #2.  Except as so admitted, denied.

104.   Admitted that Ms. Williams answered questions 3, 7, and 10

incorrectly on Quiz #1, and questions 2, 5, 8, 9, and 10 incorrectly on Quiz #2.

The scores she received on Quiz # 1 (3.5/5) and Quiz # 2 (2.5/5) were accurate and

certainly not based on bias of any kind.  Except as so admitted, denied.

105.   Defendants lack information sufficient to form a belief as to the truth

of the averments of Paragraph 105 regarding these purported discussions, and they

are accordingly denied.  By way of further response, to the extent it is averred, it is

explicitly denied that Dr. Yarwood treated any students differently because of their

race.

106.    The allegations of this paragraph refer to an email the terms of which speak for themselves and any characterization thereof is expressly denied.

107.    Denied as stated.  By way of further response, Dr. Yarwood explained why Ms. Williams' belief that there was some grade discrepancy was incorrect, and explained why some of Ms. Williams' answers were not correct.

108.    Admitted only that Ms. Williams complained about grading on two quizzes and one assignment in Dr. Yarwood's class.  Denied that her complaints were founded.   By way of further response, there was never a time that Ms. Williams' Quiz #1 or Quiz #2 scores were impacted by the above-referenced coding errors.  And, it is specifically denied that "other students" were ultimately "given credit for the same wrong answer" because after the coding errors were discovered, they were corrected.  To the extent the averments of this paragraph refer to email correspondence that is a writing that speaks for itself and any characterization thereof is denied.

109.    Admitted that Ms. Williams met with Dr. Yarwood to discuss quiz grades on or around February 3, 2020.

110.    Admitted that Ms. Williams said words to this effect to Dr. Yarwood. By way of further response, it is denied that the grading at issue was unfair or biased in any way, and specifically denied that some students were given credit for a wrong answer.

111.   Denied as stated.  By way of further response, Dr. Yarwood explained to Ms. Williams that a coding error had been corrected so that everyone's quiz was graded accurately.  This resulted in either a 0.5 point deduction or a corresponding increase for certain students' initial quiz scores (not Ms. Williams', as the coding error had been corrected by the time she belatedly took  Quiz #1, and as stated above, she had not received any of the impacted questions for Quiz #2).  For Quiz #1, on January 31, 2020, the Teaching Assistant notified the students whose score for Quiz #1 was reduced by 0.5 point because the students incorrectly received 0.5 point for the incorrect answer to one question as a result of the quiz coding error. The adjustments for Quiz #2 were communicated by email to the impacted students by Dr. Yarwood.  Dr. Yarwood recommended that Ms. Williams ask her friends to see those confirmation emails.  There was no discussion about "white students", as race was irrelevant to the discussion, and Dr. Yarwood further explained that she could not provide more detail about the other students' information due to confidentiality concerns.

112.   After reasonable investigation, Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 112, which are accordingly denied.

113.    While Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 113 relating to what the students

purportedly said to Ms. Williams, if anything, Defendants would further respond as follows: if any students made these statements to Ms. Williams, they were incorrect.  No students received credit for a wrong answer on Quiz #1 or Quiz #2 in PSYCH 425, after the coding errors were discovered and corrected.  To the extent the averments of this paragraph relate to email or text message correspondence, those writings speak for themselves and any characterization thereof is denied.

114.   Denied.  By way of further response, no students ultimately received credit for any incorrect answers on either Quiz #1 or Quiz #2 – not Ms. Williams, and not anyone else.

115.   Admitted that on or around February 4, 2020, after class, a white female student informed Dr. Yarwood that a "PackBack" assignment for the course had been set up improperly on Canvas.  Specifically, the assignment was incorrectly set up as if it was worth "zero" points (instead of 20 points), such that the entire assignment was essentially extra credit.  Admitted that Ms. Williams was nearby while this discussion was occurring.

116.   See Answer to Paragraph 115, except to further deny that this assignment was for "backpack Number 2".

117.   Denied as stated.  By way of further response, Ms. Williams did not complete PackBack (not backpack) assignment #2.  As for PackBack assignment

#3, which is what was actually being discussed on or about February 4, 2020, admitted that Ms. Williams expressed concern that she did not receive "extra credit" for this assignment. As explained above, however, this was not an "extra credit" assignment. PackBack assignment #3 initially was set up incorrectly in the Canvas gradebook, but then corrected so that it was an assignment with a possible 20 points out of 20, instead of 20 points out of 0.

118. Admitted. By way of further answer, Dr. Yarwood was explaining that she changed PackBack assignment #3 in the Canvas grade book so that the denominator or total possible points was out of /20, instead of /0. Ms. Williams received a score of 20/20 for PackBack assignment #3. The change to the total possible points did not impact the number of points (20 points) Ms. Williams received for PackBack assignment #3.

119. Defendants lack information as to what Ms. Williams did before or after any particular class, and those allegations are denied accordingly. By way of further response, there were 14 PackBack assignments administered during the course. Per the syllabus, students were required to complete 12 of the 14 PackBack assignments, and students were permitted to complete *more than* the required 12 assignments for extra credit. Ms. Williams was not eligible for this extra credit because she dropped the class mid-semester and did not complete the 12 required PackBack assignments. Further answering, upon information and belief, the

averments of this paragraph mistakenly refer to PackBack assignment #2, which Ms. Williams did not complete.  As for PackBack assignment #3, it never was intended to be solely an extra credit assignment and was not counted as extra credit for any student based on the denominator error which was corrected as explained above.

120.   The allegations of this paragraph refer to an email the terms of which speak for themselves and any characterization thereof is expressly denied.

121.   The allegations of this paragraph refer to an email, the terms of which speak for themselves.  Ms. Williams' selective and inaccurate citation thereof is expressly denied.

122.   Denied.

123.   Defendants lack information sufficient to form a belief as to the truth of the averments of Paragraph 123 regarding the length of Ms. Williams' alleged period of "incapacitation" due to "severe bronchitis", and those averments are accordingly denied.  By way of further response, to the extent the allegations of this paragraph purport to refer to a "Patient Excuse" slip noting that Ms. Williams was seen at the Mount Nittany Medical Center for testing on January 21, 2020, the "Patient Excuse" slip is dated January 25, 2020, and simply says "please excuse from class" without a specific date range.  Denied that it is a "University wide doctor's note excusing her from all University activities."

124.   Admitted only that Dr. Yarwood allowed Ms. Williams to make up certain work she had not timely submitted.  The remaining allegations of this paragraph are denied.

125.   Denied as stated.  By way of further response, PackBack assignments that are submitted timely are graded by A.I.  PackBack's A.I. grading system does not accept late assignment submissions.  Because Ms. Williams completed her assignment late, it had to be manually graded, and Dr. Yarwood conveyed to Ms. Williams what she would be looking for in grading this assignment and the written requirements for the makeup assignment.  It is denied that the guidelines Dr. Yarwood used to grade Ms. William's late submission were "harsher" than the PackBack guidelines.

126.   The allegations of this paragraph refer to an email the terms of which speak for themselves, and Ms. Williams' inaccurate quotation and characterization thereof is expressly denied.  By way of further response, it is expressly denied that Dr. Yarwood "unfairly docked" points or used a "stricter rubric" to manually grade Ms. Williams' late assignment submission.

127.   The allegations of this paragraph refer to an email the terms of which speak for themselves, and Ms. Williams' partial and inaccurate characterization thereof is expressly denied.

128.   Admitted in part, denied in part.  It is specifically denied that Dr. Yarwood ever smirked or "continued to smirk" at Ms. Williams during class. Defendants lack sufficient information to admit or deny the allegations of this paragraph relating to whether Ms. Williams "broke down".  Admitted that on February 13, 2020, Ms. Williams stood up and disrupted the class by loudly saying words to this effect to Dr. Yarwood [paraphrased]:  "You can keep smirking and not answering these questions.  Since you won't answer my questions for evidence because of your bias, I'll see you in court."  Admitted that Ms. Williams then left the class, and dropped the course within the next day or so.

129.   The allegations of this paragraph refer to multiple emails the terms of which speak for themselves.  Any characterization thereof is expressly denied.  It is only admitted that Ms. Williams repeatedly emailed about this single makeup assignment; it is specifically denied that Dr. Yarwood used a "harsher" grading rubric for Ms. Williams' makeup work.

130.   Admitted only, upon information and belief, that Ms. Williams was seen at the Mount Nittany Medical Center for testing on January 21, 2020.

131.   Denied as stated.  Ms. Williams missed a conduct conversation meeting scheduled for January 21, 2020, and was given the courtesy of a second opportunity to appear for a conduct conversation on January 24, 2020. Ms. Williams failed to attend that rescheduled conduct conversation as well.

Moreover, Ms. Williams did not say on January 21 nor January 24, 2020 that she was sick, first obtained a note on January 25, 2020, and did not mention this purported illness as a reason for her failure to appear until January 31, 2020.

132.   Denied.

133.   Denied.

134.   Denied as a legal conclusion to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

135.   Denied.

136.   Denied.

137.   Denied.  Further answering, to the extent the allegations of this paragraph refer to certain email correspondence, those are writings that speak for themselves and any characterization thereof is denied.

138.   Denied.  The averments of this paragraph as to whom Ms. Williams "reiterated that she did not get the benefit of a conduct conversation" are too vague to admit or deny, and are accordingly denied.  Further answering, it is denied that Ms. Williams submitted a formal report to the Affirmative Action Office as is alleged in this paragraph.

139.   Admitted in part, denied in part.  It is admitted that the University allowed Ms. Williams to contest the charges against her, even after she had failed to attend the two scheduled conduct conversations and had failed to timely respond

to the January 27th Conference Summary Form, such that a sanction of suspension had gone into effect.  Ms. Williams was notified by way of letter dated February 13, 2020 that a hearing was to take place before the University Conduct Board on February 21, 2020.  Further answering, it is specifically denied that Ms. Williams was denied an opportunity for a conduct conversation meeting; rather, Ms. Williams twice failed to appear for the conversation, thus and consistent with University policy and procedure, the conduct conversation proceeded with Ms. Williams in absentia.  It is further denied that Ms. Williams has a "right" to attend a conduct conversation "under the policies and procedures of Penn State", which are writings that speak for themselves, and any characterization thereof is denied.  Except as so admitted, denied.

140.   Admitted only that Ms. Williams filed a Complaint on February 19, 2020 (Doc. No. 1) initiating Civil Action No. 20-cv-298-MWB.  By way of further response, the Complaint is a written document which speaks for itself and any characterizations thereof are denied.  It is further specifically denied that the Defendants violated any of the provisions of law as averred in Paragraph 140, the Complaint, or the First Amended Complaint for this action.  Except as so admitted, denied.

141.   Admitted.

142.    Admitted only that certain local news outlets published articles relating to Ms. Williams' claims.  Any referenced "news articles" and the Complaint are writings that speak for themselves and any characterizations thereof are denied.

143.    Admitted only that a hearing before the University Conduct Board was held on February 21, 2020 relating to the following Charge Code Violations brought against Ms. Williams: 01.03 Harming or Attempting to Harm Another and 03.03 Harassment by Communication.

144.    Denied.  Further answering the University's referenced "policies and procedures" are written documents that speaks for themselves, and all characterizations of the terms of those documents are denied.

145.    Admitted that Ms. Williams, accompanied by her advisor, Mr. Ronald F. Saupe, Esquire, appeared at the February 21st hearing and had an opportunity to tell her story before a live hearing panel.  While it is admitted that the only oral testimony at the hearing was provided by Ms. Williams, it is denied that the written evidence, which included written testimony of the accusing-witnesses, was "unchallenged."  The start of the UCB Hearing, which was scheduled for 9:00AM on 2/21/2020, was delayed by over an hour to allow Ms. Williams to submit additional documents.  The hearing panel considered the available written testimony of Ms. Williams' former roommate and the Lyft driver that alleged he

was punched in the face by Ms. Williams.  The UCB hearing board noted in its

report:

> The written and oral testimony given by Ms. Williams differed
> substantially from the testimony provided by [Lyft Driver] and
> [Former Roommate]. Ms. Williams stated that [Former Roommate]
> and [Lyft Driver] were lying when describing her role in their
> respective incidents. When Ms. Williams was made aware of the
> statement provided by [Lyft Driver] as his written testimony,
> Ms. Williams declined reading the document indicating that it
> probably was a complete fabrication. In addition to putting into
> question the credibility of the complainants, Ms. Williams accused the
> Patton Township Police Department to have doctored the video
> recording of the incident between her and [Lyft Driver]. Also, soon
> after entering the hearing room, Ms. Williams affirmed that
> Ms. Lauren Langford, Assistant Director of the Office of Student
> Conduct and case manager for the hearing, had failed to share with the
> UCB the documents that Ms. Williams had sent earlier in the
> morning. Furthermore, Ms. Williams denied being supplied with the
> information contained in the information packet given to the UCB.
> Once Ms. Langford insisted that she had shared the documents with
> all concerned, Ms. Williams had to concede that indeed she had been
> given access to the same information given to the UCB and that the
> UCB had indeed received the information Ms. Williams had wished to
> share with the UCB.

Except as so admitted, denied.

146.   Denied as stated.  The University's Code provides that a respondent

"may be accompanied by an advisor" with whom she "may consult . . . during a

session" (§ VI(A)(6)), but the role of the advisor is not to speak during the hearing.

Further answering, Ms. Williams was at least twice offered an opportunity to take a

break during the conduct board proceedings, including one instance where she was

asked whether she would like to review documents with her advisor in a separate room, but she declined to do so.

147.   Denied as stated.  It is denied that Ms. Williams was "admonished for her presentation".  By way of further response, in response to Ms. Williams' attempts to raise new issues and present complaints that the conduct board could not address, she was advised that the case before the UCB only concerned two specific charges against her.

148.   Denied.

149.   Admitted in part, denied in part.  It is admitted only that Ms. Williams challenged aspects of the conduct board process that she perceived to be violations of the University's "policies and procedures."  It is specifically denied that the Defendants violated the University's policies and procedures, which are written documents that speaks for themselves, and all characterizations thereof are denied. Except as so admitted, denied.

150.   Admitted in part, denied in part.  It is admitted that Ms. Williams stated during the conduct board proceeding that she had the day before filed a federal lawsuit, and that Ms. Williams throughout her time at the University has perceived that many individuals were biased against her.  Denied that anyone at the University or on the conduct board was biased against Ms. Williams.  Denied that the "administration" did not take Ms. Williams' concerns seriously.

151.    Admitted only that on February 21st Ms. Williams was notified by email, with a copy to her advisor, of sanctions, including suspension.  Further answering, the referenced email is a writing that speaks for itself and any characterizations thereof are denied.

152.    Admitted.  By way of further response, the conduct board's report is a writing that speaks for itself and any characterization thereof is denied.

153.    Admitted in part, denied in part.  The Defendants are without knowledge or information sufficient to ascertain what is meant by "a specific finding" and that allegation is accordingly denied.  It is admitted that the former roommate who made a complaint against Ms. Williams did not provide live testimony before the conduct board.  The characterization of the conduct board's report, which is a written document, is denied.  By way of further response, the report notes that both complainants "appeared to have been traumatized through the interaction with Ms. Williams" and "Ms. Williams is not as credible as [former roommate]".  The report further states: "Having established sufficient credibility on the part of the complainants, the UCB unanimously concluded that the charges were indeed appropriate and that Ms. Williams was responsible for both."  Except as so admitted, denied.

154.    Admitted in part, denied in part.  The Defendants are without knowledge or information sufficient to ascertain what is meant by "a specific

finding" and that allegation is accordingly denied.  It is admitted that the

complainant-Lyft Driver did not provide live testimony before the conduct board.

The characterization of the conduct board's report, which is a written document, is

denied.  By way of further response, the report notes that both complainants

"appeared to have been traumatized through the interaction with Ms. Williams"

and "Ms. Williams is not as credible as [former roommate] and [Lyft Driver]".

Further answering, while Ms. Williams could not question the complainant-Lyft

Driver at the conduct board proceeding, she elected to not dispute his written

testimony.  By way of further response, the UCB report notes:

> Two facts that Ms. Williams did not dispute were that (1) she punched
> [Lyft Driver] in the face, and (2) [Lyft Driver] called the police after
> being punched in the face. However, Ms. Williams claimed to have
> acted in self-defense when [Lyft Driver's] actions ended up triggering
> intense emotions, the latter originating from the trauma Ms. Williams
> had suffered due to a sexual assault perpetrated against her in her
> recent past.

Both oral and written testimony were considered by the UCB Panel, and:

> using the 'preponderance of evidence' standard of proof . . . the UCB
> unanimously concluded that Ms. Williams is not as credible as
> [Former Roommate] and [Lyft Driver]. . . . Having established
> sufficient credibility on the part of the complainants, the UCB
> unanimously concluded that the charges were indeed appropriate and
> that Ms. Williams was responsible for both.

Except as so admitted, denied.

155.   Admitted in part, denied in part.  The Defendants are without

knowledge or information sufficient to ascertain what is meant by "a specific

finding" and that allegation is accordingly denied.  By way of further response, it is

admitted that the mother of Ms. Williams' former roommate did not attend the

conduct board proceeding, and was not questioned at the proceeding.  The UCB

considered a host of written testimony and other evidence in addition to

Ms. Williams' oral testimony, the totality of which formed the basis for the UCB

report, which is a written document that speaks for itself and any characterization

thereof or selective quotation is denied.  By way of further response, it is denied

that this paragraph accurately quotes the UCB report, which states: "the UCB

found it improbable that [Former Roommate's] mother would leave her home in

Colorado on moment's notice (i) to help her daughter move out of the apartment

shared with Ms. Williams and (ii) to contact the police about the threats her

daughter had received if [Former Roommate] had made up the accusations against

Ms. Williams."

     156.   The Defendants are without knowledge or information sufficient to

ascertain what is meant by "specific findings", and that allegation is accordingly

denied.  To the extent the averments of Paragraph 156(a)-(d) refer to the UCB's

report, that is a written document that speaks for itself, and any characterization

thereof is denied.

     157.   The Defendants are without knowledge or information sufficient to

ascertain what is meant by "a specific finding" and that allegation is accordingly

denied.  To the extent the averments of Paragraph 157 refer to the UCB's report and/or the audio recording of the hearing, those documents/recordings speak for themselves, and any characterization thereof is denied.

158.   Admitted in part, denied in part.  It is admitted only that Ms. Williams submitted a written appeal of the UCB's decision, which is a writing that speaks for itself, and any characterization thereof is denied.  Denied that Ms. Williams' appeal was meritorious.  Except as so admitted, denied.

159.   Denied as stated.  By way of further answer, the University gave Ms. Williams and her attorney the opportunity to listen to the hearing recording on multiple days, and Ms. Williams and her advisor did in fact listen to the recording and had the ability to take notes during the listening of same.  By way of further response, students do not receive "copies" of recordings from UCB proceedings.

160.   Denied as stated.  By way of further answer, the University gave Ms. Williams and her attorney the opportunity to listen to the hearing recording on multiple days, and Ms. Williams and her advisor did in fact listen to the recording and had the ability to take notes during the listening of same.  By way of further response, students do not get to "record the recording" of a UCB hearing.

161.   Admitted only that on or around March 18, 2020, Ms. Gaudelius, acting as the appeal officer, denied Ms. Williams' appeal and that Ms. Williams' suspension accordingly took effect.

162.   The averments in this truncated paragraph state a legal conclusion to which no response is required, and are accordingly denied.

**COUNT I**
**Title VI - Retaliation**
**Against Mr. Prawdzik and Penn State**

163.   All of the foregoing responses are incorporated herein by reference.

164.   The averments in this paragraph state legal conclusions to which no response is required.

165.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, they are denied.  By way of further response, Ms. Williams dismissed Dr. Prawdzik from this action on June 9, 2020 (Doc. 28).

166.   Admitted in part, denied in part.  It is admitted only that Ms. Williams submitted a report on or about October 14, 2019 against Dr. Prawdzik with the Penn State Affirmative Action office accusing him of racial bias.  The remaining averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  Except as so admitted, denied.

167.   Admitted only that in an email dated December 19, 2019, Dr. Prawdzik advised that his position was that Ms. Williams should receive an "F" in his class because she had missed eleven classes by October 21, 2019 and had only completed one assignment for the class – a research proposal worth 10%

of the final grade.  He also stated, however, that he was willing to change his stance if he received instructions to do so from an administrator.  Finally, Dr. Prawdzik did state that because Ms. Williams had made allegations against him (which were determined to be unfounded), he did not believe that he should be the person assessing her work.  Dr. Prawdzik further stated that someone else in the English Department could assess Ms. Williams' work if she chose to do it (which she never did), or she could file a grade appeal.

168.   Admitted only that Ms. Williams' transcript reflects that she failed Dr. Prawdzik's class -- which she did.  Except as so admitted, denied.

169.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, they are denied.

## COUNT II (in the alternative to Count III)
## Procedural Due Process (Deviation from Procedure)
## Against Penn State, and Ms. Langford, Ms. Feldbaum, Ms. Gaudelius

170.   All of the foregoing responses are incorporated herein by reference.

171.   The averments in this paragraph state legal conclusions to which no response is required.

172.   The averments in this paragraph state legal conclusions to which no response is required.

173.   The averments in this paragraph state legal conclusions to which no response is required.

174.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, it is denied that Ms. Williams has an unfettered property interest in continuing her degree studies at Penn State.

175.   Admitted only that the University's "student discipline policies and procedures" are written documents that speak for themselves.  All characterizations of the terms of those documents are denied.

176.   Denied as a legal conclusion to which no response is required.  To the extent these averments are deemed to be factual, it is admitted only that Ms. Williams did not attend a conduct conversation meeting because she missed both scheduled meetings.  The averments are otherwise denied.

177.   Admitted only that Ms. Williams complained about the lack of a conduct conversation as part of her appeal.  Except as so admitted, denied.  By way of further response, Ms. Williams was well aware of what actions were being considered by the conduct board, and fully attended and participated in the UCB hearing.

178.   Denied.  By way of further response, the University <u>did</u> reschedule Ms. Williams' conduct conversation meeting after she missed the first one on January 21, 2020.  Ms. Williams missed the rescheduled meeting as well.

179.   Denied as a legal conclusion to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, admitted only that a UCB proceeding moved forward and that Ms. Williams missed both of her pre-hearing conduct conversation meetings.  Except as so admitted, denied.

180.   Admitted only that Ms. Gaudelius, acting as the appeal officer, denied Ms. Williams' appeal and found "that there was no failure to follow stated procedures, such that the outcome would have been different."  Except as so admitted, denied.

181.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent these averments are deemed to be factual, they are denied.

182.   Denied as stated, as this averment is vague and unclear as pled.  Further answering the University's referenced "policies and procedures" are written documents that speak for themselves, and all characterizations of the terms of those documents are denied.

183.   Denied.

184.   Denied.

185.   Denied.

186.   Admitted only that the UCB proceeding moved forward.  Except as so admitted, denied.

187.   Admitted only that Ms. Gaudelius, acting as the appeal officer, denied Ms. Williams' appeal and found "that there was no failure to follow stated procedures, such that the outcome would have been different."  Except as so admitted, denied.

188.   Admitted.

189.   Denied.

190.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

191.   Admitted only that Ms. Gaudelius, acting as the appeal officer, denied Ms. Williams' appeal and found "that there was no failure to follow stated procedures, such that the outcome would have been different."  Except as so admitted, denied.

192.   Admitted only that respondents have the opportunity to question accusers who appear in person or over the phone at a UCB hearing.  By way of further response, the University's policies and procedures are written documents

that speak for themselves, and all characterizations of the terms of those documents are denied.  Except as so admitted, denied.

193.   Denied as a legal conclusion to which no response is required.  To the extent the averments are deemed to be factual, it is admitted that during the UCB hearing Ms. Williams did not cross examine those persons who made complaints about her, as those complainants did not attend in person or participate over the phone.  It is denied that this was a "deviation from policy."

194.   Denied as a legal conclusion to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, it is denied that there was any deviation from policy in Ms. Williams' case.

195.   Admitted only that Ms. Gaudelius, acting as the appeal officer, denied Ms. Williams' appeal and found "that there was no failure to follow stated procedures, such that the outcome would have been different."  Except as so admitted, denied.

196.   Denied.  By way of further response, the University's policies and procedures are written documents that speak for themselves, and all characterizations of the terms of those documents are denied.

197.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

198.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

199.   Admitted only that Ms. Gaudelius, acting as the appeal officer, denied Ms. Williams' appeal and found "that there was no failure to follow stated procedures, such that the outcome would have been different."  Except as so admitted, denied.

200.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

201.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, they are denied.

### COUNT III (In the alternative to Count II)
### Constitutionally Deficient Policies
### Against Penn State

202.   All of the foregoing responses are incorporated herein by reference.

203.   The averments in this paragraph state legal conclusions to which no response is required.

204.   The averments in this paragraph state legal conclusions to which no response is required.

205.   The averments in this paragraph state legal conclusions to which no response is required.

206.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, it is denied that Ms. Williams has an unfettered property interest in continuing her degree studies at Penn State.

207.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

208.   Admitted only that the accusing witnesses did not provide oral testimony at the hearing and were not questioned by Ms. Williams; but by way of clarification, the claimants did provide written statements upon which the UCB partially relied in making their "credibility assessments".  Except as so admitted, denied.

209.   Denied as a conclusion of law to which no response in required.  To the extent these averments are deemed to be factual, it is denied that the UCB process was deficient in any way.  By way of further response, the UCB evaluated all evidence presented to it and made a decision based on that evidence.

210.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

211.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

212.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, they are denied.

**COUNT IV**
**Title VI Discrimination**
**Against Penn State**

213.   All of the foregoing responses are incorporated herein by reference.

214.   The averments in this paragraph state legal conclusions to which no response is required.

215.   The averments in this paragraph state legal conclusions to which no response is required.

216.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, it is admitted that Dr. Yarwood was acting in the

course and scope of her employment when she took actions related to the teaching of PSYCH 425.

217.   Denied.  By way of further response, there was no "mistakenly graded psychology quiz of Ms. Williams."

218.   Denied.

219.   Denied.  By way of further answer, there was no "second mistakenly graded psychology quiz of Ms. Williams."

220.   Denied.

221.   Denied.

222.   Denied.

223.   Denied.  It is specifically denied that Dr. Yarwood engaged in "discriminatory grading" or that the University failed to remediate any "discriminatory grading", as there was none.  It is further denied that the situation presented Ms. Williams with no other reasonable option but to drop the course.  It is admitted only that Ms. Williams did, in fact, drop the course.  The remaining averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.

224.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, they are denied.

**COUNT V (In the alternative to Counts VI and VIII)**
**Negligent Hiring/Appointment of Title IX Hearing Panel**
**Against Penn State**

225-229.   The Defendants need not answer the averments in Paragraphs

225-229 because this Court dismissed Count V with prejudice on September 4,

2020. (Doc 33).

**COUNT VI (in the alternative to Counts V and VIII)**
**Negligent Training of Title IX Hearing Panel**
**Against Penn State**

230-237.   The Defendants need not answer the averments in Paragraphs

230-237 because this Court dismissed Count VI with prejudice on September 4,

2020. (Doc 33).

**COUNT VII**
**Retaliation- First Amendment (via 42 U.S.C. § 1983) , Title VI, and Title IX**
**Against Penn State and. Ms. Gaudelius**

238.   All of the foregoing responses are incorporated herein by reference.

239.   The averments in this paragraph state legal conclusions to which no

response is required.

240.   The averments in this paragraph state legal conclusions to which no

response is required.

241.   The averments in this paragraph state legal conclusions to which no

response is required.

242.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, they are denied.  To the extent the averments of this paragraph purport to characterize the Complaint which initiated the instant suit, that is a writing that speaks for itself and any characterizations thereof are denied.

243.   Admitted in part, denied in part.  Admitted only that the University was served with the Complaint on February 20, 2020.  The remaining averments in this paragraph state legal conclusions to which no response is required, and which are accordingly denied.  Except as so admitted, denied.

244.   Admitted that Ms. Williams was suspended for her multiple conduct violations, and she was notified of the resulting sanction of suspension on February 21, 2020.

245.   Denied.

246.   Denied.

247.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

248.   Admitted only that Ms. Williams' appeal was denied.  Except as so admitted, the averments of this paragraph are denied.

249.   Denied.

250.   Denied as a conclusion of law to which no response is required.  To the extent the averments of this paragraph are deemed to be factual, they are denied.

## COUNT VIII (In the alternative to Counts V and VI)
### Retaliation- First Amendment (via 42 U.S.C. § 1983) and Title IX
### Against Penn State

251.   All of the foregoing responses are incorporated herein by reference.

252.   The averments in this paragraph state legal conclusions to which no response is required, and are accordingly denied.  To the extent that the averments do not state legal conclusions, it is admitted only that Ms. Williams posted numerous things on Twitter on and around April 5, 2018, including criticism of how Penn State handled her internal Title IX case.  Except as so admitted, denied.

253.   Denied, upon information and belief.  By way of further response, the University lacks sufficient information to know what members of the University's community, if any, viewed the Plaintiff's tweets.

254.   Denied.

255.   Admitted in part, denied in part.  It is admitted only that Ms. Williams appealed the Title IX panel's finding and that her appeal was denied by way of letter dated June 11, 2018 via a writing that speaks for itself and any characterizations of same are denied.  The remaining averments of this paragraph are denied.

256.   Denied.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor, together with costs, fees, and any other relief the Court deems just and proper.

## <u>AFFIRMATIVE DEFENSES</u>

1.   The Plaintiff may have failed to state a claim upon which relief can be granted.

2.   The Plaintiff failed to mitigate her damages, if any.

3.   Certain of the Plaintiff's claims may be barred by the Eleventh Amendment to the United States Constitution.

4.   Any challenged actions of the UCB panel, the Title IX panel, or those involved in the student conduct process may be protected by qualified immunity.

5.   Defendants correctly applied the University's written policies and procedures.

6.   Defendants complied at all times with the University's written policies and procedures and the law.

7.   Defendants did not deprive the Plaintiff of any constitutionally protected interest.

8.   Defendants did not violate the Plaintiff's due process rights.

9.   Defendants did not violate the Plaintiff's First Amendment rights.

10.     The University's Title IX investigation was proper and conducted in accordance with the University's written policies and procedures and the law.

11.     The University's hearing processes were proper and conducted in accordance with the University's written policies and procedures and the law.

12.     The University's appellate processes and decisions were proper and conducted in accordance with the University's written policies and procedures and the law.

13.     The University's decision not to suspend the student accused by Ms. Williams in the Title IX process after finding him not responsible for sexual misconduct was appropriate, reasonable, and lawful.

14.     Defendants in no way discriminated against the Plaintiff based on her membership in a protected class under any title of the Civil Rights Act, whether Title VI or otherwise.

15.     Defendants in no way retaliated against the Plaintiff for any reason, including but not limited to, her membership in a protected class under any title of the Civil Rights Act or for any protected form of speech or expression.

16.     Plaintiff's claims may be barred by the doctrines of unclean hands, laches, or waiver.

17.     Plaintiff waived any right to complain about a "conduct conversation" by twice failing to appear.

18.     Plaintiff waived any right to complain about her two courses by:  a) missing 11 classes and failing to do 90% of the work in Dr. Prawdzik's class; and b) dropping Dr. Yarwood's class and failing to meet with the Associate Head of the Psychology Department.

19.     Plaintiff's claims are moot.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor, together with costs, fees, and any other relief the Court deems just and proper.

Respectfully submitted,

Dated: June 24, 2022          */s/ James A. Keller*
James A. Keller, Esq. (78955)
Andrea P. Brockway, Esq. (208901)
SAUL EWING ARNSTEIN & LEHR LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1964
James.Keller@saul.com
Andrea.Brockway@saul.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing *Amended Answer with Affirmative Defenses* to be served upon the following via the Court's ECF system:

Mart Harris, Esquire
Nelson Berardinelli, Esquire
The Trial Law Firm, LLC
428 Forbes Avenue, Suite 1700
Pittsburgh, PA 15219
*Counsel for Plaintiff*


Dated:  June 24, 2022                     */s/ James A. Keller*
                                          James A. Keller