**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KAYLA WILLIAMS, | : | |
| Plaintiff, | : | |
| | : | No. 4:20-cv-00298-MWB |
| v. | : | |
| | : | (Hon. Brann) |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY; LAUREN LANGFORD, in | : | Electronically Filed |
| her individual capacity; KAREN | : | |
| FELDBAUM, in her individual capacity; | : | |
| and YVONNE GAUDELIUS, in her | : | |
| individual capacity, | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1, Defendants The Pennsylvania State University (the "University" or "Penn State"), Lauren Langford, Karen Feldbaum, and Yvonne Gaudelius (collectively, "Defendants") submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, filed herewith.

A.    <u>**Introduction**</u>[1]

1.    Defendant The Pennsylvania State University is a state-related educational institution located in State College, Pennsylvania.[2]

2.    Plaintiff Kayla Williams ("Ms. Williams" or "Plaintiff") matriculated at the University as a freshman in Fall 2016.[3]    (*Deposition of Plaintiff Kayla Williams*, attached as <u>Ex. 1 and Ex. 2</u>, (hereinafter "*Pl. Dep.*") 39:10-12).

---

[1]    As indicated in the attached Table of Exhibits, certain of the exhibits cited herein were submitted to the Clerk for filing under seal pending a sealing decision on Defendants' pending Motion to Seal.

[2]    The Court may take judicial notice of this fact which is generally known within this jurisdiction and not subject to reasonable dispute.  Fed. R. Evid. 201.

[3]    Throughout her deposition, **Plaintiff baselessly and incorrectly alleged that nearly every document in this lawsuit was "falsified" or fabricated**. (*See, e.g., Pl. Dep*. 46:13-16, 77:10-13, 85:8-86:1, 94:24-95:8, 102:20-103:25, 110:5-112:10, 156:15-159:10, 164:6-165:17, 198:2-7, 221:14-223:1, 231:1-232:18, 232:23-234:5, 237:6-238:22, 257:2-257:13, 263:12-16, 285:16-287:1).  By way of example, Plaintiff confirmed her Penn State e-mail address, and, when asked if Plaintiff sent and received various e-mails from/to her e-mail address, Plaintiff responded with answers such as:  "I will say this is dating back six or seven years, so it is hard to tell you a hard yes or no.  **I will say any document you are handing me, I am automatically writing off my head as tweaked to fit Penn State's narrative**."  (*Pl. Dep.* 51:6-17 (emphasis added); *see also Pl. Dep*. 54:6-25).  Plaintiff further insisted that, "**any document I am looking at, I don't believe anything you guys hand me**" and "[a]**ny document you are giving me, I don't verify as entirely true.  And I am not going to say whether I sent an email seven years ago.  Because I am not sure**."  (*Pl. Dep.* 51:24-52:17 (emphasis added); *see also Pl. Dep.* 159:23-160:2 (alleging that nearly every document "was slightly altered"); *Pl. Dep.* 162:16-163:1; *Pl. Dep.* 286:21-25 (alleging that "any doc that you give me throughout the course of this deposition, there might be certain things in here that are true.  It is just hard for me to state what is and what isn't")).

Additionally, Plaintiff challenged documents that **she** produced in this lawsuit. (*See, e.g. Pl. Dep.* 321:5-325:1). Plaintiff further alleged that public court dockets demonstrating various criminal and civil actions against Plaintiff were false, inaccurate, or "edited." (*See, e.g., Pl. Dep.* 271:1-285:13; *see also Pl. Dep.* 284:4-21 (when handed a public docket, Plaintiff baselessly responded "This is edited.")).

Of course, apart from her own accusations, Plaintiff cannot and has not shown **any** actual evidence of any falsities, edits, or fabrications in any documents in this case, because none exist. Although it should go without saying, to be absolutely clear, there is zero evidence in this case that any documents—before or after litigation was commenced—were ever falsified.

Plaintiff even went so far as to outrageously and baselessly allege at her deposition that defense counsel had created falsified documents in this lawsuit. For example, when simply discussing her English Professor Dr. Prawdzik's syllabus for Plaintiff's English 202A course—which Dr. Prawdzik testified was a copy of the syllabus, (*see Deposition of Brendan Prawdzik*, attached as <u>Ex. 3</u>, (hereinafter "*Prawdzik Dep.*") 150:23-151:16, 154:1-4)—Plaintiff testified as follows:

> Q: Why don't we look at page 6 of 14 of the exhibit you have in front of you.
>
> A: The same document you all created after I filed the lawsuit.
>
> Q: Ms. Williams, did you just say - - so I got it right, is your allegation - - are you accusing me of creating this document after the lawsuit was filed? I want to make sure I have that crystal clear. Is that what you just said?
>
> A: Is that what you heard me say?
>
> Q: It is.
>
> A: To be honest, yes. And I have proof of many other instances that you guys edited a bunch of things.
>
> Q: Are you accusing me? Or are you accusing Penn State? Who are you accusing of that, Ms. Williams?

**B.    Plaintiff's Alleged Sexual Assault, Police Investigation, and University Title IX Investigation**

3.    On the evening of January 14, 2017, Plaintiff went out drinking with friends and other University students. (*See* Ex. 7 (University Title IX Investigative Report) at PSU[4] 2006-2007, PSU 2009-10).

4.    On January 15, 2017, Plaintiff awoke at a male student, A.A.'s,[5] apartment and called 911 to report that she believed she was sexually assaulted while intoxicated the night before.  (Ex. 7 at PSU 2007, 2045).

5.    Ferguson Township Police ("Ferguson Police") officers responded to the scene and began an investigation.  (*See* Ex. 7 at PSU 2007, 2044-46).

6.    A.A. and another male student, D.W., reported to the police that they allegedly each had consensual sexual intercourse with Plaintiff the night before.

---

A:  Whoever did it.  Whoever Penn State has working that was doing it.

(*Pl. Dep.* 85:8-86:1).    Plaintiff's offensive, outlandish, and entirely baseless allegations such as these are not entitled to any weight.

[4] Documents produced by the University in this lawsuit are bates labelled with the prefix "K. Williams v. PSU et al."  This prefix is abbreviated herein as "PSU" for purposes of pin cites within exhibits in Defendants' Statement of Facts.

[5] To preserve student privacy, and to comply with the protections under the Family Educational Rights and Privacy Act (FERPA), students other than Plaintiff referenced in this filing are identified by their initials only.

4

Plaintiff reported that she did not recall if sexual activity took place that night, nor did she recall providing consent to either male student. (Ex. 7 at PSU 2009, 2045).

7.    Plaintiff was transported to Mount Nittany Medical Center ("MNMC") emergency room at 8:24 a.m. on January 15, 2017, where she underwent a sexual assault nurse examination. Additionally, Plaintiff's blood was tested for drugs and alcohol. (See Ex. 7 at PSU 2007, 2073-76, 2048, 2070-75, 2105).

8.    Plaintiff's medical examination notes indicated that Plaintiff "has no injuries noted. Somewhat tender when performing vaginal swabs, no tears noted. Erthema to vaginal area noted." (Ex. 7 at PSU 2105).

9.    On January 18, 2017, the Ferguson Police notified the University Police of Plaintiff's alleged sexual assault. (Ex. 8 at PSU 3869-70).

10.    On January 20, 2017, Katharina Matic, Senior Title IX Compliance Specialist in the University's Office of Sexual Misconduct Prevention and Response ("OSMPR"), e-mailed Plaintiff to invite her to meet with their office and to provide Plaintiff with various resources, support, and procedural options. (Ex. 9 (Pl. Dep. Ex. D2) at PSU 786-87).

11.    Plaintiff responded to Matic by e-mail, and Matic wrote back on January 23, 2017 attempting to schedule a time to meet with Plaintiff. (Ex. 9 at PSU 786-87).

12.    On March 13, 2017, Matic again followed up with Plaintiff and advised that "I absolutely don't want to bother you or make you feel pressured to meet with me . . . , but I did want to make sure that I made myself available" and would "like to be of assistance in any way that I can." Matic provided Plaintiff with a list of available options and resources as well as a link to the University's policies and procedures. She also advised Plaintiff that:

> **At this time, I will close the matter but will maintain the record in our office**. If at any time in the future you would like to consider other ways to proceed, would like to request support services or accommodations or have any other questions, please feel free to contact me.
>
> . . . [I]f you wish to file a formal complaint, at a later time, you may certainly do so and we will proceed with the process. **It is important to consider that the longer the period of time that goes by, the information which we may be able to collect now – may be difficult to gather in the future**. This may limit the investigation or our response for example, witnesses that may be students now may graduate or leave the university. **Also, texts or messages you may have now, may not be accessible later**. This is why I encourage you to make a copy and keep any information you have now, so that if you decide to pursue a formal investigation later, you will be able to provide this to me.

(Ex. 9 at PSU 785-86 (alterations and emphasis added)).

13.    Following Plaintiff's alleged sexual assault, the University assisted Plaintiff in obtaining school accommodations including coordinating with her professors to obtain excused absences from classes. (*See, e.g., Pl. Dep*. 84:1-22;

*see also Deposition of Karen Feldbaum*, attached as <u>Ex. 4</u>, (hereinafter "*Feldbaum Dep.*") 76:9-77:9).

14.    In the meantime, the Ferguson Police continued with their investigation, which included, among other things, collecting text messages, video, and witness evidence. (*See* <u>Ex. 7</u> at PSU 2044-46).

15.    In October 2017, Plaintiff contacted the University OSMPR and <u>for the first time</u> advised that she wanted to proceed with a Title IX investigation. (*See Pl. Dep.* 56:5-58:15; <u>Ex. 7</u> at PSU 2003).

16.    The University immediately began an investigation, and on October 20, 2017, University Title IX Coordinator and Investigator Christopher Harris interviewed Plaintiff. (<u>Ex. 7</u> at PSU 2003, 2009).

17.    On October 23, 2017, Harris e-mailed Plaintiff regarding her "recent request for a formal investigation" and provided a variety of information to Plaintiff, including information on the University's Title IX procedures, Code of Conduct & Student Conduct Procedures, the University's anti-retaliation policy, and Plaintiff's right to an advisor. (<u>Ex. 10</u> at PSU 3863-64).

18.    Through its investigation, the University OSMPR interviewed at least ten (10) witnesses and gathered a variety of documents (including, but not limited to, Plaintiff's medical records, certain messages between witnesses, and the

Ferguson Police Application for Search Warrant and Affidavit of Probable Cause). (*See e,g.*, Ex. 7 at PSU 2003-05).

19.    Harris communicated with Plaintiff and provided updates to her during the investigation. (*See, e.g.*, Ex. 11).

20.    During the University's investigation, Harris asked Plaintiff if she retained any of her text messages with A.A., and Plaintiff advised that she no longer had the messages and that she had provided them to the Ferguson Police.    (Ex. 7 at PSU 2009, n.12; 2034, 2125-26).

21.    The University was not privy to the full police investigation.  Harris asked Ferguson Police for copies of the text messages; however, the police advised that they could not provide them to Harris's office.  The Ferguson Police also declined to provide certain additional information to Harris relating to the police investigation, including video evidence and information pertaining to Plaintiff's 911 call. (*See* Ex. 7 at PSU 2009, n.12, 2024, n.24, 2025, 2034, 2125-26).

22.    Ultimately, the district attorney determined that there was insufficient evidence to proceed with any criminal charges in relation to Plaintiff's alleged sexual assault. (*See Pl. Dep.* 49:9-12; 352:17-353:2).

23.    On January 5, 2018, Plaintiff posted a public tweet to her personal Twitter account including the full name of one of the individuals (A.A.) who she alleged sexually assaulted her. (Ex. 12 at PSU 24).

8

24.    On January 6, 2018, Plaintiff posted another Tweet stating, in Plaintiff's words:

> Yeah.. idk how most people don't know with the way shit spreads around PSU but I don't think the victim really told anybody.  But that nigga a rapist FR.  Just be careful and check on your friends bc he's not the only one in similar situations on campus.  It's gross..

(Ex. 12 at PSU 24).

25.    During the University's Title IX investigation, the University was initially unable to locate one of the alleged perpetrators, D.W., who was no longer enrolled in classes and had taken a leave of absence from the University.  D.W. contacted the University's OSMPR on March 14, 2018, and Harris interviewed D.W. on March 15, 2018.  (*See* Ex. 13 at PSU 2276; Ex. 7 at PSU 2034-41).

26.    On April 3, 2018, the University's OSMPR issued its updated and final Title IX Investigative Report.  (Ex. 7).

27.    On April 5, 2018, Plaintiff posted a photograph of A.A. to her Twitter with the following statement:

> His name is [A.A.] and he's one of the rapists that still walks freely on campus bc PSU keeps dragging out the investigation after a year plus!!! The other one's name is [D.W.] but I don't know what he looks like . . .

(Ex. 14 (alterations added)).

28.    Also on April 5, 2018, Plaintiff posted another Tweet stating:

> While we're on the topic, let's also talk about how Penn State
> hides and undermines just how bad rape on this campus actually
> is and how much rapists aren't condoned no matter the amount
> of evidence!! !!

(Ex. 15 at PSU 74).

29.    On May 11, 2018, the University's Office of Student Conduct ("OSC")
provided Plaintiff with access to the Title IX investigation packet starting around
8:15 a.m.  Plaintiff was given an extension to review the packet until 5:00 p.m. that
same day.  (Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response No. 1).

## C.    Title IX Hearing, Panel Decision, Appeal, and Supplemental Review

30.    On May 18, 2018, the University's Decision Panel ("DP") convened
for a hearing against A.A., one of the students accused of sexually assaulting
Plaintiff.  (Ex. 17 (Title IX Decision Panel Chair Report)).

31.    Plaintiff participated in the hearing by telephone and respondent A.A.
participated in person.[6]  (Ex. 17 at PSU 2132; *see also Pl. Dep*. 60:8-62:9).

32.    The Title IX hearing followed a hearing script.  (Ex. 17 at PSU 2132).

33.    The DP examined the entire investigative packet, along with any other
information made available to it.  (Ex. 17 at PSU 2132).

---

[6] The second accused individual, D.W., was not enrolled at the time of the hearing
and had initiated a conduct withdrawal from the University.  (*Feldbaum Dep.* 40:8-
17; *Pl. Dep*. 59:4-19).

34.    Using a preponderance of evidence standard, the DP found the respondent, A.A., not responsible for the charges of (1) Nonconsensual Intercourse and (2) Sexual Misconduct involving an Incapacitated Person.  The DP provided its decision, including its "Rationale for Findings," in its Title IX Decision Panel Chair Report dated May 18, 2018.  (Ex. 17 at PSU 2132-33).

35.    On or about May 31, 2018, Plaintiff submitted an appeal of the Title IX DP's decision.   (Ex. 18 at PSU 1999-2000; *Pl. Dep*. 61:23-62:11).

36.    Plaintiff's Title IX appeal was assigned to University appeals officer Yvonne Gaudelius—a University professor of women's gender, sexuality studies, and art education—who at the time was the Associate Vice President and Senior Associate Dean for Undergraduate Education.  (*Deposition of Yvonne Gaudelius*, attached hereto as Ex. 5, (hereinafter "*Gaudelius Dep.*") 10:6-11:7, 12:11-18, 13:16-17:10, 19:5-11).

37.    Dr. Gaudelius reviewed Plaintiff's appeal, including all of the materials considered by the DP and the audio recording from Plaintiff's hearing. (*Gaudelius Dep.* 15:5-17:10; 25:2-13, 26:7-20).

38.    On June 11, 2018, Dr. Gaudelius issued her decision denying Plaintiff's appeal.  (Ex. 19; *see also Pl. Dep.* 62:7-9; *Gaudelius Dep.* 28:16-29:20). On June 12, 2018, Karen Feldbaum, then the Interim Senior Director for the OSC,

e-mailed Plaintiff with the appeal outcome and a copy of Dr. Gaudelius's decision

letter.  (Ex. 20).

39.    On July 4, 2018, Plaintiff posted several Tweets to her Twitter account,

including the following statements:

> You right . . . bc somehow [A.A.] appealed it and they reversed
> the decision.  And NO NEW EVIDENCE was allowed to be
> presented so how did he got off on the same info they charged
> him on????  But I can't appeal back lmaoooo.  Fuck PSU on
> some real shit . . . they protect rapists period.
>
> ***
>
>  . . . I don't fucking understand how he got off and PSU gave me
> NO real reason why.
>
> ***
>
> Also, the panel members for the appeal (3 guys and 1 female, of
> course lmao) WERE LITERALLY VICTIM BLAMING. One of
> the panel members asked me if I had "ever gotten that drunk
> before" LIKE WHAT DOES THAT HAVE TO DO WITH
> ANYTHING!?  At that moment, I knew PSU set that shit up . . .

(Ex. 12 at PSU 23 (alterations added)).

40.    Although Plaintiff's Title IX appeal was denied, Plaintiff later

submitted a grievance and requested an additional review of her case.  (See Ex. 21

(Pl. Dep. Ex. 3) at PSU 17-18; see also Pl. Dep. 63:11-67:2).

41.    On May 6, 2019, Plaintiff met with Harris, at which time he informed

Plaintiff that he would review the process applied in her case.  (See Ex. 21 at PSU

17; see also Pl. Dep. 63:11-67:2).

42.    On May 31, 2019, Harris e-mailed Plaintiff attaching the results of his supplemental review of her Title IX case. (Ex. 22 at PSU 16-20). Harris advised that his review of Plaintiff's Title IX case involved:

- "A review of the investigative packet and associated documents, including the notice of investigation and information regarding your right to have an adviser assist you;
- A review of the audio from the Office of Student Conduct hearing;
- A review of your appeal letter and the appeal decision."

(Ex. 21 at PSU 17).

43.    Harris advised Plaintiff that "I believe that the Office of Student Conduct, the Title IX decision panel and the subsequent appeals process were all managed appropriately, consistent with established University policies and procedures." (Ex. 21 at PSU 17).

44.    Harris further advised Plaintiff that "[i]f you feel that your rights in this matter have been violated and that proper University procedures were improperly applied in your case, it is your right to file an external complaint with the U.S. Department of Education's Office for Civil Rights," he provided Plaintiff with contact information for the same, and he advised that "[p]lease know that we will continue to provide support to you at any time." (Ex. 21 at PSU 18).

**D.    University Student Code of Conduct**

45.    A copy of the University's "Code of Conduct & Student and Student Organization Conduct Procedures" (the "Code of Conduct" or "Code") effective

August 26, 2019 is attached as <u>Ex. 23</u> (Feldbaum Dep. Ex. 1, PSU 155-200). (*See also Pl. Dep.* 295:18-296:25; *Feldbaum Dep.* 65:16-66:5).

46.    "All students are encouraged once accepted to the university to make themselves aware of the university procedures related to the university's code of conduct." (*Feldbaum Dep.* 32:11-17).

47.    Section VI of the Code details the "Conduct Procedures" that the University follows after a report of a violation of the Code. (<u>Ex. 23</u> at PSU 173).

48.    In relevant part, the Conduct Procedures in the Code state as follows:

> **3.**    The University will typically contact students via their official University email account.  Students are expected to regularly check their University email account as well as spam folder.
>
> **4.**  The Respondent will have the opportunity to meet with a case manager during a conduct conversation.[7]
>
> **5.**    If a Respondent, with notice, does not participate in the conduct conversation, the meeting will take place in their absence, and all available information will be reviewed by the case manager.
>
> **6.**    Respondents may be accompanied by an advisor. . . .  The advisor, upon a party's request may (1) accompany the party in any meeting/proceeding, (2) advise the party in the preparation and presentation of sharing of information, and (3) advise the party in the preparation of any appeals or sanction reviews. The advisor shall not perform any function in the process other than advising the party and may not make a presentation or represent

---

[7] A "conduct conversation" is "an informal meeting intended to allow the case manager to explain the conduct process and discuss an alleged incident with the respondent to determine appropriate next steps." (<u>Id.</u> at PSU 158).

> the party. The parties must ask and respond to questions on their own behalf, without interruptions or presentations by their advisor. The advisee may consult with their advisor quietly or in writing during a session, or outside during breaks, but the advisor may not speak on behalf of the advisee or directly participate otherwise in the proceeding. . . .

(<u>Id.</u> at PSU 173-74).

49.    Additionally, following notice of the recommended charge(s) and sanction(s), the "[r]espondent may take three (3) business days to decide whether to accept the charge(s) and sanction(s), to contest the charge(s), or request a sanction review when appropriate.  Failure to respond, in writing, in the three (3) business days allotted will result in the charge(s) and sanction(s) being implemented, unless the case manager has approved an alternative timeframe.  (<u>Id.</u>  at PSU 175).

50.    If the respondent chooses to contest the charge(s), the matter will be referred to a hearing not sooner than five business days after notification of the charges. (<u>Id.</u>  at PSU 175).

51.    With regard to witnesses, the Code provides:

> All witnesses will be considered University witnesses.  Names of witnesses may be provided by the Respondent and others who may have been involved with the case.  Prior to the hearing, it is important that the case manager understand the role of each witness in the case. To assist this process, those who have not met with the investigator or case manager will be requested to provide a brief statement outlining the relevant information they will share at least two (2) business days in advance of the hearing. **Note, witness participation in this process is voluntary**.

(Ex. 23 at PSU 178 (emphasis added)).

52.    "The Respondent, hearing authority, and University Presenter will be allowed to ask questions of all witnesses who participate in the hearing." (Id. at PSU 177).

53.    The conduct hearing does not follow "[f]ormal rules of process, procedure, and/or technical rules of evidence." (Id. at PSU 178).

54.    After receipt of the evidence, the hearing authority will determine whether the Respondent is responsible for a violation of the Code using the preponderance of the evidence standard. (Id. at PSU 178).

55.    If there is a determination of responsibility, the hearing authority will determine the appropriate sanction(s). (Id. at PSU 179).

56.    A respondent may request an appeal on one or more of the following grounds:

- the Respondent has been deprived of their rights and/or stated procedures were not followed that affected the outcome;

- new evidence is presented, that was not available during the time of the original outcome, relevant to establishing whether it is more likely than not that the Respondent is responsible for the Code violation(s); and/or

- the sanction(s) imposed was (were) outside the University's sanction range for such violations and/or not justified by the nature of the violation.

(Id. at PSU 180).   "If an appeal is denied, there will be no opportunity for further review."  (Id. at PSU 182).

57.    The Code provides that "sanctions may be imposed upon any student . . . found to have violated the Code.  More than one of the sanctions listed below may be imposed for any single violation."  (Ex. 23 at PSU 191).

58.    The University's Office of Student Conduct/Office of Residence Life Sanction Guidelines ("Sanction Guidelines") in effect as of Fall 2019 provided guidance to "assist case managers and designees in determining appropriate sanctions" for various student violations.  (Ex. 24 (Sanction Guidelines) at PSU 3928).

59.    The Sanction Guidelines "include recommended sanctions for violations **assuming a student has no prior violations**."  (Id. at PSU 3928 (emphasis in original)).

60.    The Sanction Guidelines regarding the specific charges of *.01.03 Harming or Attempting to Harm Another* and *.03.03 Harassment by Communication* each individually provide for recommended sanctions of "Suspension to Expulsion, consider permanent loss of housing."  (Id. at PSU 3929, 3930, 3934).

### E. Plaintiff's Student Conduct Violations and Criminal Citations (January 2017 – August 2019)

*Altercation with Roommate S.M. (January 14, 2017)*

61.    On January 14, 2017 at 3:00 a.m., police and University Residence Life personnel received a report regarding a fight happening between Plaintiff and her then student roommate, S.M.  Plaintiff was charged with and found responsible for "Pushing and Shoving Without Injury," but the sanction was limited to a "Conduct Conversation."  (Ex. 25 at PSU 2477-78; *see also* Ex. 26 (Pl.'s Dep. Ex. 1) at PSU 656-57;[8] *Pl. Dep.* 40:18-45:19).

*Marijuana Violation (January 9, 2018)*

62.    On January 9, 2018, University Residence Life staff received a report regarding suspected marijuana use in Plaintiff's apartment, and marijuana was found in Plaintiff's room.  Plaintiff was found responsible for a violation of the Code of Conduct for Use and/or Possession of Marijuana.  Plaintiff's sanctions included Conduct Probation and Housing Review through May 6, 2018 and

---

[8] Exhibit 26 was Exhibit "D-1" at Plaintiff's deposition.  The University produced the document designated as Exhibit "D-1" with partial redactions pursuant to FERPA.  After Plaintiff's deposition, Plaintiff served a subpoena on the University for certain records in this lawsuit.  Consistent with FERPA, the University produced unredacted records in response to Plaintiff's subpoena after making reasonable efforts to notify the eligible students or their parents. *See* 34 C.F.R. § 99.31(a)(9)(i) and (ii).  Exhibit 25 is the version of Exhibit 26 that was produced without FERPA redactions.  Certain other exhibits attached to Defendants' Motion for Summary Judgment similarly reflect a redacted deposition exhibit in addition to an unredacted version produced after Plaintiff issued her subpoena.

completion of the University's Marijuana Intervention Program ("MIP").  (Ex. 27 at PSU 2481-85, 2487, 2497-2498).

### Harassment (April 5, 2018)

63.    On April 5, 2018, University police responded to a report of harassment involving Plaintiff and student T.S. "posting derogatory messages about each other on social media" and sending "each other numerous text messages indicating they want to fight each other."  An Administrative Directive[9] was issued to Plaintiff instructing her to have no contact with T.S. and another University student, P.M.  (Ex. 28 at PSU 2500-01; 2507, 2512-14).

### Violation of Administrative Directive (April 8, 2018)

64.    On April 10, 2018, student T.S. reported that Plaintiff violated the previously issued Administrative Directive by posting about T.S. on Twitter. Following a Conduct Conference, the University opted not to charge Plaintiff but reminded her that the Administrative Directive was in effect indefinitely and she was not to contact T.S., including through social media.  (Ex. 29 at PSU 2515-21).

### Disorderly Conduct (July 26, 2018)

---

[9] An "administrative directive" is "a mandate that a student . . . have no contact with another person(s) or that restricts a student's . . . access from a specific location, activity, or program.  Administrative directives are utilized in situations where there is concern that ongoing contact between individuals that may result in physical harm or significant emotional distress."  (Ex. 23 at PSU 157 (alterations added)).

65.    On July 26, 2018, Plaintiff was cited by the Hanover Township Police Department for disorderly conduct pursuant to 18 Pa. C.S.A. § 5503(a)(4), to which she later pled guilty on September 10, 2018 in the Magisterial District Court of Washington County, Docket No. MJ-27307-NT-0000809-2018.[10]  (Ex. 30 at PSU 1860, 1864-67; Ex. 31 at PSU 4147-48).

*Administrative Directive for No Contact (October 29, 2018)*

66.    On October 29, 2018, the University issued an Administrative Directive to Plaintiff instructing her to stop contacting University student C.K.  (Ex. 32 at PSU 2522-24).

*Administrative Directive for No Contact (November 3, 2018)*

67.    On or about November 3, 2018, the University issued an Administrative Directive to Plaintiff instructing her to stop contacting another University student, D.P.  (Ex. 33 at PSU 2525-27).

*Marijuana Violation (November 4, 2018)*

68.    On November 4, 2018, University Police found marijuana and paraphernalia in Plaintiff's dorm room.  Plaintiff was charged with violations of the

---

[10] During her deposition, Plaintiff denied the existence of this incident and her related guilty plea. (*See Pl. Dep.* 27:4-28:23; 271:5-272:23).  The Court may take judicial notice of Plaintiff's criminal records and public dockets and the fact that Plaintiff pled guilty to disorderly conduct.  *See United States v. Graves*, 849 F. App'x 349, 354, n.4 (3d Cir. 2021); *Mosby v. O'Brie*, 532 F. App'x 84, 85–86 (3d Cir. 2013); *Hollinger v. Reading Health Sys.*, No. CV 15-5249, 2017 WL 429804, at *6, n.6 (E.D. Pa. Jan. 31, 2017).

Code of Conduct for "Use and/or Possession of Marijuana and "Possession of Drug Paraphernalia" with  sanctions including drug counseling, housing review through May 11, 2020, and conduct probation through December 16, 2019.  (Ex. 34 at PSU 2530-33, 2536, 2538, 2546).

*Computer Lab Disruption (March 18, 2019)*

69.    On March 18, 2019, Plaintiff was involved in an incident at the University's Pollock Testing Center computer lab.  Computer lab staff submitted an incident report stating that Plaintiff became "loud and disruptive" with a staff member.  Plaintiff failed to attend three scheduled Conduct Conferences regarding that incident, but ultimately no formal action was taken.  (Ex. 35 at PSU 1559-66).

*Harassment (May 1, 2019)*

70.    On May 1, 2019, the University received an incident report from a student, C.A., reporting that "I have been harassed over 9 months by Kayla," including harassment via social media where Plaintiff "comment[ed] on my photos telling me she hope my mother dies and I'm a stupid fat cunt alone [sic] with various other comments . . . ."  C.A. reported that, among other things, Plaintiff "continues to text me every month or so and threatens to have me assaulted by her family and friends."  C.A. reported that she filed two police reports against Plaintiff.  (Ex. 36 at PSU 2547).  C.A. attached dozens of pages of screenshots of purported social

media and text messages from and to Plaintiff and individuals on Plaintiff's behalf regarding the harassment.  (*See* Ex. 36 at PSU 2549-78, 2582-2612, 2621-29).

71.    The University issued an Administrative Directive to Plaintiff instructing her to have no contact with C.A.  (Ex. 36 at PSU 2581).

*Harassment (May 14, 2019)*

72.    On May 14, 2019, another student, S.T., submitted an incident report against Plaintiff connected to the harassment involving student C.A.  (Ex. 37 at PSU 2650-60).  Specifically, S.T. reported that "Kayla Williams has been constantly writing me and others about [C.A.] and I."  (Ex. 37 at PSU 2650-51).

73.    S.T. attached to her incident report screenshots of purported messages from Plaintiff, including messages stating the following:



***

22



(Ex. 37 at PSU 2652-60).

74.    Plaintiff was charged with a violation of the Code of Conduct for

"Harassment by Communication" and sanctions including completion of

counseling through the University's Counseling and Psychological Services ("CAPS"), an Administrative Directive[11] requiring no contact by Plaintiff with students C.A. or S.T., and conduct probation through May 11, 2020.  (Ex. 36 at PSU 2616-18, 2630, 2632; Ex. 37 at PSU 2661).

### Alcohol Violation (May 5, 2019)

75.    On May 5, 2019, Plaintiff was involved in an alcohol violation for "Possession of Alcohol in a Prohibited Residence Hall/Building" where alcohol was found in her room.  Plaintiff's sanction was limited to a "Conduct Conversation." (Ex. 39 at PSU 2638-39, 2641-49).

### Drug Violation Involving Acid (May 29, 2019)

76.    On May 29, 2019, Plaintiff received a police citation for "public drunkenness."  (Ex. 40 at PSU 1570).   Plaintiff took acid and then had a bad trip during which she dialed 911 and advised the police that she was tripping.  Police responded to the scene, and the associated police citation notes that "[Plaintiff] admitted to taking acid, and was screaming in the middle of the road" and that Plaintiff "attempted to remove own clothing."  Plaintiff was "transported to [Mount Nittany Medical Center] by EMS" for treatment regarding her acid trip.  (Ex. 40 at PSU 1567-72, 1575-76).   The University determined that sufficient information

---

[11] On September 16, 2019, students S.T., C.A. and Plaintiff each contacted the OSC to allege violations of the Administrative Directives.  (Ex. 38 at PSU 2876-80).

existed to support a Code of Conduct violation, but only required Plaintiff to complete an educational sanction involving drug counseling.  (Ex. 40 at PSU 1573-76).

### Report of Alleged Harassment (July 26, 2019)

77.    On July 26, 2019, student C.A. submitted a report to the University alleging that Plaintiff "made a fake Pornhub account using my credentials encouraging people to send me unsolicited photos and messages.  Posted my Instagram name and my old phone number all over the website."  (Ex. 41 at PSU 2662-68).

### Disorderly Conduct (August 2, 2019)

78.    On August 2, 2019, the Moon Township Police Department cited Plaintiff regarding an incident at a Days Inn Hotel.  (Ex. 42 at PSU 1870-74; Ex. 43 at PSU 4155-57).

79.    Specifically, the police report states that officers were dispatched to the hotel after receiving a call from the hotel about a guest (Plaintiff) who was refusing to leave the property.  The police report notes that, as the officers escorted Plaintiff out of the hotel past the front desk, Plaintiff stated to the hotel employees: "fuck ya'll Indian asses.  I am suing you and the police.  Best believe I am getting a lawyer because this is about race!"  (Ex. 43 at PSU 4157-60).

80.    On March 16, 2020, Plaintiff entered a guilty plea to the crime of Disorderly Conduct pursuant to 18 Pa. C.S.A. § 5503(a)(4) in the Court of Common Pleas of Allegheny County, Docket No. CP-02-CR-0014059-2019 in relation to the August 2, 2019 incident, and the court placed Plaintiff on probation for 90 days. (Ex. 42 at PSU 1871, 1873; *see also* Ex. 44 at PSU 3971 (Order of Sentence)).

## F.    **Material Events in Fall 2019 through Spring 2020**[12]

### 1.    ***Plaintiff's English 202A Course with Dr. Prawdzik***

81.    In Fall 2019, Plaintiff enrolled in an English 202A advanced writing course taught by Professor Brendan Prawdzik, which took place on Mondays, Wednesdays, and Fridays.  (*Prawdzik Dep.* 36:17-25; 41:22-42:4; 72:23-73:7; Ex. 45 (Prawdzik Dep. Ex. 3) at PSU 201; *Pl. Dep.* 75:3-5).

82.    Dr. Prawdzik's course syllabus explained the point value assigned to various class requirements, with the total points adding up to 100.  A student's "Research Proposal" was worth up to 10 points of the total grade.  (*See* Ex. 45 at PSU 203; *Prawdzik Dep.* 150:23-151:16, 154:1-4).

---

[12] Plaintiff's claims relate to numerous alleged incidents involving various individuals, including professors and administrators, multiple roommates, and a Lyft/Uber driver.  The distinct events in this section of Defendant's Statement of Facts overlap from roughly August 2019 through March 2020.  For the convenience of the Court, Defendants have separated the following facts by Plaintiff's claims. As a result, the following subsections are not in strict chronological order.

83.     The Attendance Policy for Dr. Prawdzik's class stated that "a student whose absences are excessive 'may run the risk of receiving a lower grade or a failing grade,' regardless of his or her performance in the class."   Additionally, "[o]nly absences required according to legitimate documentation will be considered excused.   These must be provided in paper format."   The attendance policy further provided that "**Absences beyond three unexcused absences allotted will reduce the final letter grade.   <u>A pattern of irresponsible attendance is cause for failure for the course</u>, at the Professor's discretion and best judgment**."   (<u>Ex. 45</u> at PSU 204 (emphasis in original)).

84.     For an absence to be "excused" based on a disability, the student must contact the appropriate disability services office and provide appropriate documentation to his or her professor.   (<u>Ex. 45</u> at PSU 206; *see also Prawdzik Dep.* 53:7-23, 134:10-21).

85.     Dr. Prawdzik used the University's "Canvas" system for his course, which is a web-based learning management system, for quizzes, communications, announcements, and course information.   (*See* <u>Ex. 46</u> (Defs.' Ans. to Pl.'s Interrogs.) at Ans. No. 5; *see also Prawdzik Dep.* 61:8-17).

86.     Dr. Prawdzik took attendance each class through Canvas and maintained a document containing attendance records.   (*Prawdzik Dep.* 75:6-76:14).

87.    On September 3, 2019, after missing the first two classes on August 28 and August 30, 2019, Plaintiff e-mailed Dr. Prawdzik through Canvas and stated:

> I was added to the class halfway through the first week and was dealing with big roommate drama.  Long story short, my roommate is a literal witch!!  And tried to put hexes on me and spells to harm/kill me I'm not joking and I caught her with video and picture proof. . . .  I said that because in the midst of being added halfway through the week, not having a working laptop until yesterday evening, and dealing with a roommate that was literally trying to kill me, I had a rough first week.
>
> Is there anyway you can PLEASE let me makeup the forum discussion from the first week? . . .

(Ex. 47 at PSU 669; *see also* Ex. 48 (Pl.'s Dep. Exhibit 5) at PSU 25; *Pl.'s Dep.* 89:15-93:4; *Prawdzik Dep.* 47:6-48:22).

88.    On or about September 9, 2019, Plaintiff met with Dr. Prawdzik regarding her choice of research topic for her required research paper.  (*Prawdzik Dep.* 43:2-25, 77:24- 80:11; Ex. 47 at PSU 673).

89.    During that conversation, Dr. Prawdzik discussed racism as a research paper topic with Plaintiff.  (*Prawdzik Dep.* 43:2-25).

90.    Dr. Prawdzik researched and printed out documents for Plaintiff to help Plaintiff organize her literature review and assist with her research paper proposal relating to race.  (*Prawdzik Dep.* 43:2-25, 45:22-47:1).

91.    On September 9, 2019, Plaintiff e-mailed Dr. Prawdzik stating "**I also just wanted to say thank you for helping me figure out a set research question!**

I was going between the 2 topics all weekend and was driving myself crazy about it trying to figure out a good research question that would work for this specific project, so thank you so much." (Ex. 47 at PSU 673 (emphasis added); Ex. 48 at PSU 29).

92.    Dr. Prawdzik responded to Plaintiff's September 9, 2019 e-mail stating "I'm glad that you feel good about your research topic!  It's clearly one that will sustain your interest and produce meaningful insight." [Ex. 47 at PSU 673; *see also* Ex. 48 at PSU 29).

93.    On October 2, 2019, Plaintiff e-mailed Dr. Prawdzik and stated:

> **Sorry I was not in class twice this week**.  This is not by choice, I've been dealing with a lot outside of class since the first day of the semester and it all became too much mentally.  I had to sacrifice going to class to relax in order to be able to do the hours of work required each day. . . .

(Ex. 47 at PSU 686-87 (emphasis added); *see also* Ex. 48 at PSU 42-43).

94.    On October 4, 2019, Plaintiff e-mailed Dr. Prawdzik and wrote: "**Sorry that I will not be in class again today**.  I have one paragraph to go on my lit review anyway and am getting that finished up right now.  I just have been dealing with a lot and multiple stressors stacked up made it difficult to continue going to class.  I will get documentation for attendance up to this point but you will for sure see me in every class starting Monday." (Ex. 47 at PSU 688-89 (emphasis added); Ex. 48 at PSU 44-45).

95.    On October 4, 2019, Dr. Prawdzik e-mailed Plaintiff and asked "Did I receive disability documentation from you?  If not, I need to see the statement of reasonable accommodation and to possess a copy so that I can excuse absences that fall within the criterion of reasonable accommodation."  (Ex. 47 at PSU 688).

96.    Throughout the Fall 2019 semester, Plaintiff was behind on work in Dr. Prawdzik's English class, and Dr. Prawdzik exchanged multiple e-mails with Plaintiff through Canvas attempting to help her with her assignments, assisted her with her research, attempted to ensure that she provided documentation to support her absences, and accepted late assignments from Plaintiff without deducting points.  (See e.g., Ex. 47 at PSU 669-71, 673-89; Ex. 48 at PSU 25-27, 29-45; Pl. Dep. 106:19-108:11).

97.    As of October 14, 2019, Plaintiff had been marked absent from Dr. Prawdzik's class **eight (8)** times, including on August 28, 2019, August 30, 2019, September 20, 2019, September 23, 2019, September 30, 2019, October 4, 2019, October 9, 2019, and October 11, 2019.  (Ex. 46 (Defs.' Ans. to Pl.'s Interrogs.) at Ans. No. 23).

98.    On October 14, 2019, Plaintiff attended Dr. Prawdzik's class and arrived late.  Dr. Prawdzik went around the room to "check up on every student . . . to make sure that they're in tune with what's going on, that they're okay . . . or that they have questions, if they need help."  (Prawdzik Dep. 98:8-23).

30

99.    When Dr. Prawdzik reached Plaintiff during his classroom check-ins, he asked her if she had begun working on her course "instrument."[13] Dr. Prawdzik testified that it was clear to Dr. Prawdzik that she did not know what he was talking about. (*Prawdzik Dep*. 99:8-15).

100.    Dr. Prawdzik then reminded Plaintiff that he still needed documentation for her absences. (*Prawdzik Dep.* 99:16-21).

101.    Dr. Prawdzik testified that he could tell that "[i]mmediately, students were uncomfortable" and the situation was awkward, so he asked Plaintiff if she would like "to talk about this now or later," and Plaintiff "said now." (*Prawdzik Dep.* 99:23-100:4).  Dr. Prawdzik then walked to the door, and Plaintiff followed him a few seconds later. (*Prawdzik Dep.* 100:4-6).

102.    While in the hallway, Plaintiff accused Dr. Prawdzik of discriminating against her based on disability and "being a racist." (*Prawdzik Dep*. 100:6-12; 113:15-114:20).

103.    Dr. Prawdzik told Plaintiff that "she had to leave," but when Dr. Prawdzik walked back into the classroom, Plaintiff came inside the classroom and

---

[13] The "instrument" for empirical data collection was a requirement for the peer review assignment in Dr. Prawdzik's class.   Dr. Prawdzik testified that the "instruments take a long time" and are a "critical component of that process." (*Prawdzik Dep*. 98:8-14).

began "demanding that students give her their contact information" and exclaiming "don't you see what he did?" (*Prawdzik Dep.* 100:22-101:2).

104.    Dr. Prawdzik again told Plaintiff to leave, and she "refused to leave." At that point, Dr. Prawdzik told Plaintiff that he was going to call security if she did not leave.  Plaintiff still did not leave, so Dr. Prawdzik called security. (*Prawdzik Dep*. 101:6-10).

105.    Once Dr. Prawdzik called security, Plaintiff left the classroom, after which University Police arrived and spoke with Dr. Prawdzik.  (*Prawdzik Dep.* 101:8-102:6).

106.    The University Police issued a report regarding the incident.  (Ex. 49 at PSU 627-28; Ex. 50 at PSU 618).

107.    Also on October 14, 2019, Plaintiff filed a discrimination complaint against Dr. Prawdzik with the University Affirmative Action Office ("AAO").[14] (Ex. 51; Ex. 52; *see also Pl. Dep*. 117:19-121:23).

108.    Also on October 14, 2019, Dr. Prawdzik e-mailed Gregg Rogers, who ran the University's Program in Writing and Rhetoric, and advised that:

> I am having difficulty with a student in my MWF 1:25 – 2:15
> ENG 202A class.  The student, Kayla Williams, has shown anger
> in class and in person.  She has also been antagonist in a forum

---

[14] Plaintiff filed an initial complaint followed by a supplemental complaint the same day.  (*See* Ex. 51 (Pl.'s Dep. Ex. 8); Ex. 52 (Pl.'s Dep. Ex. D9); *Pl. Dep.* 144:4-145:12).

post, in which she labelled a student's comments racist. She has
missed 8 classes and has been far behind in work. Since Kayla
claims disability, I quietly asked (and have asked many [times])
her to send documents to account for absence. (All of my
students are expected to provide documentation to excuse
absences, and I considered myself to be doing Kayla a courtesy.
I had asked for documentation twice but have not received it.)
She snapped at me then, claiming that I was "airing out [her]
business in front of class," which is manifestly untrue. When I
asked her to talk with me in the hallway, she came out shouting
at me and accusing me of both discrimination and racism. Since
she was being hostile toward me and distracting class with loud
shouting, I asked her to leave. She entered the class shouting
accusations about me and refused to leave. One student told her
that she made her uncomfortable. I called security to escort her
out of the class, but she departed before their arrival.

(Ex. 48 at PSU 45 (alterations added); *see also Prawdzik Dep*. 102:7-19).

109.  Dr. Prawdzik testified that, at that point, Plaintiff "had done a very

small amount" of the required course work and "did not have a passing grade

because . . . there was [a] massive amount of work missing and continuing to

accumulate absences." (*Prawdzik Dep.* 104:18-24).

110.  On October 15, 2019, Dr. Prawdzik e-mailed Plaintiff and provided

conditions for Plaintiff's return to class. Specifically, Dr. Prawdzik advised that

Plaintiff could return to class if there were no further disruptions, and she needed to

"maintain a professional relationship with the professor and other students in the

class." He further stated:

At every stage of the semester, I have tried to help you with your
research project and, more importantly, to avoid the consequences

of absenteeism on classwork and the final grade. My requests for documentation were a courtesy.

I have since found that you are not registered with the Office of Student Disability. Therefore, none of the eight recorded absences is excused. Your absenteeism this semester has affected your viability in this class. Please review the attendance policy. The attendance is "irresponsible" because a) you did not communicate with me; b) you did not seek ways to catch up with missed work; and c) you have not followed through with your promises not to miss further classes.

Absenteeism has also led you to be out of touch with what is going on in class. For instance, you have not started to work on your instrument and did not know what was going on in class yesterday. The rest of the class has been working on the instrument for two weeks and is ready to start data collection.

If these terms are agreeable, please indicate this to me in writing. If these terms are not agreeable, I will refer you to Cheryl Glenn and Gregg Rogers, who run the Program in Writing and Rhetoric at Penn State and whom I have CC'd here.

(Ex. 53 at PSU 336-37; *Prawdzik Dep.* 102:9-103:23; *Pl. Dep*. 129:3-132:11).

111.    Plaintiff responded to Dr. Prawdzik's e-mail: "I have already filed a discrimination report against you and talked to the Vice Provost of education equity so we will be dealing with it that way. . . .  See ya at the Education Equity office!" (Ex. 53 at PSU 336).

112.    Plaintiff sent additional e-mails to Dr. Prawdzik on October 15, 21, and 22, 2019. (*See Prawdzik Dep.* 66:17-67:2; Ex. 54 at PSU 338; Ex. 48 at PSU 48, 49, 50-52).

113. Plaintiff did not attend any of Dr. Prawdzik's classes after October 14, 2019. She was absent from classes on October 21, 2019, October 28, 2019, November 8, 2019 and beyond.[15] (*See* Ex. 46 at Ans. No. 23; *Prawdzik Dep*. 104:13-24; *Pl. Dep.* 133:13-135:1; 138:1-143:19).

114. Dr. Prawdzik testified that Plaintiff was absent eleven (11) times as of October 21, 2019 (which included the eight (8) absences as of October 14, 2019). (*See Prawdzik Dep.* 123:13-18; *see also* Ex. 55 (Prawdzik Dep. Ex. 1) at PSU 83; Ex. 56 at PSU 1256).

115. At the very minimum, Plaintiff conceded in writing that she was absent from Dr. Prawdzik's class at least five (5) times as of October 14, 2019. (Ex. 57 (Pl. Dep. Ex. 12) at PSU 555 (alleging that she "missed 5 classes"); *see also* Ex. 54 at PSU 338 (saying she was absent "[m]aybe 3-5" times); Ex. 55 at PSU 81 (saying she missed "3-5 classes"); Ex. 47 at PSU 669, 686-89).

116. None of Plaintiff's absences from Dr. Prawdzik's class qualified as "excused" because Plaintiff never registered any disability with the University's Disability Services Office and she never provided required paperwork supporting the same to Dr. Prawdzik. (*Prawdzik Dep.* 52:10-54:2, 95:14-21, 132:24-134:21, 137:10-24; *see also Pl. Dep*. 78:3-80:19; Ex. 48 at PSU 47).

---

[15] Dr. Prawdzik testified that he "stopped counting at 11" absences, but her full number of absences would involve "count[ing] back to the end of the semester." (*Prawdzik Dep*. 104:18-23 (alterations added)).

117.  Plaintiff only completed one assignment for Dr. Prawdzik's English 202A course—a Research Proposal that was worth up to 10% of the final grade, and a handful of forum posts.  (*See* Ex. 58 (Plaintiff's English grades); Ex. 45 at PSU 203-04*; see also* Ex. 55 at PSU 82-83).

118.  Suzanne Adair, Associate Vice President for Affirmative Action, conducted an investigation into Plaintiff's bias complaint, including interviewing Plaintiff, Dr. Prawdzik, and two other students in Dr. Prawdzik's class.  (*See Pl. Dep.* 156:8-156:24; Ex. 59 (notes of interview with Plaintiff); Ex. 60; Ex. 61 (Prawdzik Dep. Ex. 2) (notes of interview with Prawdzik); Ex. 62 (notes of interviews with two classmates); *see also Prawdzik Dep.* 145:9-146:14).

119.  On December 1, 2019, Dr. Adair completed her investigation of Plaintiff's complaint against Dr. Prawdzik and notified Plaintiff by e-mail that "[a]fter speaking with you and Dr. Prawdzik, along with several other students in the course, I have determined that there is no evidence to substantiate your allegation that Dr. Prawdzik discriminated against you based on race or ethnicity." Dr. Adair advised that "[a]t this point, the investigation into your Bias complaint is officially closed and you should follow any instructions provided by the instructor regarding your involvement in the course going forward."  (Ex. 63  (Pl. Dep. Ex. 10); *Pl. Dep*. 156:15-157:8).

120.    On December 18, 2019, Tauheedah Alexander, Plaintiff's advisor and case manager in Student Care and Advocacy, e-mailed Dr. Prawdzik to request clarification on the steps Plaintiff would need to take to complete the English 202A class.  Plaintiff was copied on this email.  (Ex. 55 at PSU 84-85); *Prawdzik Dep.* 76:20-77:10; 119:16-121:11).

121.    On December 19, 2019, Dr. Prawdzik replied to Alexander's e-mail (copying both Plaintiff and Rogers, the supervisor of grade appeals for the Writing and Rhetoric Program) and explained that Plaintiff had "completed only one assignment for the class:  a Research Proposal worth 10% of the final grade."  (Ex. 55 at PSU 82-84; *Prawdzik Dep*. 119:16-125:15).

122.    Dr. Prawdzik further explained that Plaintiff had not completed "the vast majority of a demanding semester's work," including the following major assignments which amounted to "70% of the total grade:"  (1) Literature Review; (2) Findings Presentation; (3) Findings Report; or (4) Final Research Paper.  (Ex. 55 at PSU 82-84; *see also* Ex. 58; Ex. 45 at PSU 203-204; *Prawdzik Dep.* 109:3-20).

123.    In his December 19, 2019 e-mail, Dr. Prawdzik also stated that Plaintiff had by that point "missed eleven classes as of 10-21-2019" which "warrants a failing grade."  He advised that "[g]iven the fact that she was far behind the class and did not seem to know what we were doing as of 10-14-2019, when she

disrupted class and when I needed to call security to ensure that she left, it is my conclusion that she has already earned an F for the course." (Ex. 55 at PSU 83).

124.    Dr. Prawdzik also advised that he could not assess Plaintiff's work at that point "for fear that I will be treated maliciously and subject to further false accusations.  As such, were she to complete the course, the English Department would need to pay someone to assess the work.  That matter would need to be taken up with the English Department."  Dr. Prawdzik explained that Plaintiff had "too much damaged the trust between professor and student" to make it possible for him to grade any work from Plaintiff at that point.  (Ex. 55 at PSU 83).

125.    Finally, Dr. Prawdzik advised in his December 19, 2019 e-mail that "[m]y stance is that Kayla Williams has received an F for the course and that this grade is final.  I am willing to change my stance if I receive instructions to do so from an administrator with the authority to give them." (Ex. 55 at PSU 83).

126.    Dr. Prawdzik testified that, if another professor graded Plaintiff's work, he would "accept the grade and put it down."  However, he felt that, if he agreed to grade any of her work, he would be "compromising myself and any grade that the student received that was lower that what she believed she should have gotten" would have led to retaliation against him from Plaintiff.  (*See Prawdzik Dep*. 114:21-115:25).

127.   When asked during his deposition:  "[i]f Kayla did not report you to the Affirmative Action Office, might you have given her the chance to make up her work that you say she missed?", Dr. Prawdzik explained that Plaintiff had not achieved a passing grade for a variety of reasons and yet Plaintiff was still "given ways of completing the course," but she refused to do it.  (*Prawdzik Dep*. 116:16-117:14;  125:25-126:4;  128:23-129:9;  *see also  Prawdzik  Dep*.  138:7-139:22 (explaining that the basis of his fears of aggressiveness and harassment by Plaintiff were not based on the fact that she reported him, but rather her aggressive behavior in class and continued harassment of Dr. Prawdzik)).

128.   Dr. Prawdzik testified that his position that Plaintiff had received an "F" in his course had "absolutely nothing to do with whatever is going on with the Affirmative Action Office."  (*Prawdzik Dep.* 117:21-118:2).

129.   Dr. Prawdzik testified that he came "to the conclusion that [Plaintiff] ha[d] already earned an F for the course" around the time he received Alexander's e-mail in December, which was around the time he was submitting final grades. (*Prawdzik Dep.* 124:4-125:15).

130.   In response to Dr. Prawdzik's e-mail to Alexander, Plaintiff e-mailed Dr. Prawdzik and Alexander stating:  "This is not how this is about to go.  YOU caused that class disruption Dr. Prawdzik.  You will come up with a way that I can

complete this class and I will be in contact with others." (<u>Ex. 55</u> at PSU 82; *see also Prawdzik Dep.* 110:4-10).

131.  Plaintiff then e-mailed Dr. Prawdzik and Alexander asserting that "Dr. Prawdzik you lied in saying I missed 11 classes because in an email shortly after this occurred, you tried to lie and say I had missed 8 classes up to that point… and I have documentation of that email. Others will be in contact." (<u>Ex. 55</u> at PSU 82).

132.  In response to Plaintiff's e-mails on December 19, 2019, Dr. Prawdzik replied to Alexander and Plaintiff asking Alexander to "[p]lease do what you can to keep this student from harassing me. My next step is to contact Student Conduct." (<u>Ex. 55</u> at PSU 82; *see also Prawdzik Dep.* 110:11-111:6).

133.  Alexander responded and advised Plaintiff to share any further comments or concerns she may have with Alexander separately. Despite Alexander's instruction, Plaintiff again responded to both Alexander and Dr. Prawdzik stating "There is no reason I shouldn't be able to make up that course. His allegations that I missed 11 classes is false first off, because I have an email after the situation occurred where he tried to say I missed 8 classes (so which one is it?) when I had only missed 3-5 classes." (<u>Ex. 55</u> at PSU 81).

134.  On December 19, 2019, Dr. Adair confirmed with the English Department Head that "Kayla hasn't completed 70% of the work for the ENG 202 course, and that the data collection and other assignments would be very hard to

make up to complete the course now, even with a deferred grade.  Given that, we need to go with one of our other options – either petition for her to retro drop the course and retake it in the spring online (or find another course to substitute) or hope that this isn't actually a requirement so that she doesn't have to retake the course at all." (Ex. 64 at PSU 140).

135.   University personnel, including Dr. Adair, Alexander, Anna Barone, Alina Wong, and Danny Shaha (Assistant Vice President of Student Affairs) continued to work to find ways to accommodate Plaintiff, including looking for potential alternate courses she might take to replace the English 202A course. (*See, e.g.*, Ex. 65 at PSU 86; Ex. 66 at PSU 96; *see also* Ex. 67 at PSU 118-23).

136.   Plaintiff's final grade for Dr. Prawdzik's English 202A course was an "F." (Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response No. 6).

137.   On January 17, 2020, Dr. Adair e-mailed Dennis Shea, copying Joyce Hopson-King, and advised that:

> . . . I spoke with the Dept Head over in English, asking him to look into whether there was any way that Kayla might be eligible for a DF grade to give her time to complete the course.  His point was that there was so much work that she had missed, giving her a DF was not an option.  She had already missed a good many days and some assignments prior to her even filing the complaint that I investigated regarding the incident she had with the instructor. . .

(Ex. 67 at PSU 118).

138.   On January 21, 2020, Dr. Adair e-mailed Plaintiff and advised that any further concerns Plaintiff had about an alternative to re-taking her English 202A course needed "to be addressed with the appropriate academic unit (either English or BBH)."  (Ex. 68 at PSU 571-72).  Dr. Adair also advised Plaintiff that:

> I spoke with the English Department head at the end of the fall semester to determine whether there was any possibility for you to be issued a deferred grade and make up the work for the course and was informed that due to the amount of work you missed, receiving a DF was not possible.  I passed that information on to the Student Care and Advocacy staff and it was communicated to you in the January 17th email from Tauheedah Alexander.

(Ex. 68 at PSU 572-73; *see also* Ex. 67 at PSU 118-21).

## 2.   *Plaintiff's Psychology 425 Course with Dr. Yarwood*

139.   In January 2020, Plaintiff enrolled in Professor Michelle Yarwood's Psychology 425 course on "Human Emotion," which met on Tuesdays/Thursdays from 3:05 to 4:20 p.m.  (*See Pls. Dep.* 325:17-326:22; Ex. 69 (Plaintiff's Psych 425 Grades)).

140.   Dr. Yarwood's Syllabus for her Psych 425 course is found at Ex. 70.

141.   Similar to Dr. Prawdzik's course, Dr. Yarwood's class also utilized Canvas.  (*See* Ex. 70 at PSU 284; *see also* Ex. 46 at Response No. 5).  Canvas offers a quiz tool to create and administer online quizzes. The quiz tool automatically grades quiz submissions.  Dr. Yarwood and her teaching assistant, Elise Haynes, created a database of questions for each quiz.  The question format was multiple

choice questions. Each database contained the questions from which each quiz randomly selected ten multiple choice questions. Thus, each student may not have received the same ten questions on each quiz. The answer options for each question were also shuffled, so that students who did receive the same question may not have received the answer options in the same order. Dr. Yarwood and/or Haynes identified the correct answer choices for the questions when the questions were entered into the question bank. The Canvas quiz tool automatically graded each student's quizzes by comparing the students' responses and the multiple choice response selected as the correct answer when the question was added to the quiz bank. (Ex. 46 at Response No. 5).

142. Additionally, Dr. Yarwood utilized software called "Packback" through which students completed certain assignments. (*See* Ex. 70 at PSU 284-86). Dr. Yarwood's Syllabus notes that students "cannot submit Packback assignments late." (Ex. 70 at PSU 286). The Packback software itself will not permit a student to submit late assignments and receive credit for the assignment. [*See* Ex. 71 at PSU 1384; Ex. 72 at PSU 1381).

143. Plaintiff's Packback #1 Assignment for Dr. Yarwood's class was due by 8:00 a.m. on January 21, 2020. Plaintiff did not complete that assignment by the deadline. (Ex. 69 at PSU 241; Ex. 73 at PSU 1408). Although students cannot

submit Packback assignments late, (Ex. 70 at PSU 286), Dr. Yarwood permitted Plaintiff to make up that assignment by February 7, 2020. (Ex. 74; Ex. 75).

144.   The deadline for Plaintiff to take Quiz 1 in Dr. Yarwood's Psych 425 class was also January 21, 2020. Plaintiff did not complete her Quiz on time, but Dr. Yarwood allowed Plaintiff to make up the quiz **on January 29, 2020**. (Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response No. 7; *see also* Ex. 76 at PSU 446; Ex. 77 at PSU 1172).

145.   Plaintiff alleged in an e-mail to Dr. Yarwood that she was in class on January 21, 2020.[16] Specifically, Plaintiff e-mailed Dr. Yarwood through Canvas on Thursday, January 23, 2020 and stated "I don't know if you noticed, but I was the sick girl in the back of your classroom on Tuesday [January 21, 2020]." Plaintiff further stated that she "originally thought that the quiz was due tonight along with the survey and not last night. I understand though if late points still have to be deducted.. but I will most certainly be bringing you a doctors note." (Ex. 78 (Pl.'s Dep. Ex. D25); *Pl.'s Dep.* 241:10-15, 242:14-246:15, 326:16-18).

146.   On January 28, 2020, Plaintiff's Packback assignment number 2 was due in Dr. Yarwood's Psych 425 class. Plaintiff admits that she never completed

---

[16] The evidence in this case indicates that Plaintiff likely falsely stated to Dr. Yarwood that Plaintiff was in class on January 21, 2020. Dr. Yarwood informed Plaintiff that Plaintiff was absent from class on January 21, 2020. (*See* Ex. 74; Ex. 75). Moreover, Plaintiff testified that she does not think she was in class on January 21, 2020. (*Pl.'s Dep.* 241:12-242:11).

that assignment.  (Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response No. 8; *see also* Ex. 69 at PSU 242).

147.   After the Quiz 1 deadline passed (but *before* Plaintiff took Quiz 1 on January 29, 2020 with the extension she received) it was discovered that there was an error in the question and answer coding for Quiz 1 on Canvas.  (*See* Ex. 79 (PSU 1171); Ex. 80 (PSU 1169)).

148.   As a result of that coding error, students who answered the question correctly had their answer mistakenly marked incorrect, and certain students who answered the question incorrectly had their answer mistakenly marked correct.  (*See* Ex. 79; Ex. 80).

149.   On January 29, 2020 **at 1:07 p.m.**, Haynes confirmed to Dr. Yarwood by e-mail that she had corrected the incorrectly coded question from the January 21, 2020 Quiz 1.  (Ex. 79; Ex. 80).

150.   On January 29, 2020 at 3:04 p.m., Dr. Yarwood asked Haynes, "[d]id you give credit back to the students who got that question on quiz 1 right?  We might also want to give an announcement about this error on the quiz to correct knowledge before exam 1."  (Ex. 80).

151.   Later that evening at **6:43 p.m.** on January 29, 2020 (*after* the incorrectly coded question on Quiz 1 had been remedied), Plaintiff completed her makeup of Quiz 1 pursuant to the extension granted by Dr. Yarwood.  As a result,

**the earlier coding error had no effect whatsoever on Plaintiff's answers or grading**. (Ex. 81 (Pl.'s Dep. Ex. D47) at PSU 824; *see also* Ex. 82; *Pl. Dep.* 328:9-329:4).

152.    Plaintiff received a 3.5/5 points score on Quiz 1.  (Ex. 81 at PSU 824). One of the questions that Plaintiff got wrong was the question which had previously been coded incorrectly before she took her quiz.  (*See* Ex. 81 at PSU 824; Ex. 83 at PSU 642-44).

153.    Minutes later, at 6:49 p.m. on January 29, 2020, Plaintiff e-mailed Dr. Yarwood contesting her score for Quiz 1.  Plaintiff stated that "Canvas marked" her answers for Question numbers 3, 7, and 10 as incorrect on Quiz 1, but that Plaintiff was "almost certain I got #3 and #10 correct . . . I am only uncertain on #7." Plaintiff asked Dr. Yarwood to "readjust my quiz 1 score grade." (Ex. 84 (Pl.'s Dep. Ex. D48) at PSU 442).

154.    Also on January 29, 2020 at 9:04 p.m., Plaintiff completed Quiz 2 for Dr. Yarwood's Psych 425 class.  Plaintiff received a 2.5/5 point score on Quiz 2. (Ex. 85 at PSU 972).

155.  Two of the questions in the question bank for Quiz #2 contained coding errors.  If a student in Dr. Yarwood's class *happened* to get one of those questions on their quiz, the coding of their answer may have been incorrect, and had to be fixed and credit provided after the fact. By virtue of the random

assignment of questions from the question bank, though, Plaintiff's version of Quiz #2 did not contain the two questions with coding errors.  In other words, **Plaintiff's quiz grade was not impacted by the coding errors on Quiz # 2**.  (Ex. 86 (*Defs.' Am. Ans. to Pl.'s Am. Compl.* (Doc. No. 64)), ¶ 103).

156.   On January 30, 2020, Plaintiff met with Haynes for a scheduled meeting.  (Ex. 87 PSU 651-52; *see also* Ex. 88 PSU 463).

157.   As documented in Haynes's 2:27 p.m. e-mail to Dr. Yarwood on January 30, 2020 immediately following her meeting with Plaintiff, Haynes explained the correct answers for Quiz 1, but Plaintiff "immediately got defensive and said, 'I'm not playing games.'"  Haynes explained that the coding error had been corrected by the time Plaintiff took her quiz and that "[o]ne of the questions [Plaintiff] missed was the question that we have not yet sent out the message about."  Haynes reported that Plaintiff became "very angry" and was not "satisfied with" Haynes's explanation.  (Ex. 88 at PSU 463-64).

158.   Haynes further advised Dr. Yarwood regarding Haynes's meeting with Plaintiff that "[t]he other questions she flat out got wrong and she then claimed they were trick questions . . . ."  Haynes also noted that:

> In regards to the Packback assignments, I explained how they worked and then told her she could miss 2 of them and that was built in. She said it was unfair because she missed two because she was sick and could not do them and that that put her at a disadvantage as compared to everyone else. I told her your policy was that 2 misses

> were built in and that you cannot turn in Packback
> assignments late. She continued to get defensive and say
> that was unfair. I told her that that was the class policy
> and I could not say otherwise. . . .

(Ex. 88 at PSU 463-64*; see also* Ex. 89 (PSU 452)).

159.    On January 31, 2020 at 12:30 a.m., Plaintiff, still failing to understand or accept that none of the coding errors in Quiz 1 or Quiz 2 had affected her, e-mailed Dr. Yarwood and alleged that another student "had answers marked correctly on quiz 1 and 2 that I got marked wrong." (Ex. 90 (Pl.'s Dep. Ex. D49) at PSU 647; *Pl. Dep.* 334:3-336:2).

160.    On January 31, 2020 at 6:28 a.m., Dr. Yarwood responded to Plaintiff's e-mail and advised that she "reviewed your Quiz 1 answers right now. You got 3 questions wrong, which we went over yesterday." Dr. Yarwood then explained to Plaintiff the correct answer for each question that Plaintiff got wrong on Quiz 1 and why Plaintiff's answer was incorrect. (Ex. 90 at PSU 647; *Pl. Dep.* 334:3-336:2).

161.    On January 31, 2020 at 11:29 a.m., Haynes e-mailed the four students who were impacted by the coding error on Quiz 1 to notify them that their score was reduced by 0.5 as a result of the correction to the coding error. (*See* Ex. 91 (PSU 1096)).

162.    Also on January 31, 2020, Dr. Yarwood emailed the students impacted by the coding errors on Quiz 2.[17]  (*See, e.g.* Ex. 92; Ex. 93; and Ex. 94).

163.    On January 31, 2020 at 6:45 p.m., Plaintiff responded to Dr. Yarwood's e-mail and stated:

> No, that is unfair.  For Quiz 1 and 2, there was a question on each that was marked wrong on my quiz, but correct on 2 other students quizzes, and they sent me the proof! Their names don't matter, I have their proof. Therefore, regardless of what the correct answers were, you need to give everyone credit for those questions. You cannot let certain students off on wrong answers but not others.. **that is bias.**

(Ex. 90 at PSU 647 (emphasis added)).

164.    On February 3, 2020, Dr. Yarwood met with Plaintiff.  Following their meeting, Dr. Yarwood e-mailed Plaintiff at 1:40 p.m. and stated that she would allow Plaintiff to submit "Packback #1 for a makeup."  Dr. Yarwood wrote that "You were absent from Tuesday, Jan 21st to Saturday, January 25th.  Packback #1 was due on Tuesday, Jan. 21st at 8 AM ET," and that Plaintiff could e-mail her Packback #1 make-up assignment to Dr. Yarwood "by Friday, February 7th at 11:59 PM."  (Ex. 74 at PSU 1369).

165.    On February 4, 2020, Dr. Yarwood's Psych 425 class took place from 3:05 p.m. to 4:20 p.m.  After class, Dr. Yarwood was speaking with a student when

---

[17] Plaintiff did not receive this email because her quiz score for Quiz 2 was not impacted by the coding error.

the student informed Dr. Yarwood that a Packback assignment for the class had been set up improperly in the Canvas course management system, such that a perfect score would be zero points, instead of 20 points. As a result, the assignment was essentially set up as extra credit, as every point a student received over zero was a bonus point.[18] Plaintiff was nearby while this discussion was occurring, and Plaintiff then interrupted the student's "conversation with Dr. Yarwood with an aggressive tone demanding to know why she was not receiving the same buffer points as other students." (*See* Ex. 95 (PSU 638); *see also Pl. Dep.* 342:1-343:25). Plaintiff accused Dr. Yarwood of being prejudiced and stated she was filing a complaint with the university. (*See* Ex. 96 at PSU 1358-59; *Pl. Dep.* 344:20-345:21).

166.  On February 4, 2020 at 4:31 p.m., Dr. Yarwood e-mailed various faculty in the Biobehavioral Health ("BBH") Department, including Richard Carlson, the Associate Head of the Psychology Department, about Plaintiff and advised that:

> In short, this student missed the second week of class due to bronchitis. Each time I interact with her, either through email or in person, she states that I am prejudice/bias against her. She has stated that she thinks I am changing her grades on Canvas quizzes and assignments and purposefully giving her lower grades compared to anyone else, due to my bias. My graduate

---

[18] Dr. Yarwood resolved the error in the Canvas gradebook for the entire class so that the assignment was worth 20 points, and students then received a grade of xx points out of 20, instead of xx points out of 0. (*See* Ex. 69 (PSU 241-52)).

TA, Elise Haynes, had a similar experience with her last week in a meeting.

I met with her on Monday and provided her with evidence against the contrary, but she approached me after class tonight and again accused me of being prejudiced and stated she was filing a retaliation complaint with the university. She stated this in front of two other students, after I asked her to wait until I was finished speaking with the other two students. Another student witnessed the entire interaction and I have asked this student to email me documentation of the conversation she witnessed (which I will keep anonymous).

I am at the point where I do not feel comfortable meeting with this student on my own and believe that mediation is required.

(Ex. 96 at PSU 1358-59).

167.   At 4:46 p.m. on February 4, 2020, the student whom Plaintiff had interrupted when that student was speaking with Dr. Yarwood after class sent an e-mail to Dr. Yarwood documenting the incident.  (Ex. 95).

168.   On February 5, 2020, Plaintiff e-mailed Dr. Adair and Marcus Whitehurst (Vice Provost for Educational Equity) attaching a document titled "Current Semester Bias – Professor Michelle Yarwood."  (Ex. 97 at PSU 583-84). In that attached document, Plaintiff alleged that Dr. Yarwood "[h]as been bias towards me in the grading of her course, and has refused to answer the questions I asked regarding her bias."  (Ex. 97 at PSU 584; *see also* Ex. 98 at PSU 591).

169.   On February 5, 2020, Plaintiff e-mailed Dr. Yarwood and alleged that "[s]ince you are refusing to answer my questions regarding evidence of bias I have

found in the grading of me vs other students in the same class, and I am not going through the entire course dealing with these issues, I have submitted an Affirmative Action report." (Ex. 99 (PSU 443)).

170.   On February 7, 2020, Plaintiff submitted her make-up Packback # 1 assignment to Dr. Yarwood.[19]   (*See* Ex. 100 at PSU 1354).

171.   On February 12, 2020, Dr. Carlson e-mailed Plaintiff and stated:

> Hi, Kayla – I understand that you have had some problems this semester with several psychology courses and instructors.  As Associate Head and Director of Undergraduate Studies, I am concerned with this.  I would be happy to meet with you to hear about your concerns and consider how the Psychology Department might be able to help.  If you'd like to meet to discuss your concerns, please let me know your availability.

(Ex. 101 (Pl.'s Dep. Ex. D50)).

172.   On February 12, 2020, Plaintiff e-mailed Dr. Yarwood regarding the Packback #1 assignment that Dr. Yarwood had permitted Plaintiff to make-up. Plaintiff alleged that Dr. Yarwood had used a "stricter rubric and not how all students in your class is graded on PB assignments" and demanded that Dr. Yarwood "give me back the points you unfairly deducted." (Ex. 102).

---

[19] Because Plaintiff submitted her Packback assignment late, the Packback software could not grade Plaintiff's assignment. (*See* Ex. 72, Ex. 71; Ex. 103). Dr. Yarwood and her teaching assistant therefore each separately graded Plaintiff's assignment manually and gave Plaintiff the benefit of the higher of their two manual grades. (*See* Ex. 104 at PSU 1372; Ex. 105 at PSU 1376-80; Ex. 106 at PSU 280; Ex. 107 at PSU 282-83).

173.    On February 13, 2020, Dr. Yarwood responded to Plaintiff's e-mail and advised that "I will not change your grade and I will not be responding to any further grade disputes about your Packback #1 makeup assignment grade.  If you have questions about the course content, I am happy to answer those questions over email."  Dr. Yarwood further advised Plaintiff that "[g]rade disputes should be directed to Dr. Carlson," and she provided Dr. Carlson's e-mail address and also copied him on that e-mail.  (Ex. 102).

174.    On February 14, 2020, Dr. Yarwood and another psychology professor, Dr. Melissa Hunter, each reported experiencing problems with Plaintiff's behavior in their respective classes and that Plaintiff had falsely accused each of them of bias and racism.  (*See* Ex. 108 (Feldbaum Dep. Ex. 10) at PSU 1282-85; *Feldbaum Dep*. 88:7-89:17; Ex. 109 at PSU 1251).

175.    Andrew Mitchell (Associate Director of Student Conduct) spoke with psychology professors Yarwood and Hunter and then communicated with Feldbaum, Shaha, and others about the reports.  Mitchell advised that Dr. Hunter had expressed her concern about Plaintiff's behavior escalating and that Dr. Yarwood expressed that "she is concerned about her safety and the safety of her class" and that Plaintiff "has been angry and aggressive and that she feels that Kayla is not seeing reality clearly and is concerned that there may be a mental illness." (*See* Ex. 108 at PSU 1282-85).

176.   On or about February 14, 2020, Plaintiff dropped Dr. Yarwood's Psych 425 course.   (*See* Ex. 110 (Feldbaum Dep. Ex. 6) at PSU 1242; *Feldbaum Dep.* 77:21-79:7; *see also* Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response No. 12; *Pl. Dep*. 349:9-21).

177.   On February 17, 2020, Dr. Yarwood e-mailed Mitchell, copying Dr. Carlson, and requested that an individual "from campus police attend my class on Tuesday, February 18th" for safety purposes in case Plaintiff showed up and to "establish a safe learning environment for the students."   (Ex. 111 at PSU 1808-09).

178.   On February 20, 2020, Plaintiff e-mailed Dr. Yarwood with the subject line "PB Makeup Assignment Rubric – send ASAP."   Plaintiff wrote:   "Hey! Would you mind setting [sic] me that Kayla specific rubric you unfairly graded me off of for the makeup PB assignment?   You can just send the filled in rubric that shows where you docced points too please.   You docced 4 points out of 20.   I didn't forget."   (Ex. 112).

179.   On February 20, 2020, Dr. Yarwood forwarded Plaintiff's e-mail to Mitchell and Dr. Carlson and stated that "I am now feeling bullied and harassed by Kayla and also fearful she will show up at my office or my class."   (Ex. 112).

180.   On March 2, 2020, Dr. Carlson e-mailed Plaintiff in response to Plaintiff's demands for the "grading rubric" that Dr. Yarwood applied when grading the Packback #1 assignment that Dr. Yarwood permitted Plaintiff to make up.   Dr.

Carlson advised that he did not have any such document and informed Plaintiff that "If there were a grade dispute that the department[] was mediating, I would have a basis for asking Dr. Yarwood for information. Because you dropped the course, there is not that basis." (Ex. 113 at PSU 434 (alteration added)).

### 3.    *Plaintiff's Roommate A.H.'s Complaint Against Plaintiff*

181.    At the start of the Fall 2019 semester, Plaintiff moved into an apartment with three female roommates, including student A.H.  (*See* Ex. 114 at PSU 2675, 2713; *Pl.'s Dep.* 91:18-92:12).

182.    On August 30, 2019, Plaintiff's roommate A.H. submitted an incident report against Plaintiff to the University alleging that Plaintiff harassed her, physically threatened A.H., falsely accused A.H. of being racist, and falsely accused A.H. of being a "witch" who engages in paranormal activity.  (Ex. 114 at PSU 2675-77).

183.    The University charged Plaintiff with "Direct Threat of Harm to Another" in violation of the Code of Conduct.  (Ex. 114 at PSU 2704-06).

184.    Plaintiff contested the charges, although she admitted that she did threaten to "beat [A.H.] up." (*See* Ex. 114 at PSU 2710, 2729-30, 2738; Ex. 115 at PSU 2999).

185.    For example, Plaintiff informed Mitchell on September 12, 2019 that "I have freedom of speech and can talk how I want and only DIRECTLY threatened

to hit her if she didn't stop doing the weird stuff . . . ." In that same e-mail, Plaintiff threatened Mitchell, stating that Plaintiff "might even file for discrimination against you!!" (Ex. 114 at PSU 2738).

186. On September 13, 2019, Mitchell e-mailed Plaintiff and stated that "[w]e are at this point because **there is a concerning pattern of behavior as it pertains to indicating to others threats of physical harm.** Given the conversations we had in the Spring about making statements such as these, the hope would be that you would have stopped making those statements." (Ex. 114 at PSU 2710-11 (emphasis added)*; see also* Ex. 115 at PSU 2999-3000).

187. On September 20, 2019, the University notified Plaintiff that an Administrative Hearing was set for October 1, 2019 regarding the incidents with her roommate, A.H. (Ex. 114 at PSU 2748).

188. On September 24, 2019, Plaintiff demanded that the October 1st Administrative Hearing be extended. (Ex. 116 at PSU 1723-24). In response, the University rescheduled the hearing for October 22, 2019. (Ex. 114 at 2751-54).

189. On October 18, 2019, Plaintiff submitted a discrimination complaint against Mitchell alleging that he "has been severe with me" and "has put an

administrative directive on me against [A.B.],[20] one of my current roommates."
(Ex. 117 at PSU 3336-37; *see also Pl. Dep.* 148:12-151:19).

190.   On October 21, 2019, Plaintiff e-mailed Feldbaum and Mitchell and argued that, because she recently submitted a complaint against Mitchell, the hearing scheduled for the following day should be cancelled.   (Ex. 118 at PSU 1687).

191.   In light of Plaintiff's discrimination complaint against Mitchell, the University postponed the October 22, 2019 hearing until the complaint was fully investigated.   (Ex. 118 at PSU 1685-86; Ex. 119 (Feldbaum Dep. Ex. 14) at PSU 1689-90; *Feldbaum Dep*. 100:19-101:4; Ex. 120 at PSU 561).

192.   On November 13, 2019, Dr. Adair informed Plaintiff that she "completed my review of your Bias complaint against Andrew Mitchell and determined that there is no evidence to substantiate your allegation that Mr. Mitchell has discriminated against you during the Conduct process based on race or ethnicity."   (Ex. 121 at PSU 1692-93).

---

[20] As noted below, by this time Plaintiff had moved in with new roommates, and Plaintiff's *subsequent* roommate, A.B., quickly requested a no contact order against Plaintiff on October 17, 2019.  (*See* Ex. 122 at PSU 2466).  On October 18, 2019, the University issued an Administrative Directive to Plaintiff instructing her to have no contact with A.B.  (Ex. 123 at PSU 2883-84).  This was separate from Plaintiff's harassment of A.H.

193.   On November 15, 2019, the University notified Plaintiff that the Administrative Hearing regarding A.H. was rescheduled for December 3, 2019. (Ex. 114 at PSU 2755-56).

194.   On December 3, 2019, the Administrative Hearing regarding the situation between Plaintiff and A.H. took place.   (Ex. 124 at PSU 2805-06; Ex. 125 at KWPL 285-86).   Afterward, the Administrative Hearing Officer issued an Administrative Hearing Report advising that Plaintiff was found responsible on the charge of "Direct Threat of Harm to Another."   (Ex. 125 at KWPL 285-86; *see also* Ex. 126 at PSU 2866).  Plaintiff's sanctions included (1) Conduct probation with transcript notation through Fall 2020 and (2) Participation in counseling around anger management and PTSD.  (Ex. 125 at KWPL 285-86; *see also* Ex. 127 PSU 2796-97).  In explaining the rationale for its decision, the Administrative Hearing Officer noted that:

> Circumstances prior to this incident, that would seem to mitigate the sanctions to some extent, were considered during the sanctioning phase of the process.  **However, Ms. Williams has multiple prior and overlapping violations, including her current violation of the conduct policy even though she is currently on conduct probation through spring of 2020.** . . .

(Ex. 125 at KWPL 286 (emphasis added)).

195.   On December 5, 2019, Plaintiff e-mailed Mitchell, copying Feldbaum and Shaha, and advised that she disagreed with the hearing decision and that "I will

be filing another Bias report against you after receiving this information . . . ."  (Ex. 124 at PSU 2801-02).

196.   In a follow-up email on December 5, 2019, Plaintiff advised that "I submitted another affirmative action report on you."  Plaintiff also stated "Thank you for continuing to give me evidence to support my retaliation claim against the OSC and Title IX offices."  (Ex. 124 at PSU 2801).

### 4.   *Plaintiff's NEW Roommate A.B.'s Complaint Against Plaintiff*

197.   On or about September 6, 2019, after moving out of her apartment with A.H., Plaintiff moved into an apartment with new roommates, including University student A.B.  (*See* Ex. 122 at PSU 2455; *see also Pl.'s Dep.* 71:1-72:15).

198.   On October 14, 2019—the same date as the incident in Dr. Prawdzik's class—Plaintiff was involved in an incident with her new roommate, A.B.  (*See* Ex. 122 at PSU 2453, 2461; *see also Pl.'s Dep.* 182:3-183:23).

199.   On October 17, 2019, A.B. requested that the University issue an Administrative Directive instructing Plaintiff to have no contact with A.B.  (*See* Ex. 122 at PSU 2466).  On October 18, 2019, the University issued the Administrative Directive to Plaintiff.  (Ex. 123 at PSU 2883-84).

200.   On October 21, 2019, A.B. submitted an incident report against Plaintiff to the University, attaching an alleged corresponding timeline with various

screenshots including text messages and e-mails in support of her complaint.  (*See* Ex. 122 at PSU 2453-68).

201.   A.B. alleged in her report that, among other things, Plaintiff harassed and threatened her and "used my personal information without permission."  (*See* Ex. 122 at PSU 2452-53, 2461; *see also Pl.'s Dep.* 182:20-183:23).

202.   A.B. alleged that, on October 14, 2019, A.B. was in her kitchen Facetiming with her parents while she prepared dinner, at which time Plaintiff entered the room and stated "[m]an I had such a rough day, but I get to report another professor for discrimination." (Ex. 122 at PSU 2461).

203.   A.B. asserted that, moments later, A.B. "asked Kayla[,] who had started fixing food, if she could do her dishes when she's done."  A.B. alleged that Plaintiff then "blew up" and physically threatened her.  A.B. reported that her mother, who was still present on Facetime, then commented "Hey be nice!" to Plaintiff, after which "Kayla blew up even more jumping at me and screaming vulgar words at me." (Ex. 122 at PSU 2461).

204.   A.B. reported that she then ran to her room and locked her door because "I was so afraid of what [Plaintiff] would do," and she could overhear Plaintiff "talking on her phone . . . saying she is going to 'beat her a**, I don't give a f*** what happens.'" (Ex. 122 at PSU 2461-64).

205.  A.B. also reported that, because of this situation, A.B.'s mother immediately booked a flight from Colorado to State College, PA.  A.B.'s mother also contacted the PSU Crisis Line that evening.  (Ex. 122 at PSU 2465).  The following day, October 15, 2019, A.B. spoke with Anna Barone from the Penn State CARE Team regarding the situation.  A.B. and her mother also went to the police the following day.  (Ex. 122 at PSU 2462, 2464-65; *see also* Ex. 128 at PSU 3889).

206.  A.B.'s complaint further alleged, among other things, that:

- Because Plaintiff "bragged about reporting her previous roommate and threatening physical violence against her, I was afraid to report to authorities because I also felt that this situation could easily get out of hand and I did not want to be involved in anything like this." (Ex. 122 at PSU 2457-58).

- Plaintiff "has said to me at least twice that she 'get[s] to report another professor for discrimination,' which made me feel like she might falsely make claims or exaggerate incidents in order to get her way." (Ex. 122 at PSU 2458).

### 5.  *Lyft Driver Incident*

207.  On October 28, 2019, Plaintiff was involved in an incident with a Lyft[21] ride share driver, John Petrulich, in which Plaintiff admits that she punched Petrulich in the head.  (*Pl. Dep.* 189:4-8, 191:18 (testifying "yes, I hit him"); *see also* Ex. 129 (Pl.'s Dep. Ex. 46) at KWPL 200 (Plaintiff's appeal statement in which

---

[21] Mr. Petrulich is sometimes referred to within the record as a "Lyft" driver and other times as an "Uber" driver.

she argues that "I didn't admit to hitting him in the face specifically in the hearing, though that is where my unaimed panic blow landed")).

208.   Specifically, on October 28, 2019 at approximately 2:30 a.m., Plaintiff requested a Lyft ride while she was shopping at Walmart.  Plaintiff came out of the store several minutes late, placed her items in the vehicle, and a dispute arose.  (Ex. 130 (Feldbaum Dep. Ex. 5) at PSU 1217-18; *see also Pl. Dep.* 189:4-22).

209.   The Lyft driver ultimately cancelled the ride and attempted to remove the items Plaintiff had placed in his vehicle.  An altercation ensued in which Plaintiff punched the Lyft driver in his head.  (Ex. 130 at PSU 1217-18).

210.   Petrulich called the police, and Patton Township Police arrived at the scene.  Plaintiff received a police citation and was criminally charged for harassment with physical contact under Pa. C.S. § 2709(a)(1) in the Magisterial District Court of Centre County, Case No. MJ-49201-NT-0000756-2019.  (Ex. 131 (Langford Dep. Ex. 2) at PSU 478 (police citation); *Langford Dep.* 32:5-33:6; Ex. 132 (Criminal Docket and Court Records) at PSU 4119-20, 4125, 4127-28, 4146; *see also Pl.'s Dep.* 192:2-18, 193:9-17).

211.   The statute under which Plaintiff was charged for harassment provides that:

> (a) Offense defined.--A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

(1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same . . . [.]

18 Pa. C.S. § 2709(a)(1).

212.    On October 30, 2019, Plaintiff e-mailed Dr. Adair and advised her about the Lyft driver incident.  In her e-mail, Plaintiff alleged that "out of self defense I punched him" and that the police who arrived on the scene was a "clearly corrupt or racist police department."  Plaintiff also stated that she believed the Chief of the Patton Township Police was the husband of Plaintiff's University case manager, Kathleen Shupenko, and that she therefore wanted "my case manager switched ASAP."  (Ex. 133 at PSU 752-53; *see also Pl. Dep.* 202:20-204:6).

213.  On November 21, 2019, Feldbaum advised Plaintiff that Lauren Langford, Assistant Director of the OSC, replaced Shupenko as Plaintiff's case manager. (Ex. 134 at PSU 3507; *see also* Ex. 135 (Pl.'s Dep. Ex. D15) at PSU 497; *see also Langford Dep.* 12:5-8, 13:24-14:21, 24:15-26:24; *Pl. Dep.* 205:3-16).

214.  On December 12, 2019, Plaintiff was **convicted of harassment under 18 Pa. C.S. § 2709(a)(1) in relation to the Lyft driver incident** after a summary trial in the Magisterial District Court of Centre County, Case No. MJ-49201-NT-0000756-2019.  Plaintiff appealed, and she was **again found guilty** on August 28, 2020 after a Summary Appeal Hearing in the Centre County Court of Common

Pleas, Case No. CP-14-SA-0000002-2020.  (Ex. 132 (Criminal Docket and Court
Records) at PSU 4119-20, 4125, 4127-28, 4146; *see also Pl. Dep.* 195:1-202:12).

215.   On December 19, 2019, Petrulich called and e-mailed University BBH
Professor Sonia Cavigelli and submitted a complaint against Plaintiff.  (Ex. 130 at
PSU 1217-1219; *Feldbaum Dep.* 74:7-16).

216.   Petrulich alleged in his complaint that he received a request to pick
Plaintiff up at a Wal-Mart and, "[a]fter arriving at the pick up and waiting longer
than required, she exited Wal-mart and proceeded to load her items into my vehicle,
stating after she loaded her entire shopping cart and luggage that she needed to go
back in and purchase more items."   Petrulich reported that he then "politely and
dispassionately told her that I didn't want to take her ride with how long it was
taking to begin and asked her to remove her items[.]" (Ex. 130 at PSU 1217-1218).

217.   Petrulich further reported that "an argument ensued" where Plaintiff
"refused to remove her items from my car, refused to cancel the ride and after I
reiterated that I would cancel the ride after she took her stuff out, she refused, took
our her cell phone and began insulting me as she recorded it."  (Ex. 130 at PSU
1218).

218.   Petrulich advised that he cancelled the ride but Plaintiff "still refused
to take her items out of the vehicle and was acting with great hostility and
aggression."  He reported that he attempted to remove her items from his car, and

"she attempted to obstruct my trunk by blocking it with her body, then shouldering me and eventually she sucker punched me above my left ear." (Ex. 130 at PSU 1218).

219.    Petrulich reported that "[t]he police came, obtained the security footage, spoke to two witnesses and cited her on the spot for harassment." (Ex. 130 at PSU 1218).

220.    On December 19, 2019, Cavigelli forwarded Petrulich's e-mail complaint to Dennis Shea (Associate Dean for Undergraduate Studies in the College of Health and Human Development).  (Ex. 130 at PSU 1217; *Guadelius Dep*. 51:16-20; *see also* Ex. 136 (Feldbaum Dep. Ex. 9) at 1278-80; *Feldbaum Dep*. 85:14-86:9).

221.    On December 19, 2019, Shea submitted a formal incident report and Behavioral Threat Management Team Referral Form to the University regarding the Lyft incident.  (Ex. 137 (Lyft incident report) at PSU 615-617).

222.    On December 20, 2019, Shaha e-mailed Langford, Feldbaum, and Shupenko regarding the Lyft driver report stating:

> FYI for consideration in the conduct process.  If you all haven't already, I'd suggest reaching out to the identified victim.  It might also be interesting to see if you're able to obtain the video footage to help provide an accurate read of the severity of the behavior.  Given what is described below and her history, this one incident may warrant suspension, but of course, any investigation and the conduct process can ferret that out.

(Ex. 138 at PSU 1555).

### 6. Student Conduct Proceedings Regarding Incidents with (1) A.B. and (2) Lyft/Uber Driver

223.   On November 21 and 22, 2019, Langford e-mailed Plaintiff to schedule a time to meet regarding the issue with A.B., as well as the report regarding the class disruption in Dr. Prawdzik's English class. (Ex. 134 at PSU 3505-07).

224.   On November 23 and 24, 2019, Plaintiff e-mailed Langford and refused to meet regarding the English 202A class disruption incident. (Ex. 134 at PSU 3505).

225.   On November 27, 2019, Plaintiff e-mailed Langford and advised that she and her advisor could not meet with Langford until after Christmas. (Ex. 134 at PSU 3504).

226.   On December 18, 2019, Plaintiff e-mailed Dr. Adair alleging a "Bias discrimination report" regarding her BBH 402 ("African Hlth and Dev") professor Dana Naughton involving disputed absences as well as a purported "[a]dditional report" of bias against Mitchell. Plaintiff alleged that Dr. Naughton incorrectly marked Plaintiff absent throughout the semester and was biased against Plaintiff. As to Mitchell, Plaintiff alleged that "I filed my report on him for him pinning things on me with no evidence, and lying and pinning things on me, which he did again

today."[22]  (Ex. 57 (Pl.'s Dep. Ex. D12) at PSU 556-57; *Pl. Dep.* 154:4-155:13; 170:6-174:21; *see also* Ex. 139 (Feldbaum Dep. Ex. 11) at PSU 1292-93; *Feldbaum Dep*. 90:13-91:22).

227.   On January 9, 2020, Langford e-mailed Plaintiff in follow up to schedule a conduct conversation meeting to discuss Plaintiff's student conduct issues.  (Ex. 134 at PSU 3503).

228.   On January 10, 2020, Plaintiff responded to Langford and refused to attend a meeting until the OSC "formally responds to the lists of questions I gave them regarding recent situations and how they have charged me, including their recent charging on me . . . ."  (Ex. 134 at PSU 3503).

229.   On January 13, 2020, Shaha responded to Plaintiff's January 10, 2020 e-mail and advised that the OSC had already "responded to your questions, repeatedly," but offered to meet with Plaintiff to discuss any concerns.  Shaha further informed Plaintiff that:

> Regardless, you will need to respond to the Office of Student Conduct regarding the more recent allegations of misconduct.  I have instructed them to move forward as they normally would.  If you choose not to participate in that process, they will move

---

[22] During her deposition, Plaintiff alleged that she accused Mitchell, Prawdzik, and Naughton of "targeting and harassment and bullying.  I guess racism too."  She further alleged that she believes Feldbaum, Langford and Shaha were "in on stuff, too."  (*Pl. Dep.* 155:19-156:3).  Plaintiff testified that she does not think Dr. Adair, who is African American, is racist or has ever targeted Plaintiff.  (*Pl. Dep.* 147:5-13, 163:9-12).

forward without your participation. Of course, it would be beneficial for you to participate, but that is entirely up to you.

(Ex. 134 at PSU 3502-03).

230.    On January 15, 2020, Langford sent a letter to Plaintiff[23] notifying Plaintiff that a conduct conversation meeting was scheduled for **Tuesday, January 21, 2020** at 3:00 pm regarding the following incidents:

- October 14, 2019 – the Office of Student Conduct received a referral regarding an incident with your roommate. This is the same incident for which you were notified by Kathleen Shupenko.

- October 28, 2019 – the Office of Student Conduct received a police citation involving a dispute with an Uber driver (received after our last communication).

(Ex. 140 at PSU 2447-48; *see also Langford Dep.* 24:15-26:24; Ex. 141 (Pl.'s Dep. Ex. D16) at PSU 476-77).

231.    In her January 15, 2020 letter, Langford advised Plaintiff that "[i]f the above date or time is not possible because of an academic conflict," Plaintiff could contact the OSC "in advance of this meeting to reschedule." Lanford also noted that "failure to attend the conduct conversation may result in this case being managed in your absence." (Ex. 140 at PSU 2447-48; Ex. 141 at PSU 476-77).

---

[23] The letter was delivered to Plaintiff's e-mail through Maxient, the system the University's OSC used to notify students of their appointments. (*See* Ex. 142 at PSU 3528).

232.    On January 15, 2020 at 7:48 p.m., Plaintiff e-mailed Shaha, Feldbaum, Mitchell, and Adair and advised that "[u]ntil my 16 questions that I asked you guys regarding charging me in recent situations are answered, I will not be meeting with you or anyone else."  (Ex. 134 at PSU 3502; *see also* Ex. 135 (Pl.'s Dep. Ex. D15) at PSU 492).

233.    On January 16, 2020, Feldbaum e-mailed Plaintiff attaching Plaintiff's previously submitted "Questions for the Office of Student Conduct" and corresponding substantive responses to the same.  (*See* Ex. 143 at PSU 3508-13; *see also* Ex. 144 (Pl.'s Dep. Ex. 17) at PSU 498-503; *Pl.'s Dep.* 211:21-213:25).

234.    In her January 16, 2020 e-mail, Feldbaum reminded Plaintiff that "[i]t is **important that you attend the meeting with Lauren next week as scheduled**" for her conduct conversation.  (Ex. 143 at PSU 3508 (emphasis added); Ex. 144 at at PSU 498; *Pl. Dep.* 214:-22).

235.    On January 20, 2020, Plaintiff submitted a discrimination complaint against another professor, Stephen Kodish.  (Ex. 68 (Pl.'s Dep. Ex. 13) at PSU 574-576; *see also Pl. Dep.* 175:9-180:7).

236.    At **6:13 a.m.** on January 21, 2020, Plaintiff e-mailed Tanya Pesko in the University's AAO regarding her complaint against Dr. Kodish and asked that she "schedule me an appointment to meet and discuss with Dr. Adair." (Ex. 68 at PSU 573).

237.    At **8:29 a.m.** on January 21, 2020, Langford e-mailed Plaintiff to remind her that "I reached out to you through Maxient, the system we use to notify students of their appointments.  As a reminder, we have scheduled an appointment for you and I to meet today at 3:00pm.  I look forward to seeing you."  (Ex. 142 PSU 3528; *see also* Ex. 145 (Pl.'s Dep. Ex. D18) at PSU 520; *Pl.'s Dep.* 214:23-217:11).

238.    During her deposition, Plaintiff first denied receiving this e-mail,[24] but she ultimately admitted that she received this e-mail on the morning of January 21, 2020.  (*Pl.'s Dep.* 214:23-217:11, 245:16-22; Ex. 145 (Pl.'s Dep. Ex. D18) at PSU 520).

239.    Subsequently on January 21, 2020, Plaintiff went to Mount Nittany Medical Center ("MNMC") and reported that she was feeling sick.  (*See* Ex. 146 (medical records) at MNMC 156-167).  Plaintiff's medical records indicate that she was admitted to MNMC's Emergency Department at "**10:35**."  (Ex. 146 at MNMC 158).

---

[24]  Plaintiff testified at her deposition that she was sick the week beginning January 20 or 21, 2020 and "was unable to even walk to the bathroom" and "[s]o during that week I wasn't looking at emails or anything."  (*Pl. Dep*. 216:8-217:11; *see also Pl. Dep.* 220:6-221:3 (Plaintiff testifying that "I was super sick in bed on the 21st.  I wasn't even able to walk to the bathroom I know for a few days.  **I wasn't looking at emails or responding"**) (emphasis added); *Pl. Dep*. 240:22-241:4 ("I was way too sick to be worried about emails and stuff like that")).  As demonstrated herein and through the documentary record, Plaintiff's assertion that she was not active on e-mail during that period is not true.

240.   Plaintiff was tested for influenza at MNMC, and the test "was negative." (*See* Ex. 146 at MNMC 157, 160, 166-67).

241.   Plaintiff's medical records indicate that she was "discharged follow-up with PCP as an outpatient as I favor this is likely a viral URI."    The "*Final* Discharge Date/Time" in Plaintiff's medical records is listed as "01/21/20  **12:08**." (Ex. 146 at MNMC 166).

242.   Plaintiff did not show up for her scheduled conduct conversation on January 21, 2020 at **3:00 p.m.** regarding the incidents involving her roommate, A.B., and the Lyft driver, Petrulich.  (*See* Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response No. 13; Ex. 147 at PSU 3533-35; *see also* Ex. 148 (Langford Dep. Ex. 5) at PSU 525-526; *Langford Dep.* 36:9-37:22).

243.   At **3:03 p.m.** on January 21, 2020 (when Plaintiff was supposed to be at her 3:00 p.m. conduct conversation with Langford), Plaintiff e-mailed Dr. Adair and requested that she meet with her "ASAP."  (Ex. 68 at PSU 572).   Plaintiff advised that "[t]here's 2 things I need to talk to you about regarding last semester," including her discrimination complaint against Dr. Kodish and "the other regarding the English class professor [Dr. Prawdzik] situation."  (Ex. 68 at PSU 572-73).

244.   Plaintiff's Psych 425 class with Dr. Yarwood took place on Tuesday, January 21, 2020 from **3:05-4:20 p.m.**  (*See Pl.'s Dep.* 241:10-15, 326:16-18; Ex. 70 PSU 284 (Psych 425 Syllabus)).

245.    Plaintiff alleged in an e-mail to Dr. Yarwood that she was in class on January 21, 2020.[25]  Specifically, Plaintiff e-mailed Dr. Yarwood through Canvas on Thursday, January 23, 2020 and stated:

> I don't know if you noticed, but I was the sick girl in the back of your classroom on Tuesday [January 21, 2020].  I had been diagnosed with bronchitis in the ER about 2 hours before the start of class.  It came out of nowhere after my 9 am that day.  I still went to the rest of my classes and ended up stuck and suffering in bed from 10 pm that night through all of today, gradually getting better today.  That's why I was not in classes today.  I called the ER yesterday for a doctors note and I will be picking it up from them tomorrow.  I can bring it to you and show you before or after class on Tuesday if you'd like, or stop by your office hours[.] . . .

(Ex. 78 (Pl.'s Dep. Ex. D25) at PSU 461 (alteration added); *Pl.'s Dep.* 242:14-246:15).

246.    On January 21, 2020, Langford sent a letter to Plaintiff advising that Plaintiff was not present for her scheduled conduct conversation appointment that day and that, as a result "we have now scheduled an appointment for you **on January 24, 2020 at 11:00 AM** at 120 Boucke Building.  This is a mandatory appointment; **failure to appear for this appointment may result in a decision**

---

[25] The evidence in this case indicates that Plaintiff may have falsely stated to Dr. Yarwood that Plaintiff was in class on January 21, 2020.  Dr. Yarwood informed Plaintiff that she was absent from class on January 21, 2020.  (*See* Ex. 74 at PSU 1369; Ex. 75 at PSU 1370).  Moreover, Plaintiff testified at her deposition that she did not attend classes on January 21, 2020 because she was sick.  Specifically, Plaintiff alleged that "I laid in bed.  I barely was able to go to the bathroom." (*Pl.'s Dep.* 241:12-242:11).

**being made in your absence**.  (Ex. 147 at PSU 3534-35 (emphasis added); *see also*

*Langford Dep.* 24:15-26:24, 36:9-37:22; Ex. 148 at PSU 526-527).

247.  At 4:04 p.m. on January 21, 2020, Langford also e-mailed Plaintiff

advising that "[a]ttached you will find the letter that was sent to you outlining

information for a mandatory student conduct appointment for this Friday, January

24, 2020 at 11:00am."  (Ex. 147 at PSU 3533).

248.  In her Answers to the University's Requests for Admission, Plaintiff

admits "that on January 24, 2020, the University provided you a second opportunity

to attend a conduct conversation."  (Ex. 16 (Pl.'s Ans. to Defs.' Requests for

Admission), Response No. 14).

249.  At 5:13 p.m. on January 21, 2020, Plaintiff e-mailed Langford

(copying Mitchell, Feldbaum, and Shaha) and wrote:

> Again Lauren, **until I receive all formal responses from those
> I asked questions towards regarding recent sanction
> charging of me and how OSC has handled me, me nor my
> advisor will be meeting with you**. . . .

(Ex. 149 at PSU 3464 (emphasis added)).

250.  At 5:30 p.m. on January 21, 2020, Langford responded to Plaintiff's

prior e-mail and advised Plaintiff that her questions were previously "answered in

an email sent to you on January 16, 2020."  Langford further wrote:

> The appointment scheduled for Friday at 11:00am is a mandatory
> appointment.  **If you [choose] not to attend the meeting, the
> conduct process will move forward and charges and**

**sanctions will be recommended**.  Please let me know if you
have any other question about the conduct process."

Langford also advised Plaintiff that "[i]nformation can also be found on our
website" and provided a link to the Student Conduct website.  (Ex. 149 at PSU 3464
(alteration and emphasis added); *see also* Ex. 150 (Pl.'s Dep. Ex. 20) at PSU 488).

251.    On January 24, 2020, Plaintiff **again failed to appear** for her
rescheduled conduct conversation with Langford regarding the incidents involving
(1) A.B. and (2) the Lyft driver.  (Ex. 16 (Pl.'s Ans. to Defs.' Requests for
Admission), Response Nos. 14-15; *see also* Ex. 151 (Pl.'s Dep. Ex. D22) at PSU
546-48).

252.    On January 27, 2020, Langford e-mailed Plaintiff and advised that:

> A mandatory Conduct Conversation was scheduled for January
> 24, 2020 at 11:00am, which you did not attend.  Therefore, as
> outlined in the letter previously sent, the conduct process
> continued in your absence.   Attached you will find the
> Conference Summary Form with charges and sanctions; please
> read it thoroughly.  **A response is due by 5:00pm on January
> 30, 2020**.  **If the Conference Summary Form is not returned
> by that deadline, the charges and sanctions go into action**."

(Ex. 151 at PSU 546 (emphasis added); *Pl. Dep*. 224:20-225:23; *Langford Dep*.
24:15-26:24).

253.    Langford attached the Conference Summary Form to her January 27,
2020 e-mail to Plaintiff, which advised that "[o]n the basis of the information
reviewed on that date, your Case Manager has recommended" charges for Student

Code of Conduct violations for (1) *".01.03 Harming or Attempting to Harm Another"* and (2) "*.03.03 Harassment by Communication*" in relation to the incidents involving Plaintiff's roommate, A.B., and the dispute with the Lyft/Uber driver.  The University also recommended the following sanctions:  (1) Conduct Suspension through August 17, 2020 and (2) Counseling Required for Readmission.  (Ex. 151 at PSU 547).

254.   The Code of Conduct and Sanctioning Guidelines each define the charge for *.01.03 Harming or Attempting to Harm Another* (which falls under Code Section IV(A)(1) "Abuse/Endangerment") as:  "Physically harming or threatening to harm any person, intentionally or recklessly causing harm to any person or reasonable apprehension of such harm or creating a condition that endangers the health and safety of self or others."  (Ex. 23 at PSU 166; Ex. 24 at PSU 3930).

255.   The Code of Conduct and Sanctioning Guidelines each define the charge for *.03.03 Harassment by Communication* (which falls under Code Section IV(A)(3) "Harassment") as:

> Harassment means behavior consisting of physical or verbal conduct that is sufficiently severe or pervasive such that it threatens or substantially interferes with an individual's employment, education or access to University programs, activities or opportunities and such conduct would detrimentally affect a reasonable person under the same circumstances.  . . .  Additionally, behaviors include engaging in a course of conduct

or subjecting a person or persons to unwanted physical contact or threat of such.

(Ex. 23 at PSU 167; Ex. 24 at PSU 3934).

256. The Conference Summary Form provided Plaintiff with various options including to (1) "accept the charges and sanctions as assigned," (2) "contest the charge(s) and request a Hearing," or (3) "accept the charges but request a Sanction Review." (Ex. 151 at PSU 548).

257. Plaintiff failed to respond to the Conference Summary Form by January 30, 2020 by 5:00 p.m. as required. (Ex. 152 at PSU 549).

258. On January 31, 2020, Langford e-mailed Plaintiff and advised that "[t]he Conference Summary Form was not turned in to the Office of Student Conduct by January 30, 2020. Therefore, the sanctions are in effect. I have attached to this email a letter that serves as a final notice of the charges and sanctions." (Ex. 152 at PSU 549). A "Notice of Final Outcome" letter attached to Langford's January 31, 2020 e-mail to Plaintiff advised Plaintiff that "your Conference Summary Form was due on or before January 30, 2020 at 5:00 p.m.; however, no response was provided." The Notice advised that the previously noted charges and sanctions were therefore in effect. (Ex. 153 (Pl.'s Dep. Ex. 23) at PSU 7).

259. On January 31, 2020, Plaintiff responded to Langford's January 31st e-mail and alleged that "I never received any of your emails regarding any

meeting.[26]  I am not accepting suspension, and me and my personal advisor that I have been working with would like to schedule an appointment to meet with you to discuss the [A.B.] & [J.P.] situation and provide my proof.  You never got back to me about that."  (Ex. 154 at PSU 3521; *see also* Ex. 155 (Pl.'s Dep. Ex. D24) at PSU 403).

260.   Plaintiff further alleged in her e-mail that "You are suspending me for what?????  I didn't do anything!!  I have been busy with classes and did not receive any of your follow up emails regarding anything."  (Ex. 154 at PSU 3521; *see also* Ex. 155 at PSU 403).

261.   In a subsequent e-mail on January 31, 2020, Plaintiff again wrote to Langford, copying Dr. Adair, and stated:  "You are literally charging me with no proof, and I know there's not proof because I did nothing to neither of them and I have all text message proof against them both."  (Ex. 154 at PSU 3521; *see also* Ex. Ex. 155 at PSU 403).

262.   Plaintiff also alleged that:  "I literally asked you to respond to my questions regarding how OSC has last charged me and nobody within OSC

---

[26] Contrary to Plaintiff's assertion in this e-mail, Plaintiff testified that she had previously received Langford's e-mail advising of the January 21, 2020 meeting. (*Pl.'s Dep.* 214:23-217:11, 245:16-22).  She also admits that, after missing the first meeting, the University provided her a second opportunity to attend a conduction conversation on January 24, 2020 and that she did not appear for that meeting either. (Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response Nos. 13-15).

responded to my questions regarding my last charge but wanted me to meet with

them to discuss something else before they answered my questions?  Now I'm being

charged because I didn't meet with you before my questions were answered?[27]  How

is that allowed?  And I'm being charged on the basis of NO PROOF!"  (Ex. 154 at

PSU 3521; *see also* Ex. 155 at PSU 403).

263.  Up to that point in time, Plaintiff had not stated to anyone in the

University's OSC that Plaintiff allegedly missed both her conduct conversation

meetings because she was purportedly sick.

264.  Later that evening on January 31, 2020 at 7:41 p.m., Plaintiff e-mailed

Langford, Feldbaum, and Adair with the subject line "Proof of Bronchitis week of

missed OSC meeting."  In her e-mail, Plaintiff alleged for the first time that she

purportedly missed her conduct conferences because she was "super sick" and had

been "unable to move out of bed from 1/21 to the night of 1/25." Specifically,

Plaintiff stated that:

> There is literally no way you can suspend me for simply
> missing the meeting. I got super sick with bronchitis on
> 1/20 and was unable to move out of bed from 1/21 to the
> night of 1/25. This was during the time of the missed
> meeting that you are trying to charge me for. Attached is
> my doctors note, which is a university excused absence. I
> was so weak I was unable to even keep up with class work
> and I have been playing catch up with classes since then,

---

[27] As demonstrated above, the University previously responded to Plaintiff's
questions in writing on January 16, 2020.  (*See* Ex. 143 at PSU 3508-13).

which is why I missed your follow up email about the summary form.

(Ex. 156 at PSU 3514; *see also* Ex. 157 (Pl.'s Dep. Ex. 26) at PSU 504; *Pl.'s Dep.* 255:8-14).

265.   Plaintiff attached to her January 31, 2020 e-mail a photograph of an alleged "sick note" from MNMC dated **January 25, 2020**.  (Ex. 156 at PSU 3515; *see also* Ex. 157 at PSU 504-505).  The sick note states that "Kayla Williams was at Mount Nittany Medical Center for testing on 01/21/20.  Please excuse **from class** seen with Bronchitis viral."  (Ex. 157 at PSU 505 (emphasis added)).

266.   Although Plaintiff failed to timely return her Conference Summary Form by January 30, 2020 and forfeited her right to contest the charges and sanctions against her, Langford nonetheless e-mailed Plaintiff on February 3, 2020 and gave her an additional opportunity to submit a Conference Summary Form and contest the charges and sanctions against her by February 5, 2020 at 5:00 p.m.  (Ex. 158 (Pl.'s Dep. Ex. D34) at PSU 510-12; Ex. 159 at PSU 3523-25; *Pl.'s Dep.* 288:11-289:13; *Langford Dep.* 28:21-29:9).

267.   Feldbaum testified that, although the University procedures provided that the University should "move forward and implement" the recommended charges and sanctions in light of Plaintiff's failure to timely respond, they decided to extend "the deadline rather than moving forward with putting the conduct outcome into place so Kayla would have more time to request a hearing."

(*Feldbaum Dep.* 25:4-24; *see also Langford Dep.* 28:21-29:9 (testifying that even though Plaintiff failed to timely return her Conference Summary Form, the University allowed her to contest the charges and have a hearing because "she clearly wanted to be heard and we wanted to give her that opportunity even though at that time we did not have to provide that additional opportunity")).

268.   On February 3, 2020, Plaintiff e-mailed Langford and demanded to know the "[r]easoning/rationale behind why sanction charges were recommended in the first place."  (Ex. 160 at PSU 3475).

269.   Langford responded to Plaintiff's e-mail on February 3, 2020 and advised that:

> Based on the information submitted by the Uber driver and the citation from the Police you engaged in a physical altercation, Harming or Attempting to Harm Another. Additionally, your roommate submitted information that there were multiple threats made over a course of time that led to the Harassment by Communication charge. These behaviors, along with your conduct history and current status on Conduct Probation with a Transcript Notation, rises to a recommendation of suspension. You have the opportunity to respond to these charge(s) and sanction(s) via the Conference Summary Form.

(Ex. 160 at PSU 3474).

270.   Also on February 3, 2020, Plaintiff e-mailed Langford and requested that Langford send Plaintiff copies of the police citation relating to the Lyft driver incident as well as the corresponding University incident report and the incident report against her regarding her roommate, A.B..  (Ex. 160 at PSU 3473-74).

271.   On February 4, 2020, Langford sent Plaintiff copies of the incident reports Plaintiff requested, including the police citation from the Lyft driver incident and corresponding incident report and the incident report submitted by A.B.  (Ex. 161 at PSU 3546-3570).

272.   On February 5, 2020, Plaintiff signed the Conference Summary Form and indicated that she contested the charges and sanctions against her and requested a hearing.  (Ex. 162 at PSU 2445-46).

273.   On February 6, 2020, a friend of Plaintiff, University student B.K., submitted an incident report regarding an event that allegedly occurred on September 7, 2019 at the apartment shared by Plaintiff and A.B.  (Ex. 163 at PSU 3633).

274.   On February 13, 2020, the University sent Plaintiff a Hearing Notice advising that a University Conduct Board ("UCB") hearing was scheduled for February 21, 2020 at 9:00 a.m. regarding the charges relating the incidents involving her roommate, A.B. and the Lyft driver, Petrulich.  (Ex. 164 (Pl.'s Dep. Ex. 35) at PSU 08-10; Ex. 165 at PSU 3468-70; *see also* Ex. 166 (Pl.'s Dep. Ex. 36) at PSU 373; *Pl.'s Dep.* 290:2-294:2).

275.   The February 13, 2020 Hearing Notice also advised Plaintiff, among other things:

- Plaintiff "[m]ay be assisted by an advisor of your choice;"

- "There are various ways for you to participate, to include in-person, via phone/technology and/or a written statement;"
- Plaintiff "may elect not to appear for your hearing. If you are absent or late for your hearing, the hearing will proceed without you;"
- Plaintiff "may provide a student statement of facts to be included in the packet to which the hearing authority will have access;"
- Plaintiff had the right to identify individuals who may be asked to serve as witnesses;
- Plaintiff had "the right to be informed in writing of all charges at least five business days before a hearing;"
- Plaintiff had the "right to question witnesses that appear in person or by telephone at your hearing (the University cannot compel witnesses to participate)."

(Ex. 164 at PSU 08-10).

276.   On February 13, 2020, Langford responded to a variety of additional questions from Plaintiff regarding the conduct hearing, and also provided Plaintiff a weblink to the Code of Conduct. (*See* Ex. 165 at PSU 3468-70; *see also* Ex. 166 at PSU 372-73; *Pl.'s Dep.* 294:3-295:15).

277.   Also on February 13, 2020, Langford forwarded to Plaintiff her February 4, 2020 e-mail once again attaching the relevant police citation and incident reports relating to the conduct hearing. (Ex. 160 at PSU 3471).

278.   On February 14, 2020, Langford e-mailed Plaintiff's former roommate A.B. and advised her of the UCB hearing scheduled for February 21, 2020. Langford asked A.B. if she would participate in the hearing as a witness. Langford also advised that A.B. had the options to participate "in person, via phone/technology, or in writing." (Ex. 167 at PSU 3918-19).

279.   On February 15, 2020, A.B.'s mother e-mailed Langford and asked to speak with her regarding the hearing.  A.B.'s mother advised that "we are concerned with the possibility of further retaliation if [A.B.] should attend but would like to discuss further."  (Ex. 168 at PSU 3921).

280.   Langford responded to A.B.'s mother by e-mail and advised that "I understand you concerns about retaliation and am happy to discuss them with you. I will call [A.B.] back this morning and hope to address her concerns as well.  While I can't talk about specific information with you, I can talk about the conduct process and how witnesses can choose to participate in a hearing."  (Ex. 168 at PSU 3921).

281.   On Friday, February 14, 2020, Langford spoke with the Lyft driver, Petrulich.  (*See* Ex. 169 (Langford Dep. Ex. 6) at PSU 1392; *Langford Dep.* 27:11-28:20, 38:15-40:12).

282.   On February 17, 2020, Langford followed up with Petrulich by e-mail "to provide information about serving as a University Witness" for the UCB hearing.  (Ex. 169 at PSU 1392-93; *Langford Dep.* 27:11-28:20).  In her February 17, 2020 e-mail, Langford requested that Petrulich serve as a witness at Plaintiff's UCB hearing.  Langford advised that:

> From my recollection, you do not wish to participate via person. However there are other options to participate, such as by phone, video conferencing, or in writing.  You would be asked to speak to any information about the incident that you believe is important for the University Conduct Board panel to know.

> Are you available on Friday to participate in the hearing?  If so, please let me know how you would like to participate.
>
> Thank you in advance for considering and please let me know if you have any questions or if you're not available on the 21st.

(Ex. 169 at PSU 1392-93).

283.   On February 18, 2020, Petrulich advised that he wanted "to participate and provide any information the university has regarding this individual and the incident.  **I apologize for not being able to attend in person; the mere sight of this individual has a negative impact**.  Please let me know how you wish for me to present this information.  I'm more than happy to help, **so long as I don't have to confront her again**."  (Ex. 169 at PSU 1391-92 (emphasis added)).

284.   On February 18, 2020, Langford reminded Petrulich that his options to participate in the hearing included "via phone or submit a written statement."  (Ex. 169 at PSU 1390-91).

285.   Langford also e-mailed Petrulich on February 18, 2020 and advised that "[t]he extent that you participate in the hearing is voluntary and based on what you believe is best for yourself.  I understand that this incident has caused a lot of stress and it's understandable that you don't wish to participate in person or via phone.  If you would still like to submit a statement, you can email it to me.  As a reminder, the hearing is on Friday, so a submission by Thursday is probably best."  (Ex. 170 at PSU 1398).

286.   On February 18, 2020, Petrulich advised that he did not wish to attend by phone but that "I will write up a statement for you folks; **I do not want to hear her voice, see her face or interact with her in anyway.  I had severe PTSD and this incident with her has exacerbated it**, along with her dragging this out."  (<u>Ex. 169</u> at PSU 1390 (emphasis added)).

287.   Dr. Gaudelius testified that the University has "no ability to compel someone to attend a hearing," so when a witness instead submits written testimony, "the written document is the testimony -- or is the evidence."  (*Gaudelius Dep.* 38:13-22).

288.   On February 19, 2020—two days before her scheduled UCB Hearing—Plaintiff filed the present lawsuit.  (<u>Ex. 171</u> (Pl.'s Dep. Ex. D38 (Complaint)); *see also Pl.'s Dep.* 301:13-302:25).

289.   On February 19, 2020, Plaintiff confirmed to Langford that Plaintiff's advisor for purposes of the UCB Hearing was attorney Ronald Saupe.  (<u>Ex. 172</u> (Pl.'s Dep. Ex. D40) at PSU 379-80),

290.   On February 20, 2020 at 10:36 a.m., Langford e-mailed Plaintiff and her advisor, Saupe, and advised that "[i]n preparation for tomorrow's hearing, and as a reminder, I have attached to this email the reports that the board will have access to" at the UCB Hearing.  Langford also advised that "[y]ou will also have

access to the hard copies when you arrive." (Ex. 173 at PSU 3603; *see also* Ex. 174 (Pl. Dep. Ex. 39) at PSU 1746).

291.    Langford attached the following documents to her February 20, 2019 e-mail to Plaintiff and Saupe:  (1) A.B.'s incident report, (Ex. 173 at PSU 3604-19); (2) the police citation and incident report regarding the Lyft driver incident, (Ex. 173 at PSU 3620-23); (3) the February 13th Notice of Hearing, (Ex. 173 at PSU 3624-26); and the January 27, 2020 Conference Summary Form signed by Plaintiff, (Ex. 173 at PSU 3627-28).

292.    On February 20, 2019 at 11:03 a.m., Plaintiff responded to Langford and requested that the "Incident Report my friend, [B.K.] submitted" also be given to the UCB during the conduct hearing.  (Ex. 175 at PSU 3571).

293.    On February 20, 2020, Langford e-mailed student B.K. and asked if she was available to participate in Plaintiff's conduct hearing.  (Ex. 176 at PSU 2420-21).  B.K. advised that she was not available to participate in person, but she submitted a supplemental statement for purposes of the hearing.  (Ex. 176 at PSU 2418-19; Ex. 177 PSU 3659).[28]

---

[28] On February 24, 2020, after the conduct hearing took place, B.K. e-mailed Langford and advised that "I recently sent in two statements regarding the Kayla Williams case and I would like to retract both of my statements.  I do not want to be involved in this case anymore and would appreciate if my statements weren't included anymore and I was no longer considered a witness."  (Ex. 176 at PSU 2418).

294.    On February 20, 2020, Petrulich sent Langford his written statement to be included in the UCB hearing materials.    (Ex. 169 at PSU at 1389; Ex. 178 (Langford Dep. Ex. 7) at PSU 1394-97 (Petrulich statement); *Langford Dep*. 44:24-45:12).

295.    On **February 21, 2020 at 4:46 a.m.**, A.B. responded to Langford's request that A.B. participate as a witness in the UCB hearing and advised that "**I wanted to let you know that I have chosen to not participate in the hearing as I fear Kayla will continue the harassment and retaliate**.  I have been through a great deal of stress regarding this situation and honestly **just want to stop living in fear**."  A.B. further advised Langford that "[t]his has been incredibly frustrating, scary, and expensive for myself and my family and I would just like for it all to be over." (Ex. 167 at PSU 3918-19 (emphasis added)).

296.    The UCB hearing[29] was scheduled to begin at 9:00 a.m. on February 21, 2019, but it was delayed for over an hour to allow Plaintiff to submit additional materials to be included in the hearing packet the morning of the hearing, and she did not arrive on time.  (*See* Ex. 179 at PSU 2450; *see also Pl. Dep*. 309:11-12, 310:12-313:12).

---

[29] The members that comprised the hearing panel for the February 21, 2020 UCB included Francesco Costanzo, Veronica David, Rosemary Petrunyak, and two student members.  Langford served as the "presenter" at the hearing.  (Ex. 179 at PSU 2449).

297.    Specifically, at **9:04 a.m.** on February 21, 2019—when the hearing was supposed to already be in progress—Plaintiff e-mailed Langford with the subject line "**Email 1/3 I want included for hearing**" and advised that she was attaching "-14 screenshots I wanted included for [A.B]'s roommate report." (Ex. 180 at PSU 3670-3685).

298.    At **9:11 a.m.,** Plaintiff sent another e-mail to Langford with the subject line "**Email 2/3**" and advised that "Attached is the statement I also want included for the hearing." (Ex. 181 at PSU 3660; *see also* Ex. 182 (Pl.'s Dep. Ex. 41) at PSU 1349). Attached to Plaintiff's e-mail was a Statement in which Plaintiff disputed certain allegations from A.B.'s incident report and the Lyft driver police citation and report. (Ex. 181 at PSU 3662-65).

299.    In her Statement, Plaintiff admitted that "I hit the Uber driver" but she alleged it was "only in Self Defense." Plaintiff also admitted that she was convicted in relation to Lyft driver incident, and that her "verdict has been appealed." Plaintiff's Statement also alleged that "the police officer edited" the Wal-Mart security camera footage "that led to my guilty verdict." (Ex. 181 at PSU 3664-65).

300.    At **9:17 a.m**., Plaintiff sent a third e-mail to Langford with the subject line "**Email 3/3**" in which Plaintiff attached screenshots regarding the Uber driver incident, and she advised "I am about to be on my way." (Ex. 183 (Pl.'s Dep. Ex. 42) at PSU 624-26).

301.   The UCB Hearing follows a script that is "followed by the chairperson who's leading the hearing."  (*Feldbaum Dep.* 37:1-38:1).

302.   At the outset of the UCB Hearing, Plaintiff was asked if she wished to challenge any member of the UCB Board on the basis of bias, and Plaintiff stated "no."  (Ex. 184 (UCB Hearing audio recording) at 3:00).[30]

303.   The UCB Chair also advised Plaintiff regarding the role of her advisor at the hearing.  Specifically, Plaintiff was informed that:

> As an advisor, you may do the following at the request of Kayla: Quietly advise Kayla in a manner that doesn't disrupt the normal flow of the hearing and consult with Kayla during breaks.  As an advisor you may not do the following:  perform any function in the hearing other than advising Kayla; make a presentation on behalf of or represent Kayla in any way, or question any witness or provide any direct information to the Board.  Kayla is expected to ask and respond to questions on his or her own behalf, without representation by you.

(Ex. 184 (UCB Hearing audio recording) at 4:20).

304.   During the UCB hearing, Plaintiff became emotional at points, and the UCB Chair asked Plaintiff on separate occasions if she would like to take a break. Each time Plaintiff declined.  (Ex. 184 (UCB Hearing audio recording) at 15:29-15:45, 46:40-46:55).

---

[30] The audio recording of the February 21, 2019 UCB Hearing is attached as Ex. 184.

305.    The UCB hearing panel considered the available written materials for

the hearing, including:[31]

a.  The Hearing Cover Sheet, (Ex. 185 at PSU 3654);

b.  The incident report submitted by Plaintiff's roommate A.B., (Ex. 122 at PSU 2453-2468);

c.  The police citation and incident report regarding the incident with the Lyft/Uber driver, Petrulich, (Ex. 186 at PSU 3650-53);

d.  The incident report submitted by Plaintiff's friend, B.K., (Ex. 163 at PSU 3633);

e.  The supplemental written statement by B.K., (Ex. 177 at PSU 3659);

f.  The written statement by the Lyft/Uber driver, Petrulich, (Ex. 178 at PSU 1394-97);

g.  The materials submitted by Plaintiff the morning of the hearing, including:
    i.  Screenshots of text messages between Plaintiff and her former roommate, J.P. (attached to Plaintiff's e-mail submitted that morning with the subject line "Email 1/3 I want included for hearing"),  (Ex. 180 at PSU 3670-85);

    ii.  Plaintiff's written statement (attached to Plaintiff's e-mail submitted that morning with the subject line "Email 2/3"), (Ex. 181 at PSU 3660-65); and

    iii.  A picture of the Uber vehicle with various items on the ground and a screenshot of a message from Sgt. Matthew Shupenko of the Patton Township Police department (attached to Plaintiff's e-mail submitted that morning with the subject line "Email 3/3"), (Ex. 183 at PSU 624-626).

---

[31]  The University's policies do not require any specific time period prior to the hearing for a student to review documents to be considered at a UCB hearing. Rather, "[i]nformation can be provided at the hearing." (*Feldbaum Dep*. 39:19-23).

(*See* Ex. 179 at PSU 2449 (UCB Chair Report)).

306.    Plaintiff had the opportunity to, and did, challenge the former roommate A.B.'s incident report and written statement with Plaintiff's own testimony and exhibits.    During the hearing, Plaintiff verbally expressed her disagreement with A.B.'s accounts and provided her own account of the events that transpired for the UCB's consideration.    (*See, e.g.*, Ex. 184 (UCB Hearing audio recording) at 13:06-13:29, 17:10-19:55, 23:50-29:09; 35:00-37:00; 40:00-44:30; 47:50-1:00:28).

307.    During the UCB Hearing, Plaintiff also had the opportunity to question and challenge the incident report, written statements, and testimony submitted by Petrulich regarding the Lyft incident.    (*See, e.g.*, Ex. 184 (UCB Hearing audio recording) at 19:55-23:40; 1:00:25-1:08:50).

308.    During her testimony regarding the incident with Petrulich, Plaintiff admitted that she "hit the Uber driver," but she alleged that it was in "self defense." (Ex. 184 (UCB Hearing audio recording) at 21:04-21:12, 1:03:45-1:04:15).

309.    Toward the end of the UCB hearing, Plaintiff was given an additional opportunity to look through all of the materials presented "just to make sure that you feel you have read everything," including the testimony from the Lyft driver. (Ex. 184 (UCB Hearing audio recording) at 1:15:30-1:18:18).

310.  The UCB Chair also advised Plaintiff that "if you wanted to review the information with your advisor, even in a separate room, this can all be done, so it's up to you." (Ex. 184 (UCB Hearing audio recording) at 1:16:10-1:16:46).

311.  Plaintiff declined to take the opportunity to meet with her advisor in a separate room to further review the materials presented at the UCB Hearing.  (*See* Ex. 184 (UCB Hearing audio recording) at 1:16:10-1:18:20).

312.  Plaintiff elected to not dispute the Lyft driver's written testimony. Plaintiff stated at the hearing "I don't even care to read this [Petrulich's written testimony] honestly. Reading this false report gets my emotions going." (Ex. 184 (UCB Hearing audio recording) at 1:17:20-1:17:38).

313.  At the end of the hearing, the UCB Chair asked Plaintiff if she felt she had the opportunity to address everything that was presented in the hearing, and Plaintiff responded "yes." (Ex. 184 (UCB Hearing audio recording) at 1:14:55-1:15:30; 1:18:00-1:18:28).

314.  On February 21, 2020, after the UCB Hearing, Langford sent Plaintiff and her advisor by e-mail "the documents that were reviewed in the hearing and available to the board, yourself, and your advisor." (Ex. 187 at PSU 3632; Ex. 188 (Pl.'s Dep. Ex. 44) at PSU 1756).

315.  Subsequently on February 21, 2020, Langford notified Plaintiff that the UCB completed its deliberations and recommended finding Plaintiff responsible

for both the charges and imposing the recommended sanctions.  Langford also advised Plaintiff that the UCB would be issuing a written report within five days, and that Plaintiff she had the ability to appeal the decision.  (Ex. 189 at PSU 426-27).

316.   On February 27, 2020, Feldbaum asked Gaudelius if she was willing to serve as appeal officer for any UCB decision appeal submitted by Plaintiff. Feldbaum advised that the appeal officer who "would typically be receiving this appeal," was a member of the University's Behavioral Threat Management Team where Plaintiff had been discussed at a number of meetings, "and we think it may be best to have someone else consider the appeal if submitted."  (Ex. 190 (Gaudelius Dep. Ex. 2) at PSU 1237; *Gaudelius Dep.* 54:13-56:3; 74:21-23).

317.   On February 28, 2020, Langford sent Plaintiff a copy of the UCB Chair Report containing the UCB's decision.   Langford provided Plaintiff with information regarding her ability to appeal and advised Plaintiff that, per the Code of Conduct, her appeal was due in five business days by March 6, 2020 at 5:00 p.m.[32]  (Ex. 191 at PSU 1553-54; Ex. 179 (UCB Chair Report); *see also* Ex. 192 (Gaudelius Dep. Ex. 1) at PSU 1097; *see also Guadelius Dep.* 49:23-50:13; *Pl. Dep.* 325:2-11).

---

[32] Although Plaintiff's appeal was due by March 6, 2020, the University agreed to extend Plaintiff's deadline to file an appeal until March 11, 2020 at 5:00 p.m.  (*See* Ex. 193 at PSU 2423; Ex. 23 at PSU 180).

318.   The UCB found Plaintiff responsible for violations of the Student Code of Conduct section ".01.03:  Harming or Attempting to Harm Another" in relation to the Lyft driver incident and section ".03.03:    Harassment by Communication" in relation to Plaintiff's roommate A.B.  (Ex. 179 at PSU 2449).

319.   Plaintiff's sanctions consisted of "Suspension starting immediately until the end of the 2020 Summer Term" and "Conduct Probation with Transcript Notation through graduation.   Re-enrollment for the 2020 Fall Semester is conditional to a favorable assessment from a counselor."  (Ex. 179 at PSU 2449).

320.   The UCB provided the "Rationale for the Findings" within its report as well as the "Rationale for the Sanctions."  (Ex. 179 at PSU 2450-52).   In its rationale for the sanctions assigned, the UCB stated that:

> Once responsibility was established, the UCB was made aware **of the various sanctions that had already been assigned to Ms. Williams for the same categories of the University's Code of Conduct, plus additional charges pertaining to use of marijuana**.  As such, the UCB unanimously concluded that **both violations of the code were major violations**.  Once established the severity, the UCB unanimously decided that a separation was in order, while making sure that Ms. Williams continues to receive appropriate counseling.  The length of the separation was deemed to be the very minimum that should be assigned.

(Ex. 179 at PSU 2452 (emphasis in original)).

321.   On March 11, 2020, Plaintiff appealed the UCB's decision.  (Ex. 193 at PSU 2422; *Pl.'s Dep.* 321:3-19).  Plaintiff submitted a written statement as well as various other attachments with her appeal.  (Ex. 193 at PSU 2423-34).

94

322.   On March 12, 2020, Gaudelius was provided access to the UCB Hearing materials as well a Plaintiff's appeal and the documents attached to her appeal.  (Ex. 194 (Gaudelius Dep. Ex. 3) at PSU 1281; *Gaudelius Dep.* 57:23-59:21; 58:23-63:1).

323.   On March 11 and 12, 2020, Langford e-mailed Plaintiff acknowledging receipt of Plaintiff's appeal.  (Ex. 195 at PSU 744; Ex. 196 at PSU 1718-19).  Langford advised Plaintiff that the appeal officer has "5 business days to review the materials and provide a response.  However, given the current status of the University and navigation of telecommuting, they may request more time." (Ex. 196 at PSU 1718).

324.   Plaintiff responded to Langford on March 12, 2020 and stated "No, I am not allowing an extension beyond the 5 business days given for the appeal officer to get back to me."  (Ex. 196 at PSU 1718).

325.   On March 18, 2020, Gaudelius denied Plaintiff's appeal.  (Ex. 197 (Gaudelis Dep. Ex. 5) at PSU 1438; *Gaudelius Dep.* 59:25-62:4).

326.   Plaintiff admits that she has not fulfilled the terms of her suspension for potential re-enrollment and has "not received a favorable assessment from a counselor."  (Ex. 16 (Pl.'s Ans. to Defs.' Requests for Admission), Response Nos. 19, 21, and 22).

327.   On April 27, 2020, Plaintiff filed her First Amended Complaint in this lawsuit adding claims related to her February 2020 conduct proceeding and sanction.  (Ex. 198 (Pl.'s Am. Compl.)).

                            Respectfully submitted,

Dated:  April 6, 2023            */s/ James A. Keller*
                            James A. Keller (PA 78955)
                            Matthew J. Smith (PA 314157)
                            SAUL EWING LLP
                            Centre Square West
                            1500 Market Street, 38th Floor
                            Philadelphia, PA 19102-2186
                            Phone: (215) 972-1964
                            Fax:  (215) 972-4152
                            James.Keller@saul.com
                            Matthew.Smith@saul.com

                            *Attorneys for Defendants*