## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAYLA WILLIAMS,

        Plaintiff,

    v.

THE PENNSYLVANIA STATE
UNIVERSITY; LAUREN
LANGFORD; KAREN FELDBAUM;
and YVONNE GAUDELIUS,

        Defendants.

No. 4:20-CV-00298

(Chief Judge Brann)

### MEMORANDUM OPINION

### OCTOBER 11, 2023

Modern universities are behemoths; educational department stores spread across multiple campuses, combining undergraduate colleges, graduate schools, professional schools, online courses, and research institutions. These institutions have largely displaced—or acquired—smaller colleges guided by more narrow missions. Defendant The Pennsylvania State University epitomizes this evolution. A far cry from its humble beginnings as an agricultural college, Penn State counts nearly 90,000 students on its rolls, with over half of those at its University Park campus.[1] As schools have grown to the size of small cities, so have the

---

[1]   Student Enrollment, Penn State (Fall 2022), available at https://datadigest.psu.edu/student-enrollment/.

administrative institutions within them. American universities maintain police forces, formalized codes of conduct akin to criminal codes, and pseudo judicial institutions which hear and rule on disputes between those on campus and conduct code violations.

Few individuals are more familiar with these features of the modern university and how they interact with their municipal counterparts than Plaintiff Kayla Williams. As a freshman, Williams accused another Penn State student of rape, and alleges that Penn State declined to sanction the accused because she criticized the University's handling of the case. Later, Williams accused a professor of racial bias and alleges he subsequently retaliated against her for levying those accusations. Finally, a few credits short of graduation, Williams herself was accused of harassment and assault, leading to her suspension from Penn State. Williams alleges that, in those proceedings, she was deprived of due process.

There is much less to Williams' claims than meets the eye. Dissatisfaction with adverse academic or disciplinary decisions does not give rise to a legally cognizable harm. Therefore, the Court will grant Defendants' Motion for Summary Judgment.

## I.   PROCEDURAL HISTORY

Williams filed her eight-count First Amended Complaint on April 27, 2020, against Defendants The Pennsylvania State University, Brandon Prawdzik, Lauren

Langford, Karen Feldbaum, and Yvonne Gaudelius.[2] On September 4, 2020, the Court granted Defendants' Motion to Dismiss[3] with regard to Counts V and VI.[4] Remaining for disposition are Williams' Title VI retaliation (Count I) and discrimination (Count IV) claims, Due Process claims (Counts II and III), and First Amendment Claims (Counts VII and VIII).[5] Defendants have filed a Motion for Summary Judgment as to each remaining claim,[6] which is fully briefed by the parties and now ripe for disposition.[7]

## II.   LEGAL STANDARDS

### A.    Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  As expressed by the Supreme Court of the United States in *Celotex Corp. v. Catrett*, summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[8] Material facts are those "that could

---

[2]   Am. Compl., Doc. 18. Williams subsequently voluntarily dismissed Prawdzik. Doc. 28.

[3]   Mot. to Dismiss Doc. 22.

[4]   Mot. to Dismiss Order, Doc. 33.

[5]   *See* Am. Compl.; Williams Opp., Doc. 92 at 5 (describing Williams' three "classes" of claims).

[6]   Mot. Summ. J., Doc. 77.

[7]   Defs.' Br. Supp. Summ. J. ("MSJ Br."), Doc. 84; Williams' Br. Opp. Summ. J. ("Opp."), Doc. 92; Defs.' Reply Supp. Summ. J. ("Reply"), Doc. 100.

[8]   477 U.S. 317, 322 (1986).

alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[9]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[10] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved by only a finder of fact because they may reasonably be resolved in favor of either party."[11] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[12] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[13]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[14] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[15] Moreover, "[i]f a party fails to properly support an assertion of

---

[9]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[10]  *Celotex*, 477 U.S. at 323.

[11]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[12]  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[13]  *Port Auth. Of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[14]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 422, 448 (1871)).

[15]  *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[16] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[17]

### B.    Local Rule 56.1

Local Rule 56.1 requires all motions for summary judgment to be "accompanied by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." The party opposing summary judgment must then include with its papers an answer to the movant's statement of facts in which it identifies, in corresponding numbered paragraphs, those material facts which the nonmovant contends there is a genuine issue to be tried.[18] "Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."[19] Material facts in the movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."[20]

### 1.    Statement of Additional Material Facts

---

[16]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[17]  Fed. R. Civ. P. 56(c)(3).

[18]  LR 56.1.

[19]  *Id.*

[20]  *Id.*

In support of their motion for summary judgment, Defendants submitted a 327 paragraph Statement of Undisputed Material Facts.[21] Williams' answer to Defendant's Statement of Facts responded to each paragraph and included 107 paragraphs of "Additional Material Facts."[22] Defendants subsequently filed a motion asking the Court to either strike or allow Defendants to respond to Williams' Statement of Additional Material Facts.[23]

Defendants argue that the Court should not exercise its discretion to depart from the requirements of Rule 56.1 because (1) Williams' AMF asserts facts without record support, and (2) Defendants would be prejudiced because they will not have the opportunity to address these inaccuracies.[24] These concerns are somewhat undermined by Defendants having taken the initiative to preemptively submit the response—in which they address Williams' purportedly unsupported assertions—that they ask permission to file.[25] Williams submitted a single paragraph response, arguing that Defendants' position would preclude her from "point[ing] to sufficient facts on which a jury could find" in her favor, instead forcing her to rely on

---

[21]   Defs.' Statement of Material Facts ("SMF"), Doc. 77-2.

[22]   Williams' Resp. to Defs.' Statement of Material Facts ("RSOF"), Doc. 93 at 1-25, ¶¶ 1-327; Williams' Additional Material Facts ("AMF"), Doc. 93 at 25-38, ¶¶ 1-107.

[23]   Mot. to Strike, Doc. 101. Defendants filed as an exhibit the response that they ask the Court to allow them to file. Defs.' Resp. to Williams' Additional Material Facts ("RAF"), Doc. 101-2.

[24]   *See* Mot. to Strike, Section V.A.

[25]   *See Alcantara v. Aerotek, Inc.*, 2018 WL 3007528, *12 (M.D. Pa. June 15, 2018), *aff'd* 765 F. App'x 692 (3d Cir. 2019) (considering statement of additional facts where movant filed a response to those facts with the reply). Defendants attempt to distinguish *Alcantara* on the grounds that they filed their response separate from their reply brief. Mot. to Strike at 7 n.3. This is a distinction without a difference. The Court now has the RAF; therefore, Defendants will not be prejudiced if the Court considers Williams' AMF.

Defendant's "false narrative."[26] In reply, Defendants reiterate their argument that Rule 56.1 does not permit Williams to file her own Additional Material Facts, and assert that it is Williams who is presenting the false narrative.[27]

As an initial matter, the Court assures the parties that it is not persuaded by the rhetorical flourish of their counterpart. Though counsel may think of themselves as modern day Daniel Websters, no amount of yarn spinning in a Statement of Material Facts will move the Court beyond the bounds of "ordinary range of thought and feeling."[28] If the parties agree on a fact, the Court will accept the fact as stated. If they do not, the Court will look to the parts of the record cited by each party and make its own determination. No more, no less. Williams could have denied each of the SMF's paragraphs with citations to the record, and that would have been sufficient to obviate any concerns of a false narrative.

Courts in this District have repeatedly held that "Local Rule 56.1 does not permit a non-moving party to file an additional statement of material facts that does not respond to the moving party's statement."[29] Instead, Rule 56.1 "requires the

---

[26] Mot. to Strike Opp., Doc. 103.

[27] Mot. to Strike Reply, Doc. 104, at 2.

[28] Burack, Thomas S., *Wax Wick, and Flame: Performing Daniel Webster's Peroration from the Dartmouth College Case*, 18 U.N.H. L. Rev. 3, 3-4 (2019) (describing Webster's peroration as "so moving that it brought Chief Justice John Marshall to tears.").

[29] *Evans v. Kaye*, 2021 WL 5416282, at *5 (M.D. Pa. Nov. 19, 2021) (citing *Holt v. Pennsylvania*, 2021 WL 3511104, at *4 (M.D. Pa. Aug. 10, 2021); *Farmer v. Decker*, 353 F. Supp. 3d 342, 347 n.1 (M.D. Pa. 2019); *Barber v. Subway*, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015)); *accord Patra v. Pennsylvania Sys. of Higher Educ.*, 2019 WL 4861444, at *1 n.8 (M.D. Pa. Aug. 30, 2019); *Sash v. Hogsten*, 2009 WL 249649, at *2 (M.D. Pa. Feb. 2, 2009); *Carson v. Aurand*, 2019 WL 2569447, at *1 n.1 (M.D. Pa. June 20, 2019); *Dreibelbis v. Young*, 2007 WL 4344120, at *2 (M.D. Pa. Dec. 10, 2007).

nonmoving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement, and to 'include references to the parts of the record that support the statements.'"[30] Where the non-movant fails to abide by these requirements of Rule 56.1, the movant's uncontroverted statements of fact may be deemed admitted.[31] Ultimately, "the proper sanction for violating Rule 56.1 is within the district court's discretion."[32]

In determining the proper sanction, the Court is mindful of Rule 56.1's purpose: to "structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration to the motion."[33] The movant's statement and the non-movant's response should enable "the court to identify contested facts expeditiously."[34] Given that Defendants' "short and concise statement of the material facts"[35] consists of 327 paragraphs over nearly 100 pages, the Court is skeptical that even strict adherence to the requirements of

---

[30] *Landmesser v. Hazleton Area Sch. Dist.*, 982 F. Supp. 2d 408, 413 (M.D. Pa. 2013) (quoting LR. 56.1).

[31] *Id.* (citing LR. 56.1); *see also Conn v. Bull*, 307 F. App'x 631, 633 (3d Cir. 2009) (upholding district court's decision to deem facts admitted under Local Rule 56.1).

[32] *Hickey v. Merritt-Scully*, 2021 WL 949448, at *2 (M.D. Pa. Mar. 12, 2021) (citing *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 614 (3d Cir. 2018)).

[33] *Park*, 2011 WL 1831708, at *3 (quoting *Hartshorn v. Throop Borough*, 2009 WL 761270, at *3 (M.D. Pa. Mar. 19, 2009)).

[34] *See id.* at *3 (quoting *Pinegar v. Shinseki*, 2009 WL 1324125, at *1 (M.D. Pa. May 12, 2009)).

[35] LR. 56.1.

Rule 56.1 by Williams would make a material difference in the expedience with which the Court is able to identify the contested facts.[36]

Practically, disregarding Williams' AMF would make it impossible for the Court to evaluate her arguments opposing summary judgment. Williams' opposition brief contains dozens of citations to the AMF.[37] Excising those citations and references would render much of Williams' opposition unintelligible, likely resulting in a waiver of her arguments.[38] Though I would prefer that Williams paid more heed to the Rules of this Court, waiver of her opportunity to defend her claims on the merits is too harsh a sanction. Nor is requiring Williams to redraft her RSOF in accordance with Rule 56.1 a viable option. Given how intertwined Williams' AMF is with her opposition, both her RSOF and opposition would need to be largely rewritten. Allowing Williams to correct her filings would reward her for failing to adhere to the Court's Rules by giving her the opportunity to consider and respond to Defendants' filings.[39]

---

[36] Defendants and Williams insist that the other is to blame for the voluminous nature of the parties' summary judgment filings. Reply 1. This is one dispute the Court will abstain from weighing in on.

[37] *See generally* Opp.

[38] *See Diodato v. Wells Fargo Ins. Svcs., USA, Inc.*, 44 F. Supp. 3d 541 at 556-57 (M.D. Pa. 2014) (collecting cases observing that failure to offer a response to a movant's summary judgment arguments constitutes an abandonment of claims left undefended).

[39] The Court notes that this would not be an issue had Defendants not preemptively filed their RAF. Generally, litigants seeking permission from a court to submit a filing should wait until permission is granted to do so. There may be the rare circumstance where it is necessary to seek forgiveness rather than permission from a court, but it is not the case here. Defendants would have been better served by allowing the Court to consider their request before filing, let alone spending considerable resources drafting, a 54-page RAF. Nonetheless, the Court recognizes that it is Williams' failure to adhere to the rules which led to Defendants being

As Defendants note, many of Williams' Additional Facts are (procedurally improper) responses to Defendants' SMF or commentary and argument that belongs in briefing.[40] Therefore, the Court will consider Williams' AMF in conjunction with her RSOF and her opposition brief.[41] This does not mean, however, that the Court will do so uncritically and accept at face value statements in the AMF, or the parties' briefings generally, which contain "mischaracterizations" or "facts that are not supported by the record."[42] Accordingly, the Court denies Defendants' request that the Court to strike Williams' statement of Additional Material Facts. The Court will consider the entirety of the parties' filings, including Defendants' RAF.[43]

## 2.      Failure to Respond to Material Facts

Defendants also argue that Williams "failed to properly respond to many of the facts in the Defendants' SMF."[44] The Court agrees. Williams' objection to nearly 100 paragraphs in the SMF on the basis that they do not posit "a material fact to any claim or defense" is nonresponsive and those facts are deemed admitted.[45] So to are

---

confronted with only uncertain and imperfect options. Therefore, the Court will limit the fallout from Williams' error accordingly.

[40]  *See* RAF ¶ 1 n.1 (observing that, in many of the paragraphs in her AMF, Williams cites to Defendant's SMF).

[41]  *See Alcantara*, 2018 3007528, at *13 (allowing additional statements where they permitted the nonmovant to resent all of the evidence they believed would rebut the motion for summary judgment).

[42]  *Cf.* Mot. to Strike 11, 12.

[43]  As Defendants have already filed their response, their request for leave to file that response is denied as moot.

[44]  Reply 3.

[45]  *See Weizner*, 909 F.3d at 613 ("Where an opposing party fails to object in its answer, those facts in the party's statement are considered admitted.") (citing LR 56.1). The Court also notes

the facts to which Williams has various, generalized evidentiary objections. "While summary judgment is generally subject to the rules of evidence, 'general objections such as characterizing the evidence as hearsay, will not suffice' to raise a proper evidentiary objection."[46] Williams' bare citations to the Rules of Evidence[47] and conclusory statements—*i.e.* that portions of the SMF are hearsay,[48] "confuse the issues,"[49] or "were made without personal knowledge,"[50]—are insufficient to raise legitimate objections. Williams also lodges numerous baseless objections under Rule 106, complaining that she need not respond to paragraphs in the SMF without considering the entire document.[51] Rule 106 requires the introduction of an entire document "that in fairness ought to be considered at the same time." Williams does not explain why it would be unfair to only consider the cited portions in her objections. Even if she did, the entire documents *are* on the record.[52]

---

that if these facts are truly immaterial, then Williams will not be prejudiced by their being deemed admitted.

[46] *See Chambers v. York Cnty. Prison*, 2021 WL 1212532, at *1 n.2 (M.D. Pa. Mar. 31, 2021) (quoting *United States v. Sandini*, 803 F.2d 123, 126 (3d Cir. 1986)).

[47] *E.g.*, RSOF ¶¶ 31-34, 47-54, 121-126, 254-55.

[48] *E.g.*, RSOF ¶¶ 33-34, 201-207 (objecting under Fed. R. Evid. 802).

[49] RSOF ¶ 22.

[50] RSOF ¶ 24.

[51] *E.g.*, RSOF ¶¶ 46-54, 119, 121-26, 254-55 (objecting to SMF on basis that entire document should be considered); *see also* Williams Dep., Ex. 1, Doc. 80-2 at 104:18-105:2 (objecting to question regarding email between Williams and Prawdzik on the basis that the entire email thread should be considered).

[52] *Compare* RSOF ¶¶ 47-54 (objecting under Rule 106 that "the entire code should be used, including the Special Protocols for crimes of violence") *with* Ex. 23, Doc. 78-11, at 27-29 (Special Protocols for Crimes of Violence); *compare* RSOF ¶ 121-26 (objecting that "the entire email to Alexander should be considered") *with* Ex. 55, Doc. 78-29 (entire email thread).

Williams also makes several similarly deficient spoliation arguments related to Penn State's failure to preserve Williams' student emails. For its part, Penn State admits that Williams' emails were automatically deleted by a "routine IT function" when Williams' emails were deleted once her status in the University's systems was changed to reflect her suspension. Penn State's "duty to preserve potentially relevant evidence is an affirmative obligation that [it] may not shirk" and it is no defense that Penn State "inadvertently failed to place a 'litigation hold' or 'off switch' on its document retention policy to stop the destruction of that evidence."[53] However, sanctions for spoliation are not automatic, and Williams' conclusory arguments that she is entitled to adverse inferences are insufficient.[54] Nor is Williams entitled to an adverse inference based on her unsupported belief that documents which *were* produced are unreliable or altered.[55]

Finally, Williams' conclusory statements that certain issues are "not undisputed because [they are] issue[s] of credibility for the jury" are similarly deficient.[56] Though the Court may not make credibility determinations in evaluating

---

[53] *Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004).

[54] *See Bozic v. City of Washington, Pa.*, 912 F. Supp. 2d 257, 271-72 (W.D. Pa. 2012) (collecting cases discussing four-factor test for determining what, if any, sanctions are appropriate where a party has spoliated evidence)

[55] *Carty v. Steem Monsters Corp.*, 2022 WL 17083645, at *5 (E.D. Pa. Nov. 28, 2022).

[56] *E.g.*, RSOF ¶¶ 98-101, 127-129. These objections are also often contradictory of Williams' own position. For example, Williams objects to the statement of fact that "Prawdzik . . . reminded Plaintiff that he still needed documentation for her absences" on the grounds that it is an issue of credibility. SMF ¶ 100; RSOF ¶ 100. But Williams complains that Prawdzik did just that. *See* AMF ¶ 27; Ex. 51, Doc. 78-25; Williams Dep., Doc. 80-2, 121:24-122:126:15.

a motion for summary judgment, Williams' conclusory statements that certain paragraphs of the SMF are issues of credibility do not make them so.[57]

To the extent that Williams does raise cognizable objections or supports her denials with citations to the record, the Court will address those accordingly. As to the balance of the SMF, the Court deems those facts admitted.

## III.    FACTUAL BACKGROUND[58]

Williams' claims relate to four distinct timelines and series of events that overlap during the latter half of 2019 and into 2020. For clarity, the Court describes the four relevant timelines independently.

### A.    Penn State Title IX Investigation of Williams' Rape Allegations

On January 17, 2017, Williams awoke at the apartment of fellow Penn State Student A.A. and called 911 to report that she had been sexually assaulted the night before.[59] Ferguson Township Police officers responded to the scene and talked to A.A. and D.W., another Penn State Student, who reported that they had consensual sexual intercourse with Williams the prior night.[60] Williams was transported to Mount Nittany Medical Center where she underwent a sexual assault examination.[61]

---

Williams may disagree with how Prawdzik characterizes the interaction, but that is not at issue in SMF paragraph 100.

[57] *Conlon v. Ryder Sys., Inc.*, 2014 WL 5843421, at *1 n.1 (D.N.J. Nov. 12, 2014).

[58] Citations to numbered exhibits refer to Defendants' exhibits filed in support of their motion for summary judgment. Citations to RSOF exhibits and AMF exhibits refer to exhibits filed by Williams in support of those respective documents.

[59] SOF ¶ 4

[60] SOF ¶¶ 5-6.

[61] SOF ¶ 7.

The Ferguson Police notified the University Police of Williams' allegations the next day.[62] On January 20, Katharina Matic of the University's Office of Sexual Misconduct Prevention and Response ("OSMPR") emailed Williams to invite her to meet with the Office and to provide Williams with resources and procedural options.[63] Williams initially responded, but did not reply to a follow up on January 23.[64] On March 13, 2017, Matic followed up informing Williams that they would close the matter, but maintain the record if she would like to proceed in the future.[65] She also advised Williams that evidence, including text messages, could be lost with the passage of time.[66] In October 2017, Williams advised OSMPR that she wanted to proceed with a Title IX investigation.[67] Over the next six months, Title IX Coordinator and Investigator Chris Harris investigated Williams' claims.[68] It was discovered that D.W. had withdrawn from the University, so the Title IX case proceeded as to A.A. alone.[69] Over the course of the investigation, Harris interviewed ten witnesses, including D.W. and Williams, attempted to interview A.A. who refused to participate.[70] Harris also considered other evidence, though he was unable to review records such as text messages and video evidence that the

---

[62]  SOF ¶ 9.
[63]  SOF ¶ 10.
[64]  SOF ¶ 11.
[65]  SOF ¶ 12.
[66]  *Id.*
[67]  SOF ¶ 15.
[68]  SOF ¶¶ 16-21.
[69]  SOF ¶ 25.
[70]  SOF ¶¶ 16, 25; Ex. 7, Doc. 80-5, at 1 n.1.

Ferguson Township Police Department declined to share with Penn State.[71] Harris issued his report on April 3, 2018.[72]

On April 5, 2018, Williams tweeted a picture of A.A. captioned:

His name is [A.A.] and he's one of the rapists that still walks freely on campus bc PSU keeps dragging out the investigation after a year plus!!! The other one's name is [D.W.] but I don't know what he looks like…[73]

The same day, she also Tweeted:

While we're on the topic, let's also talk about how Penn State hides and undermines just how bad rape on this campus actually is and how much rapists are[] condoned no matter the amount of evidence!! !![74]

The next day, Lisa Powers, Senior Director of the Office of Strategic Communications reached out to Danny Shaha, Assistant Vice President, Student Rights & Responsibilities, regarding Williams' Tweets, asking if there were any criminal or conduct proceedings ongoing related to her allegations.[75] Shaha and Harris exchanged emails regarding the Tweets.[76] Williams was provided with the Title IX investigation packet by the Office of Student Conduct on May 11, 2018.[77] The University Decision Panel ("UDP") convened a hearing against A.A. on May 18, 2018, during which Williams participated by phone and A.A. participated in

---

[71]  SOF ¶¶ 18-21.
[72]  SOF ¶ 26.
[73]  Ex. 14, Doc. 80-10.
[74]  Ex. 15, Doc. 80-11 at 74. Williams' Tweet read that "rapists *aren't* condoned no matter the amount of evidence" which appears to be a typo.
[75]  RSOF Ex., Doc. 94-30.
[76]  *Id.*, AMF Ex., Doc. 96-51.
[77]  SOF ¶ 29.

person.[78] The UDP issued its decision, finding A.A. not responsible, the same day.[79] Williams submitted an appeal of the decision on May 31, which was denied on June 11, 2018. In the meantime, Harris had reviewed the process applied in the case and told Williams that he "believe[d] the Office of Student Conduct, the Title IX decision panel, and the subsequent appeals process were all managed appropriately, consistent with established University policies and procedures."[80] Harris further advised Williams that, if she felt her rights were violated and that University procedures were improperly applied, she could file an external complaint with the U.S. Department of Education's Office for Civil Rights.[81]

## B.   Prawdzik's Class and Williams' Title VI Complaint

During the Fall 2019 semester, Williams was enrolled in an English 202A advanced writing course taught by Dr. Brandon Prawdzik.[82] Prawdzik maintained an attendance policy which stated that "a student whose absences are excessive 'may run the risk of receiving a lower or failing grade,' regardless of his or her performance in the class."[83] Further, Prawdzik would only excuse absences "according to legitimate documentation."[84]

---

[78]   SOF ¶¶ 30-31.
[79]   Ex. 17, Doc. 80-12.
[80]   Ex. 21, Doc. 70-9, at 17.
[81]   *Id.* at 18.
[82]   SOF ¶ 81.
[83]   SOF ¶ 83.
[84]   *Id.*

As part of the class, students were required to write a research paper.[85] Williams chose to write her research paper about racism and discussed the topic with Prawdzik early in the semester.[86] Williams subsequently emailed Prawdzik "to say thank you for helping [her] figure out a set research question!"[87] Throughout September and October, Williams missed several classes and had not provided Prawdzik with any documentation excusing her absences.[88] On October 14, 2019, Williams attended Prawdzik's class and Prawdzik approached her regarding the missing documentation.[89] Prawdzik's attempt to discuss Williams' absences in earshot of others in the class upset Williams.[90] The pair went into the hallway where the situation escalated, leading Prawdzik to dismiss Williams from class.[91] Following this incident, Williams filed a discrimination complaint against Prawdzik with the University Affirmative Action Office ("AAO").[92]

After class on October 14, 2019, Prawdzik emailed Gregg Rogers, a director of the Program in Writing and Rhetoric, seeking advice on how to handle the situation with Williams going forward.[93] In the email, Prawdzik said that Williams "has shown anger in class and in person" and "has also been antagonist[ic] in a forum

---

[85]   SOF ¶¶ 82, 88.
[86]   SOF ¶ 89.
[87]   SOF ¶ 91.
[88]   SOF ¶¶ 93-101.
[89]   SOF ¶ 100; *see also* AMF ¶¶ 27-29.
[90]   SOF ¶ 101; AMF ¶ 28.
[91]   SOF ¶ 102-104; AMF ¶ 30-32.
[92]   SOF ¶ 107.
[93]   SMF ¶ 108; AMF ¶¶ 36-38.

post, in which she labelled a student's comments racist."[94] He described the incident during class that day and said that he was "uncomfortable about this student being in my classroom and very uncomfortable about the accusations [of racism] that she was shouting at me."[95] The next day, Prawdzik emailed Williams and told her that she could return to class provided that there would be "no further disruption of class" and she "maintain a professional relationship with the professor and other students.[96] He also notes that, because she is "not registered with the Office of Student Disability" "none of the eight recorded absences is excused."[97] He tells her that if she is unwilling to agree to these conditions, he will refer her to the Directors of the Program in Writing and Rhetoric, Rogers and Cheryl Glenn.[98] Williams responds that she has "already filed a discrimination report against" Prawdzik "so we will be dealing with it that way" and that it was Prawdzik who created the distraction by asking about her personal issues during class.[99]

That evening, Williams sent a follow up email insisting that she was absent "maybe 3-5 times, but NOT 8" and that she had "NEVER been a class distraction and didn't have any problems with any students in the class except the RACIST comments one student made at the VERY beginning of the semester."[100] Further,

---

[94]  Ex. 47, Doc. 78-21, at 689.
[95]  *Id.*
[96]  *Id.* at 691.
[97]  *Id.*
[98]  *Id.*
[99]  *Id.* at 692.
[100] *Id.*

18

she accuses Prawdzik of "treat[ing her] differently" after she chose her "Racism topic for the course trying to convince me that minorities are partly at fault for racism and structural racism etc."[101] She concludes by asking Prawdzik why he found it necessary to start talking about her "personal situation" in class and to explain how she is a "class distraction."[102] She follows up with a third email on October 21, 2019, asking if he plans on answering her questions.[103] On October 22, Prawdzik responds by reiterating his stance from his October 15 email, again referring her to Glenn and Rogers and telling Williams that he "do[es] not feel comfortable having [Williams] in class until this matter is mediated by a third party."[104] Williams replies that day with three successive emails, effectively repeating her position from her earlier emails.[105]

Dr. Suzanne Adair, the Associate Vice President for Affirmative Action, investigated Williams' complaint.[106] As part of the investigation, she interviewed Williams, Prawdzik, and two other students in Williams' class.[107] Adair interviewed Williams on October 25.[108] Williams reiterated that she became upset after Prawdzik asked her about her absences in front of the rest of the class.[109] Williams also tells

---

[101] *Id.*
[102] *Id.* at 693.
[103] *Id.* at 693.
[104] *Id.*
[105] *See id.* at 694-96.
[106] SMF ¶ 118; RSOF ¶ 118.
[107] *Id.*
[108] Ex. 59, Doc. 78-33.
[109] *Id.*

Adair that Prawdzik told her that minorities were responsible for racism and mentioned the discussion board posts about racism from earlier in the semester.[110]

Adair then interviewed Prawdzik on November 1.[111] Prawdzik tells Adair about the discussion board post when Williams accused a student of "post[ing] a racist comment" and his meeting with Williams regarding her research topic in which he says Williams misconstrued his words, accusing him of "saying black people are responsible for racism."[112] He admits that, in hindsight, he could have approached Williams differently regarding her absences, but maintains that it was Williams who escalated the situation.[113] Prawdzik says that he asked if she wanted to discuss the issue outside of the classroom when he noticed that she was "fuming" and that, once they left the room, she immediately attacked him for "discriminating against her" and being "racist to her."[114] At this point, Prawdzik says he told Williams she needs to leave class.[115] Instead, he says that she returned the class and yells to the other students that they need to report Prawdzik for discriminating against her.[116] Prawdzik further detailed the conditions he set out for Williams to return to class and expressed his concern that he needs a third party involved because

---

[110] *Id.*
[111] Ex. 61, Doc. 78-35.
[112] *Id.* at 1.
[113] *Id.* at 2.
[114] *Id.*
[115] *Id.*
[116] *Id.*

he does not think he can "grade her and have it be perceived as fair."[117] He also notes that "[s]he likely can't pass the class at this point—it's a done deal given how much she's missed. She'd have to do a lot of work to get back up to speed. If he was her advisor, he'd suggest she drop the course."[118] On November 21, Adair interviewed two students in Williams' class regarding the October 14 incident and those students corroborated Prawdzik's version of events.[119]

On December 1, 2019, Adair notified both Prawdzik and Williams that she had concluded there was no evidence to substantiate Williams' complaint.[120] Adair told Williams that she "should follow any instructions provided by the instructor regarding your involvement in the course going forward"[121] and advised Prawdzik of the same.[122] On December 16, 2019, Williams emailed Prawdzik that her "advisor will be in communication with you regarding completing your class first thing tomorrow."[123] On December 18, 2019, Tauheddah Alexander, a case manager in Student Care & Advocacy, reached out to Prawdzik via email copying Williams regarding "the necessary steps Ms. Williams will need to take to complete the course," asking him to confirm a list of outstanding assignments.[124] Prawdzik

---

[117] *Id.*
[118] *Id.* at 3.
[119] Ex. 62, Doc. 78-36.
[120] Ex. 47, Doc. 78-21, at 31; Ex. 63, Doc. 78-37.
[121] Ex. 63, Doc. 78-37.
[122] Ex. 47, Doc. 78-21, at 31.
[123] AMF Ex., Doc. 96-25.
[124] Ex. 55, Doc. 78-29, at 84.

responded that the list of assignments in Alexander's email "does not remotely approach the steps that Kayla Williams would, in theory, need to complete to receive credit for the course."[125] He notes that list excludes four assignments that "constitute 70% of the total grade."[126] Prawdzik also states that Williams "missed eleven classes as of 10-21-2019" which "warrants a failing grade."[127] He also says that she was "far behind and did not seem to know what we were doing as of 10-14-2019 . . . it is my conclusion that she has already earned an F for the course."[128]

Prawdzik then makes clear that he will have no active role in Williams completing the course:

> Instead of completing the class, Kayla Williams filed an Affirmative Action complaint against me after first accusing me of disability discrimination (she had declared no disability with Disability Services). I have expressed to Dean Suzanne Adair my outrage about this complaint, which I have consistently seen as fallacious and malicious. The complaint was dismissed after evidence—including interviews with students who were present on 10-14 and during the semester— showed that Kayla Williams had been judiciously treated and served by her instructor: that no policies had been compromised.

> Because I was suddenly faced with false and malicious accusations related to racial bias, I could not and cannot assess her work. I refuse to assess any of Kayla Williams' work, for fear that I will be treated maliciously and subject to further false accusations.

> As such, were she to complete the course, the English Department would need to pay someone to assess the work. That matter would need to be taken up with the English Department.

---

[125] *Id.* at 83.
[126] *Id.*
[127] *Id.*
[128] *Id.*

As such, Kayla Williams will not be able to complete the course with me facilitating it. She has too much damaged the trust between professor and student to make that possible.

My stance is that Kayla Williams has received an F for the course and that grade is final. I am willing to change my stance if I receive instructions to do so from an administrator with the authority to give them. But again, I will not assess this student's work. [129]

Williams responded "This is not how this is about to go. YOU caused that class disruption Prawdzik. You will come up with a way that I can complete this class and I will be in contact with others."[130] She also accuses Prawdzik of lying regarding the number of absences.[131] Prawdzik then asks Alexander to "[p]lease do what you can to keep this student from harassing me. My next step is to contact Student Conduct."[132] Alexander then thanked Prawdzik for the "detail[ed] clarification" and said that "[n]o further email correspondence between you and Ms. Williams will be necessary at this time."[133] Alexander tells Williams to "please share with me any further comments or concerns you may have."[134] Williams responds by sending a reply to everyone on the thread, including Prawdzik, saying there is "no reason [she] shouldn't be able to make up that course" and then, addressing Prawdzik specifically: "I had every right to file that report on you after you violated my privacy in[ front] of the whole class for NO reason."[135]

---

[129] *Id.*
[130] *Id.* at 82.
[131] *Id.*
[132] *Id.*
[133] *Id.* at 81.
[134] *Id.*
[135] *Id.*

Adair subsequently reached out to the English Department Head who informed her that "Kayla hasn't completed 70% of the work for the ENG 202 course" and that it "would be very hard to . . . complete the course now, even with a deferred grade."[136] Adair ultimately concluded that the only options would be for Williams "to retro[actively] drop the course and take it in the spring online (or find another course to substitute) or hope that this isn't actually a requirement so she doesn't have to retake the course at all."[137] Adair subsequently informed Williams that it was not possible for her to receive a deferred grade and make up the work.[138] As a result, Williams' final grade for Prawdzik's class was an "F."[139]

## C.    Dr. Yarwood's Class and Williams' Title VI Complaint[140]

During the Spring 2020 semester, Williams was enrolled in a Psychology course taught by Dr. Michelle Yarwood.[141] Yarwood utilized an online quiz tool to create multiple choice quizzes for the class.[142] Each quiz consisted of ten questions which were pulled from a larger pool of questions.[143] The tool would automatically grade the quizzes.[144] On two separate occasions, there was an error with the tool

---

[136] Ex. 64, Doc. 78-38, at 140.
[137] *Id.*
[138] SOF ¶ 138.
[139] SOF ¶ 136.
[140] Williams asserts that each of the SOF paragraphs regarding Yarwood's class are immaterial.
[141] SOF ¶ 139.
[142] SOF ¶ 141.
[143] *Id.*
[144] *Id.*

which resulted in incorrect grading of certain questions.[145] Williams was not impacted by either of these grading issues because the error was either rectified prior to her taking the quiz, or her quiz did not contain one of the questions that had been incorrectly graded.[146]

Williams insisted that her grades for these quizzes, as well as other assignments, had been improperly calculated.[147] Williams accused Yarwood of using a "stricter rubric" to grade Williams' assignments and submitted an Affirmative Action complaint against Yarwood.[148] Williams subsequently dropped Yarwood's class.[149]

### D.    Penn State Investigation and Subsequent Suspension of Williams for Harassment and Assault

On October 18, 2019, the University issued an Administrative Directive to Williams, instructing her to have no contact with her roommate, A.B., following an incident days earlier.[150] A.B. alleged that Williams harassed and threatened her and used A.B.'s personal information without permission.[151] In particular, A.B. claimed that, on October 14, Williams physically threatened her while A.B. was Facetiming with her mother.[152] On October 28, 2019, Williams was involved in a separate

---

[145] SOF ¶¶ 147, 155.
[146] SOF ¶¶ 147-152; 155.
[147] SOF ¶¶ 163-165.
[148] SOF ¶¶ 168.
[149] SOF ¶ 176.
[150] SOF ¶¶ 198-99.
[151] SOF ¶ 201.
[152] SOF ¶¶ 202-07.

incident in which she struck a Lyft driver, John Petrulich, in the head.[153] Petrulich called the police and Williams was cited by the Patton Township Police for harassment with physical contact.[154] Williams would eventually be convicted of harassment in relation to this incident following a summary trial.[155] The conviction was upheld on appeal.[156]

Lauren Langford, Assistant Director, Office of Student Conduct, initially reached out to Williams to schedule a time to meet regarding A.B's complaint on November 21, 2019.[157] Williams advised Langford that she would be accompanied by an advisor and that they would not be available to meet until after Christmas.[158] Langford responded that she would be "happy to find a time to meet that works for you and your advisor when you return after break."[159]

On December 19, 2019, Petrulich submitted a complaint to Penn State regarding the Lyft incident.[160] The complaint was forwarded to the Associate Dean for Undergraduate Studies in the College of Health and Human Development, Dennis Shea, who subsequently submitted a formal incident report and Behavioral Threat Management Team Referral Form to the University.[161] Shea emailed

---

[153] SOF ¶ 207.
[154] SOF ¶ 210.
[155] SOF ¶ 214.
[156] *Id.*
[157] Ex. 134, Doc. 80-38, at 3506-07.
[158] *Id.* at 3504-05.
[159] *Id.* at 3504.
[160] SOF ¶ 215.
[161] SOF ¶¶ 220-21.

Langford and others regarding the incident, stating that "this one incident may warrant suspension, but of course, any investigation and the conduct process can ferret that out."[162]

On January 9, 2020, Langford reached out to Williams to "find time to meet" and Williams responded, copying individuals from the Office of Student Affairs, that she would not meet until the "Office of Student Conduct formally responds to the lists of questions I gave them regarding recent situations and how they have charged me."[163] On January 13, Danny Shaha from the Office of Student Affairs responded:

> As I have shared before, we have responded to your questions, repeatedly. However, I'm happy to talk with you about any remaining concerns you have. Please let me know if you would like to speak with me.
>
> Regardless, you will need to respond to the Office of Student Conduct regarding the more recent allegations of misconduct. I have instructed them to move forward as they normally would. If you choose not to participate in that process, they will move forward without your participation. Of course, it would be beneficial for you to participate, but that is entirely up to you.[164]

Williams responded on the January 15, insisting that she would not be meeting with anyone until questions "regarding charging [Williams] in recent situations are answered."[165] The same day, Langford sent Williams a letter notifying her that a

---

[162] SOF ¶ 222.
[163] Ex. 134, Doc. 80-38, at 3503.
[164] *Id.* at 3502.
[165] *Id.*

conduct conversation had been scheduled for January 21 at 3:00 P.M..[166] The letter advised her that she "may contact the Office of Student Conduct at in [sic] advance of this meeting to reschedule" if she would be unable to attend due to an academic conflict.[167]

At 6:13 a.m. on January 21, Williams emailed an individual in the Affirmative Action Office asking for a meeting to discuss a discrimination complaint she filed the previous day.[168] At 8:29 a.m., Langford emailed Williams to remind her of her conduct conversation scheduled for that afternoon.[169] Then, at 10:35 a.m. Williams was admitted to the Emergency Department at the Mount Nittany Medical Center where she tested negative for the flu, was advised to follow up with a primary care physician or student health services, and subsequently discharged at 12:08.[170] Williams did not show up for her 3:00 p.m. conduct conversation. Instead, she sent an email to Dr. Adair at 3:03 p.m. asking for a meeting as soon as possible.[171] She also later sent an email to Dr. Yarwood, saying that she "was the sick girl in the back of your classroom" during class on January 21.[172] Yarwood's class took place from 3:05 p.m.-4:20 p.m.. The parties seem to agree that it is unlikely Williams actually

---

[166] Ex. 140, Doc. 79-29.
[167] *Id.*
[168] Ex. 68, Doc. 78-42, at 573.
[169] Ex. 142, Doc. 80-39 at 3528.
[170] Ex. 146, Doc. 80-41 at 157-8, 160, 166-67.
[171] Ex. 68, Doc. 78-42, at 572.
[172] Ex. 78, Doc. 78-52, at 461.

attended class that day[173] and, for her part Williams notes that there was a conflict with the originally scheduled conduct conversation, despite Langford noting it had been scheduled "[a]fter a review of [Williams'] class schedule."[174] However, Williams apparently did not advise Langford that the time was "not possible because of an academic conflict."[175]

At 4:04 p.m., Langford sent Williams a letter advising her that, as she had missed her conduct conversation scheduled for that day, it had been rescheduled for January 24 at 11:00 a.m..[176] Williams again said that neither her or her advisor would attend any meeting until she received answers to her questions.[177] Langford advised Williams that all of her questions had been answered in a January 16 email, and that the conduct conversation scheduled for January 24 "is a mandatory appointment [and i]f you choose not to attend the meeting, the conduct process will move forward without you.[178]

That is precisely what happened.[179] The meeting went on in Williams' absence, and Langford recommended Williams be sanctioned for "harming or attempting to harm another" and "harassment by communication."[180] On January 27,

---

[173]  SMF ¶ 245 n.25; RSOF ¶ 245.
[174]  RSOF ¶ 246; Ex. 70, Doc. 78-44 at 1.
[175]  *Cf.* Ex. 140, Doc. 79-29.
[176]  Ex. 147, Doc. 79-33; Ex. 16, Pl.'s Resp. to Defs.' RFAs, Doc. 78-6, Resp. No. 14.
[177]  Ex. 149, Doc. 80-42.
[178]  *Id.*
[179]  Ex. 16, Pl.'s Resp. to Defs.' RFAs, Resp. No. 15.
[180]  Ex. 151, Doc. 79-36 at 547.

Langford advised Williams that, if she did not respond to the charges by 5:00 p.m. on January 30, 2020, the charges and sanctions would go into effect.[181] Williams did not respond, and was subsequently informed on January 31 that the sanctions, suspension through August 17, 2020 and a requirement that Williams satisfactorily complete counseling, went into effect.[182] At 7:41 p.m. on January 31, after sending emails in which Williams refused to accept the suspension and complaining that she had been charged with no proof,[183] Williams asserted, for the first time, that she had missed the conduct conversation because she was sick.[184]

On February 3, 2020, Langford offered Williams a second opportunity to submit the Conference Summary Form and contest the charges, which Williams did on February 5.[185] On February 23, 2020, Williams was sent a notice of a University Conduct Board ("UCB") hearing regarding the charges relating to the A.B. and Petrulich incidents scheduled for February 21.[186] Leading up to the hearing, Langford reached out to A.B. and Petrulich to invite them to participate in the hearing, but both declined.[187] Williams filed the instant lawsuit on February 19, and Penn State was served with the suit the following day.[188] Following a hearing on

---

[181] *Id.* at 546.
[182] Ex. 153, Doc. 79-38; SMF ¶¶ 258-59; RSOF ¶¶ 258-59.
[183] *See* Ex. 154, Doc. 80-43.
[184] Ex. 156, Doc. 80-44 at 3514.
[185] SOF ¶¶ 266, 272.
[186] SOF ¶ 274.
[187] SOF ¶¶ 278-86, 295.
[188] Compl., Doc. 1; Summons, Doc. 3.

February 21,[189] the UCB decided to suspend Williams in a written opinion issued on February 28.[190] Williams' suspension was upheld following an appeal.[191]

## IV.    Title VI Retaliation

To establish a retaliation claim under Title VI, Williams "must show that she (1) engaged in constitutionally protected conduct, (2) suffered an adverse action at the hands of a public official, and (3) her constitutionally protected conduct was a substantial or motivating factor in the adverse action."[192] Opposition to conduct that a complainant reasonably believes constitutes unlawful discrimination is a protected activity under Title VI.[193] The final two elements are satisfied where the adverse action suffered is material[194] and because of opposition to unlawful discrimination.[195] The parties do not dispute that Williams' failing grade in Prawdzik's class is a materially adverse action.[196] The questions then are (1) whether

---

[189]   SOF ¶¶ 297-300.

[190]   SOF ¶ 317.

[191]   SOF ¶ 325.

[192]   *Williams v. Pennridge Sch. Dist.*, 782 F. App'x 120, 125 (3d Cir. 2019) (citing *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003)). Courts apply the same standard for claims brought under Title VI, Title IX, the Pennsylvania Human Relations Act, and 42 U.S.C. § 1981. *Id.*; *Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 669 (E.D. Pa. 2019).

[193]   *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008) (applying standard to Title VII claim). *Cf. Ke v. Drexel Univ.*, 645 F. App'x 161, 165 (3d Cir. 2016) (affirming dismissal of Title VI and § 1981 claims where plaintiff "d[id] not claim he was retaliated against because he complained of racial discrimination") (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005)).

[194]   *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[195]   *Jackson*, 544 U.S. at 184.

[196]   Opp. 7; *see also* MSJ Br. 59 (arguing that Williams "cannot show any causal link between the alleged adverse action (her receipt of an 'F' grade in Prawdzik's class) and the protected activity").

Williams engaged in constitutionally protected conduct, and (2) if so, did Prawdzik retaliate because of it.

### A.     Protected Conduct

Penn State argues that Williams "did not engage in protected activity" because "the undisputed facts demonstrate that [Williams] did not have an objective, reasonable, good faith belief that the alleged action by Prawdzik was discriminatory."[197] Williams counters that Penn State misstates the law, arguing that, while courts have recognized that the elements for retaliation are the same under Title VI, Title IX, and § 1981, it does not follow that the evidentiary burdens for those elements are similarly interchangeable.[198] She suggests that it is sufficient that her complaint to Penn State's Affirmative Action Office was facially about racial discrimination, so arguments regarding whether she had a good faith belief that she was being discriminated against are a red herring.[199] Instead, Williams says that the inquiry as to whether a complainant has an objectively reasonable belief that they are engaging in protected conduct relates to whether the complaint is one that, on its face, falls within the relevant statute.[200] Penn State observes, and the Court agrees, that to accept Williams' argument would be to hold that a frivolous complaint would constitute protected activity under Title VI.[201] It is not sufficient that Williams

---

[197] MSJ Br. 54.
[198] Opp. 10 n.2.
[199] *Id.* at 7.
[200] *See id.* at 9.
[201] *Cf.* Reply 8.

purported to bring a complaint alleging racial discrimination; she must "show that [s]he had a reasonable good faith belief that the practice [s]he opposed was unlawful under Title VI."[202]

Turning to the substance of Williams' complaint against Prawdzik, Penn State insists that "no reasonable person could objectively understand [Prawdzik's] conduct to constitute unlawful racial discrimination."[203] Williams responds that Penn State is misapplying the summary judgment standard and shifting the goal posts by focusing on whether Prawdzik discriminated against Williams rather than whether he retaliated against her.[204] As discussed above, whether Williams reasonably believed that Prawdzik unlawfully discriminated against her is the first step in the inquiry. Retaliating against a student for filing frivolous complaints may be inadvisable, but it would not support a Title VI claim. Therefore, the substance of her complaint is not "irrelevant to the claim at issue here."[205]

Though the Court must view the facts in the light most favorable to Williams, it is Williams' burden to show that she had "a reasonable good faith belief that the practice [s]he opposed was unlawful under Title VI."[206] It is clear from the record

---

[202] *Ke v. Drexel Univ.*, 2015 WL 5316492, at *38 (E.D. Pa. Sept. 4, 2015), *aff'd* 645 F. App'x 161 (3d Cir. 2016); *accord Peters*, 327 F.3d at 321; *Morales v. NYS Dep't of Labor* 865 F. Supp. 2d 220, 252 (N.D.N.Y. 2012), *aff'd* 530 F. App'x 13 (2d Cir. 2013). *See also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (holding that a plaintiff could not survive summary judgment on a Title VII claim where "no reasonable person could have believed" there was a Title VII violation).
[203] MSJ Br. 56.
[204] *See* Opp. 10-11.
[205] *Contra* Opp. 11.
[206] *Ke*, 2015 WL 5316492, at *38.

that Williams was motivated to file her complaint with the University Affirmative Action Office because she was angry that Prawdzik "start[ed] to discuss [Williams'] personal information"[207] "in[ ]front of the whole class."[208] Though it may be improper for Prawdzik to discuss Williams' personal medical issues or related absences in a classroom, to the extent that Williams' complaint to the Affirmative Action Office was based on this misstep by Prawdzik it is not a complaint of racial discrimination, and therefore not protected conduct under Title VI. However, that alone is not enough to sink Williams' claim. In her complaint to the Affirmative Action Office, Williams says that the October 14, 2019 incident was just the last straw in a long chain of abuses she had suffered at the hands of Prawdzik.[209] Williams says that Prawdzik had treated her differently ever since she chose racism as the topic for a research project.[210] She claimed that Prawdzik had tried to talk her out of her choice by saying "minorities are partly at fault for the racism [minorities

---

[207] Ex. 52, Doc. 78-26, .at 106.

[208] *See* Opp. 11, n.4 (arguing that a reasonable juror could conclude that, had Prawdzik "been more mindful October 14, 2019" Williams would not have filed her report); Ex. 51, Doc. 78-25, at 2; Ex. 55, Doc. 78-29, at 1 ("I had every right to file that report on you after you violated my privacy in[ front] of the whole class for NO reason."); Williams Dep. 124:11-15 (Williams testifying that, after Prawdzik asked her to leave class, she said "I didn't even do anything. . . . You just violated my whole privacy in front of the whole class, and you are telling me I have to go because of what you did."), 125:3-4 (Williams testifying that she told Prawdzik she would be "filing an affirmative action report" after he called 911); 125:7-8 (testifying that she filed the report after leaving class), 129:22-130:4 (Williams testifying that she would "not return[] to class where the professor . . . disrespected me [and] embarrassed me in front of 25 people. For no reason let them know I had mental health issues."), 132:18-22 (" . . . you can't just bully a student and disrespect her and violate her in front of the whole class and expect her to return to class and continue as your student.").

[209] Ex. 51, Doc. 78-25 at 1.

[210] *Id.*

34

experience" and "for no advancements being made when it comes to structural racism."[211]

Prawdzik offers a different version of events. He insists that he "steered Kayla in the direction of a paper about race because that's what she wanted to do."[212] Rather than dissuade her during office hours, Prawdzik says he "helped her organize her literature review" and "printed out documents to give her on this paper about race, and she thanked me for it."[213] In response, Williams e-mailed Prawdzik on September 9, 2019:

> I also wanted to say thank you for helping me figure out a set research question! I was going between the 2 topics all weekend and was driving myself crazy about it trying to figure out a good research question that would work for this specific project, so thank you so much.[214]

---

[211] *Id.*; *see also* AMF ¶¶ 14-18; Williams Dep. 98:1-6 ("Actually, whenever I picked a topic of race, after that class [Prawdzik] held me back for an hour and a half, and explained to me why I should pick a different topic. And how stigmatized groups, or however you may want to say it, is basically responsible for the racism we experience."), 98:11-14 (". . . I picked my own topic of racism. Prawdzik did not like that. And he was doing everything to convince me that racism is minorities' issues.")

[212] SMF ¶¶ 88-90; Prawdzik Dep. 43:18-20.

[213] SMF ¶¶ 89-92; AMF ¶¶ 89-92; Prawdzik Dep. at 43:22-24. Williams' objection to SMF paragraph 89 that the evidence does not support the fact that the conversation occurred on a particular day is not well taken. *See* AMF ¶ 89. The emails Williams cites do not indicate "a meeting regarding [Williams' research] topic also occurred at the end of September." *Id.* Instead, they simply say Williams "planned on talking to [Prawdzik] after class" on September 27, 2019. Ex. 47, Doc. 78-21, at 74. That e-mail does not say that a meeting actually occurred, and the subsequent email exchange suggests that it did not. *Id.* at 75-77. Also, the emails cited by Defendants indicate that there was a meeting at some point either on or before September 9, 2019, which is an email that everyone agrees did happen. *See* SMF ¶¶ 88-89; AMF ¶¶ 88-89.

[214] Ex. 47, Doc. 78-21, at 673.

Prawdzik responded "I'm glad that you feel good about your research topic! It's clearly one that will sustain your interest and produce meaningful insight."[215] Williams and Prawdzik continued to discuss the research proposal and other assignments into October.[216] They also discuss Williams' attendance and need to provide Prawdzik with the necessary documentation so that he may excuse her absences.[217] The tenor of these emails is objectively cordial at worst; there is no suggestion of any disagreement between the two prior to October 14.[218]

When confronted with documentary evidence undermining her complaints of racial animus during her deposition, Williams suggested Prawdzik was "super nice in emails" despite being "super rude" when she would meet with him in person.[219] Unfortunately for Williams, she "cannot defeat [a] Motion for Summary Judgment by relying solely on [her] self-serving deposition testimony to create genuine issues of material fact."[220] Williams does not cite to any evidence other than her own

---

[215] *Id.*

[216] *See generally id.* at 674-99.

[217] *Id.* 685-89.

[218] *See generally id.* at 6-21.

[219] Williams Dep. 105:12-15. This testimony followed a lengthy exchange in which she appeared to baselessly dispute the authenticity of the emails. *Id.* at 99:19-105:8. Her self-serving statements that the documents at issue are altered or incomplete are insufficient to withstand a motion for summary judgment. *See Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018) (self-serving testimony insufficient to challenge authenticity of documents). Further, Williams has subsequently admitted to the content of the emails. RSOF ¶¶ 91-92.
The Court also notes that it is not clear Williams and Prawdzik ever met outside of class other than the initial meeting to discuss her research topic. Neither party cites to any evidence in the record, nor has the Court found any on its own review, of any subsequent meeting.

[220] *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012) (citing *Gonzalez v. Sec'y of the Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012); *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011))

testimony that Prawdzik ever "tried to convince Williams not to write her research paper about racism" or that "minorities were at fault for the racism they experience."[221]

Instead, Williams points to an interaction on an online discussion post where "Prawdzik took it upon himself to defend" another student against Williams' suggestions that their comment "seems racist."[222] Williams took issue with another student who, discussing a research article about "racial microaggressions," put quotation marks around the phrase "stigmatized groups" and used the phrase "the effects [minorities] suffer from d[ue] to their ethnicity and place in the world."[223] First, Prawdzik said that he was "certain that [student] put 'stigmatized groups' in quotation groups because [student] is referring to language used by the researchers in the quote that [student] includes."[224] Second, he highlights that the student had used the phrase "their place in the world" in the context of minorities being "kept within 'their place.'"[225]

Not only was Prawdzik doing his job as a professor when he "inserted himself"[226] in the discussion, his comments and critique of Williams' suggestion that the student's comments were racist were objectively reasonable. Using quotation

---

[221] *Cf.* Opp. 12-13.
[222] *Id.* at 13.
[223] *Id.*; *see also* Ex. 47, Doc. 78-21, at 672.
[224] Ex. 47, Doc. 78-21, at 672.
[225] *Id.*
[226] *Cf.* Opp. 13.

marks when quoting the language of a source is just that, nothing more. The sentence from which Williams pulls the offending language notes that the study's authors' "compassion and understanding" for stigmatized groups.[227] Even assuming a reasonable juror could find that this is evidence of racial bias, the question is whether Williams believed it was so when she filed her complaint. Williams does not mention this incident in the complaint filed with the Affirmative Action Office.[228]

As Williams bears the burden of proof to show that she had a reasonable, good faith belief that she was engaging in protected conduct,[229] Penn State need only to show "that there is an absence of evidence to support [Williams'] case."[230] Here, Penn State has met that burden and then some, providing uncontroverted evidence in the form of Williams' emails, undermining Williams' claim that Prawdzik had unlawfully discriminated against her. Williams Title VI discrimination claim cannot survive "the absence of facts of record which would contradict the facts identified by" Penn State.[231]

## B.   Retaliation

If Williams had a reasonable, good faith belief that her October 14 complaint constituted protected conduct, she would still need to show that the adverse action, receiving a failing grade in Prawdzik's class, was in reaction to her complaint. Penn

---

[227] Ex. 47, Doc. 78-21, at 672.
[228] Ex. 51, Doc. 78-25; Ex. 51, Doc. 78-26.
[229] *Ke*, 2015 WL 5316492, at *38.
[230] *Celotex*, 477 U.S. at 325.
[231] *Port Auth.*, 311 F.3d at 233.

State argues that Williams "received an 'F' in Prawdzik's class on merit" because she "was absent from an excessive number of classes," "and she completed only a small fraction of the required course work.[232] Williams, echoing Penn State's arguments discussed above, says that Prawdzik's testimony that Williams failed his class on merit is insufficient at summary judgment.[233] Further, Williams argues that Penn State "essentially ignores" key moments in the sequence of events between the October 14 classroom incident and Williams receiving a failing grade.[234] Penn State replies that no amount of "mental gymnastics" can "rebut the undisputed fact that Plaintiff received an 'F' in Prawdzik's class on merit."[235]

"Because retaliation is almost never subject to proof by direct evidence" a plaintiff will generally have to "rely on circumstantial evidence to prove a retaliatory motive."[236] Williams can satisfy her burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism with timing that suggests a causal link."[237] "Race discrimination claims under Title VI based upon circumstantial evidence are analyzed using the burden-shifting framework developed by the

---

[232] MSJ Br. 61.
[233] Opp. 13-14.
[234] *Id.* at 14.
[235] Reply 9-10.
[236] *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).
[237] *Id.*

Supreme Court in *McDonnell-Douglas Corp. v. Green*."[238] The *McDonnell-Douglas* framework calls for a three-step, burden-shifting analysis: (1) Williams must first establish a *prima facie* case of discrimination; (2) then Penn State must clearly set forth a legitimate, nondiscriminatory reason for the adverse decision; (3) then Williams must show that the legitimate reasons offered by Penn State were not its true reasons, but were a pretext of discrimination.[239]

### 1.   Williams' Title VI Complaint

Defendants point to Prawdzik's October 15, 2019 email as evidence that, despite the incident the day before, he remained willing to have her in class.[240] Williams concedes that a "reasonable jury could conclude that, despite all the class Williams allegedly missed, Prawdzik was nonetheless willing to work with Williams if she would capitulate to him."[241] Williams does not explain how agreeing to his conditions that she act respectfully and professionally would constitute capitulating to Prawdzik. Ultimately, Williams decided to "deal with" the issue through the process initiated by her complaint filed with the Affirmative Action Office.[242]

---

[238] *Davis v. Quaker Valley Sch. Dist.*, 2016 WL 912297, at *9 (W.D. Pa. Mar. 10, 2016) (citing 411 U.S. 792 (1973); *Gazarox ex re. Gazarov v. Diocese of Erie.*, 80 F. App'x 202, 204-205 (3d Cir. 2003)).

[239] *Id.* at *10 (citing *McDonnell-Douglas*, 411 U.S. at 802, 804; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

[240] MSJ Br. 61.

[241] Opp. 14.

[242] *Id.*

Williams points to Prawdzik's comment in his email to Rogers that Williams had "labelled a student's comments racist" as evidence of Prawdzik's retaliatory intent.[243] She says that a reasonable jury could find that Prawdzik "purposefully misquoted Williams to discredit her Affirmative Action report against him."[244] This overstates the difference between Williams' comment to the other student—"Your wording is very slick but seems racist"[245]—and what Prawdzik said in his email over a month later.[246] Further, in an October 15 email to Prawdzik, *Williams herself explicitly characterized the student's comment as racist*.[247] Though litigants and courts have long struggled to define what is meant by "reasonable jury," accepting Williams' argument here would require such an expansive definition as to render the standard meaningless.

At the very least, no reasonable jury could find that, at this point, Penn State or Prawdzik had retaliated against Williams. She had not yet failed the class, and Prawdzik's willingness to have her in class immediately following her filing the complaint indicates that he had not yet decided to fail Williams.

### 2.      Williams' Failing Grade

---

[243] *Id.*

[244] *Id.*

[245] Ex. 47, Doc. 78-21 at 672.

[246] *Cf. id.* at 702 (email to Prawdzik in which Williams says she "didn't have any problems with any students in the class except the RACIST comments one student made").

[247] Ex. 47, Doc. 78-21 at 694.

Penn State argues that Williams received an F "on merit" because she failed to complete the lion's share of the coursework and accrued an excessive number of absences.[248] Williams argues that Prawdzik's failure to contact her following Dr. Adair's email on December 1, 2019 could lead a reasonable jury to "conclude that Prawdzik disobeyed orders, in order to put Williams further behind regarding missing class (which, again, he kicked her out of pending her acceptance of his conditions)."[249] Williams also argues that Prawdzik's statement that he would not assess her work "[b]ecause [he] was suddenly faced with false and malicious accusations" is an admission that he gave her a failing grade because of her complaint.[250] In support of this argument, Williams says that Prawdzik's comment that Williams "was far behind the class and did not seem to know what we were doing as of 10-14-19 . . . it is my conclusion that she has already earned an F for the course."[251] Contrasting this with Prawdzik's email on October 15 in which he tells Williams she can return to class, she argues Prawdzik's "December 19 comment that Williams earned an F *as of October 14*' when 'instead of completing the class' she 'filed an Affirmative Action complaint against me' and 'because' he was 'suddenly faced with accusations related to racial bias' *he refused to grade any of her work*, [s]he was getting an 'F' and the 'F' was 'final.'"[252]

---

[248] MSJ Br. 63-65.
[249] Opp. 15.
[250] *Id.* at 16.
[251] *Id.* at 3.
[252] *Id.* at 16 (quoting Ex. 55, Doc. 78-29, at 3) (emphasis in original).

The Court disagrees with Williams that a reasonable jury could find that Prawdzik "disobeyed orders" when he "did not contact Williams" following Adair's December 1 email. Not only does this argument rest on a tortured reading of the email, Williams does not cite to any evidence in the record that Adair had the authority to "order" Prawdzik to contact Williams. Further, Williams herself acknowledges that Prawdzik had already given her instructions regarding completing the class when he sent her an email telling her that she could return if she treated others professionally and did not disrupt class.[253] Instead, Williams admits that she was unwilling to "capitulate" to Prawdzik's conditions.[254] Just like any student, Williams was not entitled to return to class or otherwise complete the coursework on her own terms.[255]

Nor is there any evidence that Williams herself reached out to Prawdzik—or anybody else—regarding how to complete the coursework until her December 16, 2019 email.[256] She never reached out to Glenn or Rogers, despite Prawdzik referring her to them as early as October 15. Williams regularly communicated with Adair after she filed her complaint, but never inquired about her options for the rest of the

---

[253] *Cf.* Opp. 15 (asserting that Prawdzik "kicked her out of class pending her acceptance of his conditions").

[254] *Id.* at 14.

[255] *See* Ex. 63, 78-37 (email from Adair to Williams stating that Williams "should follow any instructions provided by the instructor regarding your involvement in the course going forward"). During her deposition, Williams insisted that this email was altered or inauthentic and that Adair had sent her an email saying "something along the lines of Prawdzik is going to give you an alternative to complete this course." Williams Dep. 158:10-162:15.

[256] AMF ¶ 45.

semester.[257] At the time Williams filed her complaint with the Affirmative Action Office, she had missed a number of classes[258] and was well behind on the required coursework.[259] Prawdzik told Williams on October 2, almost two weeks before she filed her complaint, that he was worried that she would "drift into crisis regarding work for this course."[260] Further, on December 19 Prawdzik did not say, as Williams suggests, that "Williams earned an F as of October 14."[261] Rather, he said, "[g]iven the fact that she was so far behind the class and did not seem to know what we were doing as of 10-14-2019 . . . she has already earned a failing grade."[262] Alexander emailed Prawdzik to inquire about "the necessary steps Ms. Williams will need to take to complete the course."[263] Prawdzik's response is that there are no such steps, because she was well behind on October 14, she has done nothing in the interim, and now the semester is over. Whether Williams would fail the class was not dependent

---

[257] *See generally* Ex. 120, Doc. 79-18 (emails thread between Adair and Williams from October 17, 2019 to October 21, 2019).

[258] *See* Ex. 62, 78-36 (Adair notes from interview with student who said that "Kayla had not been to class except for about 3-4 times in a 3x/week semester"); Ex. 47 at 686-699 (emails from Williams apologizing for missing three classes during the week of September 30); SOF ¶ 97 (observing that Williams had been absent eight times as of October 14, 2019). Williams objects to SOF paragraph 97 on the grounds that Prawdzik did not always keep track of attendance. ROSF ¶ 97; *see also id.* ¶ 86 (citing Adair's notes from her interview with Prawdzik). The evidence Williams cites in support shows that, if anything, he had *undercounted* Williams' absences. *See* Doc. 94-3 (Adair's notes that Prawdzik "takes attendance vi[a] Canvas but sometimes forgets to do it. 21 days total so far, he took attendance for 14 and she missed 8 of those").

[259] SOF ¶ 96. Williams objects that her standing in the class of October 14 "is not a material fact to any claim or defense." RSOF ¶ 96.

[260] Ex. 47, Doc. 78-21 at 687.

[261] Opp. 16.

[262] Ex. 55, Doc. 78-29, at 83.

[263] *Id.* at 84.

on whether Williams could complete the coursework; she had already failed because that was impossible.[264]

Arguing otherwise, Williams makes too much of Prawdzik's comment that "Williams could 'in theory' complete the work."[265] The relevant inquiry is whether Williams could have actually completed the coursework in practice,[266] and a reasonable jury would understand Prawdzik's comment to mean that she could not.[267] In the absence of any evidence to suggest Williams could have completed a semester's worth of work after the semester had already ended,[268] any reasonable jury would reach the same conclusion as Dr. Adair: Williams' only option for passing the class would be to take it again the next semester.[269] Whether Williams could have completed the coursework and passed Prawdzik's class "in theory" may

---

[264] *Id.* at 83. Williams effectively admits as much, when she testifies that Prawdzik should have "come up with an alternative to let me complete" the course. Williams Dep. 163:23-24.

[265] Opp. 16.

[266] *See LaGatta v. Penn. Cyber Charter Sch.*, 2012 WL 393423, at *3 (W.D. Pa. Feb 6, 2012) (discussing earlier order granting summary judgment where plaintiff "failed to produce sufficient evidence to support" an explanation that was plausible "in theory"); *Baker v. Office Depot., Inc.*, 115 F. App'x 574, 576 (3d Cir. 2004) (observing that though "in theory, it is possible to render . . . claim timely," plaintiff presented no evidence in support of that theory and therefore affirming grant of summary judgment where there was no genuine factual issue for trial).

[267] *See* "In theory," *Oxford English Dictionary* (Online Ed.) (accessed Sept. 15, 2023) (defining the phrase "in theory" via comparison to definition of the phrase "in practice"); *supra* n.264 (Williams admitting she could not have completed the coursework).

[268] *See* ROSF Ex., Doc. 94-9, at 13 (schedule for Prawdzik's class identifying December 11, 2019 as the final class); Williams Dep. 168:5-12 (Williams testifying that the semester was over "or close to ending").

[269] *See* Ex. 64, Doc. 78-38, at 140; Ex. 68, Doc. 78-42, at 571-72 (email from Adair to Williams, advising her that she "spoke with the English Department head at the end of the fall semester to determine whether there was any possibility for you to be issued a deferred grade and make up the work for the course and was informed that due to the amount of work you missed, receiving a DF was not possible").

be sufficient to survive a motion to dismiss, but summary judgment is the time for facts, and Williams offers none.[270] Penn State has met its burden to set forth a legitimate, nondiscriminatory reason that Prawdzik failed Williams.[271] Williams has not met her burden to show that those reasons were mere pretext.[272] Williams cannot simply ignore the fact that she was in danger of failing Prawdzik's class before she made her complaint[273] and that she made no effort to avoid that outcome afterwards.[274]

## V.     Title VI Discrimination

Williams also brings a claim for Title VI discrimination against Penn State on the basis that Dr. Yarwood discriminated against her when Yarwood "refused to correct" grading errors relating to two assignments.[275] To succeed on this claim,

---

[270]   During her testimony in which she claimed that the December 1 email from Adair to Prawdzik was altered, Williams testified at her deposition that "Dr. Adair told Prawdzik in an email he was to come up with an alternative for me to complete the course." Williams Dep. 166:4-9. There is no evidence, other than Williams' testimony, of such an email or directive.

[271]   *Davis*, 2016 WL 912297, at *10.

[272]   *Id.*

[273]   *See Williams v. City Univ. of New York*, 2014 WL 4207112, at *12 (E.D.N.Y. Feb. 7, 2014) (holding that "an inference of retaliatory intent simply cannot be inferred" when a student was already on notice that they were unlikely to receive a high grade in a class prior to a Title VI complaint).

[274]   The Court recognizes that Williams did not feel comfortable returning to Prawdzik's class after October 14. *See* Ex. 59, Doc. 78-59 (notes from Adair's interview of Williams stating that she is missing class and embarrassed by what Prawdzik did). However, Williams does not argue, nor does the record indicate, that she had been "constructively discharged" from Prawdzik's class. *Elliott v. Delaware State Univ.*, 879 F. Supp. 2d 438, 448 (D. Del. 2012). To establish constructive discharge, Williams would have to show that "acts committed contemporaneously or after the protected activity" made her continued participation in class "objectively intolerable." *Id.* at 448-49. Other than Prawdzik imposing objectively tolerable conditions for Williams' return to class, she does not allege that he did anything at all that would have impacted her participation in class after she filed her complaint.

[275]   Am. Compl. Count IV.

Williams must show that she, as a member of a protected class at a state university, suffered an adverse action under circumstances that give rise to an inference of discrimination.[276] Williams claims that Yarwood's failure to correct her grade on two online quizzes, as she had done for non-black students, was discriminatory.[277] However, the record shows that Williams was not impacted by any grading errors. Each online quiz was created from a database of questions, so each student received different sets of questions in different orders.[278] In both quizzes at issue, there was a grading error resulting in correct answers being marked incorrect.[279]   However, Williams was not impacted because, as to the first quiz, she completed the quiz after the error was discovered and corrected, and, as to the second, did not receive a question that had a grading error.[280] Regarding other assignments, there is no evidence in the record to support Williams' claims that Yarwood used a "stricter rubric"[281] to grade Williams' assignments or otherwise evaluated her coursework differently than she did for non-black students.

Rather than offer any argument or evidence in support of her claim, Williams avers that each SMF paragraph relating to this claim is "not a material fact to any

---

[276] *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 561 (E.D. Pa. 2016).
[277] Am. Compl. at ¶¶ 220-223.
[278] SMF ¶ 141.
[279] SMF ¶¶ 147, 155.
[280] SMF ¶¶ 144-163.
[281] Am. Compl. ¶ 221.

claim or defense"[282] and does not offer any defense in her opposition brief.[283] Therefore, Williams has abandoned her Title VI discrimination claim.[284]

## VI.    Williams' Due Process Claims

In Count II, Williams claims that her Due Process rights were violated when Penn State "unfairly deviated from its own policy."[285] Williams's alleges that she was denied due process because 1) Defendants refused to reschedule her conduct conversation until she was no longer ill and could attend a conduct conversation meeting;[286] 2) she was not provided notice of the alleged violations of the Code of Conduct;[287] 3) she was not permitted to speak to her advisor during her hearing;[288] and 4) she was not permitted to cross-examine witnesses.[289]

In the alternative, Williams claims in Count III that Penn State's policies and procedures were constitutionally deficient on their face because they "allow[] a hearing panel to make credibility assessments of accusing witnesses who do not appear before it, and who cannot be questioned or cross examined,"[290] and "fail[] to establish a proper procedure to account for reasonable excuses for an accused student missing a scheduled conduct conversation meeting."[291] In her opposition to summary

---

[282] RSOF ¶¶ 139-180.
[283] *See generally* Opp.
[284] *Diodato*, 44 F Supp. 3d at 556-57 (collecting cases).
[285] Am. Compl. ¶ 176.
[286] Am. Compl. ¶¶ 176, 178-80.
[287] *Id.* ¶¶ 177, 182-87.
[288] *Id.* ¶¶ 188-91.
[289] *Id.* ¶¶ 192-95.
[290] Am. Compl. ¶ 209.
[291] *Id.* ¶ 211.

judgment, she also argues that Penn State's "'notice' to accused students as to their allegedly violative conduct is insufficient."[292]

In general, "[d]ue process is a 'flexible concept and the process due in any situation is to be determined by weighing: (1) the private interests at stake; (2) the governmental interests at stake; and (3) the fairness and reliability of the existing procedures and the probable value, if any, of any additional procedural safeguards.'"[293] Though the "Due Process Clause protects students during disciplinary hearings at public institutions . . . there is not a specific format these proceedings have to follow, so long as the university provides sufficient protections to comply with due process."[294] "'[T]he fundamental requirement is the opportunity to be heard at a meaningful time and in a meaningful matter' by 'an impartial decision maker.'"[295] The timing and content of the notice and the nature of the hearing "depend on appropriate accommodation of the competing interests involved" and "longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."[296]

## A.     Penn State's Policies are Facially Valid

---

[292]  Opp. 18.

[293]  *Fraser v. Penn. State Univ.*, --- F. Supp. 3d ----, 2023 WL 1805209, at *8 (M.D. Pa. 2023) (quoting *Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989)).

[294]  *Id.* (citing *Phat Van Le v. Univ. of Medicine & Dentistry of N.J.*, 379 F. App'x 171, 174 (3d Cir. 2010); *Sill v. Penn. State. Univ.*, 462 F.2d 463, 469 (3d Cir. 1972)).

[295]  *Id.* (quoting *Park v. Temple Univ.*, 757 F. App'x 102, 106 (3d Cir. 2018)).

[296]  *Doe v. Penn. State Univ.*, 336 F. Supp. 3d 441, 447-48 (M.D. Pa. 2018) (quoting *Goss v. Lopez*, 419 U.S. 565, 579, 584 (1975)).

As Count II claims that Defendants unfairly deviated from Penn State policy, the Court begins with Williams' claim that Penn State's policies themselves are facially unconstitutional.[297] As an initial matter, the Court notes that Williams has not introduced any evidence of any pattern or practice of these purported violations.[298] Instead, Williams relies on the alleged due process violations she herself suffered. Even assuming that Williams was deprived of due process, discrete violations are not sufficient to establish a policy.[299] In the absence of such evidence, the Court's analysis of Penn State's policies is largely limited to the published Code of Conduct.

### 1.    Policies Regarding Rescheduling Hearings

The Constitution does not categorically require "sick students to be allowed to reschedule their conduct conference once they are better."[300] Though "illness could no doubt adversely affect the right to be heard in a 'meaningful manner,'" that alone is not enough to create a due process violation.[301] Due process does not require that a student, even one who "faces a long term suspension," "be physically present

---

[297] Even if they are, Williams still needs to show that she was deprived of due process because of the allegedly deficient policy. *Moeck v. Pleasant Valley Sch. Dist.*, 983 F. Supp. 2d 516, 524 (M.D. Pa. 2013). Therefore, the Court's finding that Williams was not denied due process, discussed *infra*, is sufficient to dismiss Count III.

[298] *Moeck*, 983 F. Supp. 2d at 524.

[299] *Id.*

[300] Opp. 20.

[301] *See Qi Lang Chen v. Atty Gen. of U.S.*, 314 F. App'x 414, 417 (3d Cir. 2008) (upholding finding by the Board of Immigration Appeals that there was not a due process violation where alien facing deportation had received treatment in the emergency room the night before because alien failed to produce evidence showing extent of illness or that illness prevented him from testifying).

50

at [her] disciplinary hearing."[302] "In other words, physical absence from a hearing is not an automatic constitutional deficiency; whether a person is able to physically attend [her] disciplinary hearing only matters insofar as it affects [her] right to be heard."[303] Penn State's policy regarding hearings permits a respondent to "submit a response to charges prior to the hearing" and that, if a respondent does not appear, "all available evidence will be reviewed by the hearing authority."[304] Whether Williams should have been permitted to reschedule a hearing so she could attend is an issue that will be addressed in greater detail below. But the lack of an explicit policy permitting sick students to reschedule a conduct hearing does not render Penn State's policies so unfair or unreliable as to be constitutionally deficient.[305]

---

[302] *Uzoechi v. Wilson*, 2018 WL 2416113, at *9 (D. Md. May 29, 2018), *aff'd* 735 F. App'x 65 (4th Cir. 2018).

[303] *Id.*

[304] Ex. 22, Doc. 78-11, at 22.

[305] *See Keles v. Bender*, 2022 WL 840311, at *3 (3d Cir. 2022) (observing that the Due Process Clause requires only "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion" prior to dismissing a student for disciplinary reasons) (citing *Goss*, 419 U.S. at 581).

## 2.     Cross Examination Policy

As the Court observed in its memorandum opinion regarding Defendants' motion to dismiss, "the right to confront witnesses, and the right to cross examine witnesses generally have not been deemed necessary elements of due process of law."[306] However, the Court also noted that there is a narrow exception where the credibility of the witness is material to the decisionmaker's finding.[307] Based on the Williams' complaint in which she alleged that this was such a case, the Court denied Defendants' motion to dismiss Count III and permitted discovery.[308] Penn State's policy regarding disciplinary hearings provides that "[t]he Respondent, hearing authority, and University Presenter will be allowed to ask questions of all witnesses who participate in the hearing."[309] Williams argues that this is insufficient, because "there is no mechanism for an accused student to question a witness who does not appear at a hearing."[310]

Penn State cannot force a witness to participate in a hearing. It does not have subpoena power, it cannot hold witnesses in contempt, and it cannot issue warrants to secure the appearance of noncooperative witnesses. Even if Penn State created a policy that said Williams could cross-examine a non-appearing witness, it would have no authority to enforce it. This does not mean that Penn State could hide behind

---

[306] MTD Op., Doc. 32 at 20.
[307] *Id.*
[308] *Id.* at 20-21.
[309] Ex. 23 at 22; AMF ¶ 77; RAF ¶ 77.
[310] AMF ¶ 78.

this lack of authority to sanction students based on third-party testimony alone. But in the absence of evidence of a pattern or practice of doing so, Penn State's policies are not facially deficient because they do not include a provision that only applies in exceptional cases, and that could not be enforced in any case.[311]

### 3.    Notice

"Notice is one of the most basic requirements of due process."[312] The Code of Conduct provides that, if a case manager recommends charges and sanctions, a respondent "may take three days business days to decide whether to accept the charge(s) and sanction(s), to contest the charge(s), or request a sanction review when appropriate."[313]

> If the respondent contests the charge(s) (i.e., denies responsibility for the alleged violation(s)), the matter will be referred to a hearing. The hearing will take place as soon as reasonably possible, but not sooner than five (5) business days after the respondent has been notified of the charge(s), unless the respondent waives the five-day notice and the University can accommodate a shortened timeframe.[314]

Williams argues that this policy is insufficient because it "only requires an accused student to be informed of the specific portion of the Code of Conduct they

---

[311] *See Khouzam v. Atty Gen. of U.S.*, 549 F.3d 235, 259 (3d Cir. 2008) (observing that "[a] statute is not facially unconstitutional unless 'no set of circumstances exists under which the Act would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That Penn State's Conduct Code is not a statute further militates against finding it facially unconstitutional. *See Sill*, 462 F.2d at 467 (observing that "codes of conduct prescribed for students by educational institutions are not required to satisfy the same standards" for clarity as criminal statutes).

[312] *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 250 (E.D. Pa. 2012) (citing *Goss*, 419 U.S. at 581).

[313] Ex. 23, Doc. 78-11, at 20.

[314] *Id.*

are being charged with violating."[315] "The term 'charge' is defined as an identification of the Code of Conduct section(s) that the respondent is alleged to have violated."[316] While oral notice is sufficient for a short suspension, formal written notice, identifying the charged violations and possible penalties, is required for lengthier suspension.[317] Where a student is threatened *with expulsion*, the notice "should include the specific charges *and the grounds, which, if proven*, justify expulsion."[318]

Williams' suspension was for the remainder of the Spring 2020 semester, which is not a short suspension, but also not expulsion. She was entitled to notice of the violation and the possible penalty, which is what the Code provides for, and, as discussed below, what she received. There may be a colorable argument that the policy is deficient to the extent that it does not explicitly provide students faced with expulsion notice of the facts supporting the charges. However, that potential defect is not implicated here because Williams was not facing expulsion.[319]

---

[315] Opp. 25.

[316] Ex. 23, Doc. 78-11, at 3.

[317] *Furey*, 884 F. Supp. 2d at 250 (citing *Flaim v. Med. College of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005)).

[318] *Id.* (citing *Palmer*, 868 F.2d at 94) (emphasis added).

[319] The Court notes that the Code does provide for conduct conversations, during which the facts supporting the charges would be discussed. *See* Ex. 23, Doc. 78-11, at 18-20. Therefore, a student facing expulsion would likely have constructive notice of the grounds for the charges, and failure to include that information in a formal written notice may not unfairly prejudice the student. As discussed below, that is effectively the case here; Williams was aware of the grounds for the charges. So, even if Williams were entitled to written notice of the grounds for the charges, she was not injured by Penn State's failure to provide it.

### B.   Williams' Due Process Rights Were Not Violated

Though Penn State's policies for conduct hearings are not facially unconstitutional, that has little bearing on the issue of whether Williams herself was afforded due process. Williams may have suffered a due process violation unrelated to any Penn State policy. Alternatively, Penn State may have unfairly deviated from its policies. However, "failure to follow [Penn State] polic[y] is not, in itself, a violation of due process."[320] "So long as the procedural protections actually provided were sufficient and fairly administered, due process is satisfied."[321]

Central to Williams' argument that Penn State unfairly violated its policies is whether the charged conduct was a "crime of violence" as defined by the Code of Conduct, and therefore subject to the Code's Special Protocols for Crimes of Violence. As Williams notes, a "crime of violence" is "any alleged behavior that may involve a crime of violence as defined in the Code of Federal Regulations, Title 34, Appendix A."[322] This includes:

> (b) Simple Assault. An unlawful physical attack by one person upon another where neither the offender displays a weapon, nor the victim suffers obvious severe or aggravated bodily injury involving apparent broken bones, loss of teeth, possible internal injury, severe laceration, or loss of consciousness.
>
> (c) Intimidation. To unlawfully place another person in reasonable fear of bodily harm through use of threatening words or other conduct, or

---

[320] *Lee*, 379 F. App'x at 175.
[321] *Id.*
[322] Opp. 31; Ex. 23, Doc, 78-11 at 3.

55

both, but without displaying a weapon or subjecting the victim to physical attack.[323]

The incident with the Lyft driver falls squarely within the definition of Simple Assault.[324] The definition of Harassment in the Code of Conduct is broader than that in Appendix A, as it is not limited to placing "another person in reasonable fear of bodily harm." The Code prohibits conduct "sufficiently severe or pervasive such that it threatens or substantially interferes with an individual's employment, education or access to University programs, activities or opportunities and such conduct would detrimentally affect a person under the same circumstances."[325] Nevertheless, a reasonable juror could conclude that A.B.'s allegations that Williams "physically threatened her" fall within the definition of intimidation under Appendix A.[326] Therefore, under Penn State policy, Williams was entitled to the procedures provided for by the Special Protocols.

## 1.     Conduct Conversation

A "conduct conversation" is defined by the Code of Conduct as "an informal meeting intended to allow the case manager to explain the conduct process and

---

[323]  Assault Offenses, 34 C.F.R. Pt. 99, App. A.

[324]  *See* MSJ Br. 76 (observing that the Code of Conduct "in simple terms . . . prohibit[s] harming or threatening to harm another person").

[325]  Ex. 23, Doc. 78-11, at 12.

[326]  *See* SOF ¶¶ 201-204, 295; A.B. Incident Report, Ex. 122, Doc. 80-30 at 2461-62. The Court emphasizes that, while Harassment and Intimidation are objectively not as serious as sexual assault, *see supra*, that does not preclude it from being in the same category of offenses as defined by Penn State. The Court's finding here is accordingly limited to that context, which is an important distinction as discussed below.

discuss an alleged incident with the respondent to determine appropriate next steps."[327] It is not, as Williams characterizes it, a "pre-deprivation hearing."[328]

Williams advances two arguments regarding Lauren Langford's failure to reschedule her conduct conversation: (1) a conduct conversation was mandatory under Penn State policy, and the failure to provide her with one was an unfair deviation from that policy; and (2) the failure to allow Williams to reschedule her conduct conversation when she was sick was a due process violation.

### i.       Deviation from Policy

Williams observes that both the Conduct Procedures and the Special Protocols state that "a conduct conversation will take place with the respondent," but that only the Conduct Procedures provides that, "should the respondent not appear, then the meeting will take place in their absence."[329] Williams suggests that this means her attendance at a conduct conversation was mandatory in her case.[330] This interpretation of the Special Protocols would permit a respondent to completely forestall any hearing for serious misconduct by simply refusing to attend a conduct conversation. Langford repeatedly tried to schedule a conduct conversation, specifically advising her that it was mandatory, and Williams repeatedly refused to

---

[327] Ex. 23, Doc, 78-11, at 3.
[328] *See* Opp. 20-21.
[329] Opp. 32.
[330] *Id.*

attend.[331] The Court will not interpret the Code of Conduct as requiring Penn State to abandon disciplinary proceedings for students who refuse to participate.

### ii.      Failure to Reschedule

Langford cannot be faulted for failing to reschedule the conduct conversation until Williams was no longer sick when Williams had not informed anybody that she was sick or requested it to be rescheduled. Further, even if Langford had known Williams was sick, and had failed to reschedule a hearing, that alone is not a violation of due process.[332] But Williams' claim fails for a more fundamental reason: the conduct conversation *was not a deprivation hearing*. Due process requires that Williams have notice and a hearing prior to a deprivation. The letter sent by Langford on January 27, 2020, which Williams failed to return by the deadline, specifically allows her to "contest the charge(s) and *request a Hearing*."[333] It was only after she failed to do so that the charges and sanctions went into effect.[334]

### 2.      Cross Examination of Complainants

The parties advance a number of distinct and overlapping arguments regarding whether, and if so, to what extent Williams was entitled to cross examine either or both of the complainants in her case, A.B. and the Lyft driver, Petrulich. As an initial matter, the Court finds that the charges against Williams were

---

[331] *See* Ex. 149, Doc. 80-42.
[332] *Chen*, 314 F. App'x at 415-16.
[333] Ex. 151, Doc. 79-36, at 548.
[334] The Court also notes that Williams does not address her repeated refusals to attend a conduct conversation meeting for reasons other than illness.

sufficiently serious, and the credibility of the complainants was sufficiently material to trigger a right to cross-examination. Penn State argues that Williams' claims regarding her suspension for assaulting Petrulich are barred by her criminal conviction for that offense and that this is sufficient to uphold Williams' suspension because either of the charges against her could support the suspension. On the first point, the Court agrees, but finds that a reasonable jury could conclude Williams would have received a lighter suspension if sanctioned for only one of the charges against her. Therefore, the Court must then determine whether Williams was entitled to cross examine A.B. Williams argues that both Penn State policy and due process require that she be given the opportunity to do so. Again, the Court agrees on the first point, but finds that, under the circumstances, Williams was provided with sufficient due process.

### i.　　　Credibility and Cross-Examination

Though due process does not ordinarily require the right to cross-examination in the university context, where the university's determination turns on the credibility of witnesses not subject to cross-examination due process issues can arise. When that right is triggered is an issue of some debate. In *Doe v. University of Sciences*,[335] the Third Circuit held that "the basic elements of federal procedural

---

[335] 961 F.3d 203 (3d Cir. 2020). Though University of Sciences was a private university, and therefore not subject to the Constitution's due process guarantees, the Third Circuit noted that the due process requirements in *Goss* were consistent with those required under Pennsylvania law. *Id.* at 214-15 (citing *Goss*, 419 U.S. at 581).

fairness in a Title IX sexual-misconduct proceeding include a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for cross-examination of witnesses."[336] However, cross-examination is "unnecessary when the university's decision did not rely on any testimonial evidence at all."[337]

It is unsettled whether this requirement applies to other cases of misconduct. The Third Circuit noted that sexual misconduct cases are unique "because the consequences are potentially dire and permanent: 'a finding of responsibility for a sexual offense can have a lasting impact on a student's personal life, in addition to h[er] educational and employment opportunities, especially when the disciplinary action involves a long-term suspension."[338]

Defendants argue that Williams "was accused of serious misconduct, but objectively not conduct equivalent to sexual assault" and that her suspension "for just a semester" was not sufficiently long term.[339] There is no bright line for what constitutes a "long term" suspension, but the Court finds that a suspension that results in the loss of a semester's tuition, grades, and credits is sufficiently long term.[340] Williams' return to Penn State was also conditioned on her satisfactorily participating in counseling at her expense. Sexual assault may be unique among

---

[336] *Id.* at 215 (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 663-64 (7th Cir. 2019); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018)).

[337] *Baum*, 903 F.3d at 583-84.

[338] *Univ. of Sciences*, 961 F.3d at 213 (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018).

[339] MSJ. Br. at 98-99.

[340] *Doe v. Penn. State Univ.*, 336 F. Supp. 3d at 447-48; *Goss*, 419 U.S. at 579, 584.

violations of university codes of conduct for carrying "potentially dire and permanent" consequences, but it is not alone in that regard.[341] Williams' own situation—facing suspension for an assault that was unrelated to her role as a student at Penn State—demonstrates this.[342] The reasoning for requiring  cross-examination in cases of sexual assault applies with equal force to other crimes of violence.[343]

Penn State "acknowledges" the Court's motion to dismiss opinion holding that "'the absence of the opportunity to cross examine in [a] case that hinged on witness credibility . . . does not pass Constitutional muster.'"[344] Penn State argues that cross-examination was not required here because "the panel did not rely solely rely on one person's word against another—rather, the panel also expressly relied on documentary evidence supporting the charges."[345] Penn State misunderstands both this Court's earlier opinion and the precedent on which it relied. Penn State argues that "*Doe v. University of Cincinnati* is distinguishable because, in that case, the school's conduct finding relied solely on written statements of the accuser to investigators and the institution 'proffered no other evidence to sustain the

---

[341] *Univ. of Sciences*, 961 F.3d at 213.

[342] *Cf. Univ. of Sciences*, 961 F.3d at 213 (observing that sexual assault is a serious offense because it can have a lasting effect on educational

[343] *See* Sanctioning Guidelines, Ex. 24 at 3930 (defining a major violation of the "Harming or Attempting to Harm Another" charge code).
The Court notes that crimes involving sexual misconduct lend themselves to "he said/she said" issues of credibility that are perhaps less prevalent in other crimes of violence. *See Baum*, 903 F.3d at 583-84. However, this is not a good argument for rejecting the reasoning for requiring cross-examination in those cases in cases of other crimes of violence that also hinge on credibility.

[344] MSJ Br. 95 (quoting MTD Op. at 21).

[345] *Id.* at 95-96.

University's findings and sanctions apart from . . . hearsay statements."[346] This reading of *University of Cincinnati* is inconsistent with that of the Sixth Circuit, which later clarified that "if credibility is in dispute *and material to the outcome*, due process requires cross-examination."[347]

Penn State concedes that the University Conduct Board made credibility determinations and that the UCB relied on the written testimony of A.B. and Petrulich at least in part.[348] In its report, the UCB concluded:

> Given all the available testimony (oral and written) and using the, "preponderance of evidence" standard of proof, in the end the members of the UCB unanimously concluded that Ms. Williams is not as credible as [A.B.] and Mr. Petrulich. The latter two individuals, and Mr. Petrulich in particular, provide a much more coherent and consistent account of events. . . . In addition, the UCB found it improbable that [A.B.]'s mother would leave her home in Colorado on a moment's notice to (i) help her daughter move out of the apartment shared with Ms. Williams and (ii) to contact the police about the threats her daughter had received if [A.B.] had made up the accusations against Ms. Williams. When it comes to the altercation between Ms. Williams and Mr. Petrulich, the UCB found it improbable that Mr. Petrulich would call the police while being video-recorded by security cameras and observed by eye witnesses if he had been the aggressive party.
>
> Having established sufficient credibility on the part of the complainants, the UCB unanimously concluded that the charges were indeed appropriate and that Ms. Williams was responsible for both.[349]

---

[346] *Id.* at 97 (quoting *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017)).

[347] *See Baum*, 903 F.3d at 584 (emphasis added) (observing that this holding is consistent with its prior holding in *University of Cincinnati*). *See also Furey*, 884 F. Supp. 2d at 251-52 (observing that cross-examination is essential where credibility is of sufficient "importance" or a witness' testimony is "determinative") (citations removed).

[348] MSJ Br. 95-96.

[349] Ex. 179, Doc. 80-54 at 2.

Reading the UCB's report in the light most favorable to Williams, the UCB found A.B. credible on the strength of A.B.'s mother's belief that A.B. was credible. That A.B.'s mother traveled from Colorado to Pennsylvania and contacted the police is evidence that she believed her daughter. This credibility hearsay, for lack of a better term, is not sufficient to show that A.B.'s credibility was immaterial to the UCB's decision.[350]

As discussed above, Penn State's arguments that it "lacks subpoena power and cannot force witnesses to attend a disciplinary hearing" are well taken.[351] However, the unavailability or unwillingness of witnesses to testify is not a circumstance unique to the university context.[352] The Court is not persuaded Penn State's slippery slope argument that requiring cross-examination would be "unjust, and problematic for the maintenance of discipline in our institutions of higher education, if respondents in school disciplinary proceedings could escape liability by traumatizing or threatening retaliation against their victims."[353] Penn State could still sanction a respondent based on other evidence. If a witness fails to appear because of threats by the respondent, those statements could still be admitted.[354] But

---

[350] The UCB Report explains that the Board also considered other evidence in evaluating Williams' and A.B.'s credibility. *See generally id.* However, because the Court is obliged to read the Report in the light most favorable to Williams, it only considers the evidence that the UCB specifically says it relied on in making its credibility determination.

[351] MSJ. Br. at 99.

[352] *See* Fed. R. Evid. 804(a)(2) (rule regarding testimony of unavailable witnesses).

[353] MSJ Br. 100.

[354] *See* Fed. R. Evid. 804(b)(6) (allowing statements by witness where party intentionally, wrongfully caused the witness' unavailability). The Court is mindful that the Federal Rules of

if due process requires that Williams have an opportunity to cross-examine witnesses, then Penn State must provide some mechanism affording her the opportunity to do so such as, for instance, allowing questions to be submitted to the witness through the hearing authority.[355]

### ii.        Assault of Petrulich

As to Petrulich, the Court finds that Williams' conviction in the Magisterial District Court of Washington County, Pennsylvania to the charge of Harassment[356] precludes her argument that she did not violate the Code of Conduct's prohibition on "harming or attempting to harm another."[357] Williams was not denied due process by not being permitted to cross-examine Petrulich when she was in fact guilty of violating a substantially similar criminal statute. The Court finds persuasive Penn State's arguments that Williams' claims are barred by the Supreme Court's holding in *Heck v. Humphrey*.[358] Under *Heck*, a "district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of [her]

---

Evidence do not apply; the admission of statements by unavailable witnesses need not be sufficient to meet the requirements of the Rules.

[355] *See* Code of Conduct, Ex. 23 at 28 (provision of the Special Protocols for Crimes of Violence providing for questions by the respondent to be posed to the complainant through the hearing authority); *Univ. of Sciences*, 961 F.3d 203 (holding that the university was required to allow cross-examination but declining to prescribe the exact method by which a college or university must implement such procedures).

[356] *See* Ex. 30, Doc. 78-13.

[357] *Compare* 18 Pa. C.S. § 2709(a)(1) *with* Ex. 24, Doc. 78-12 at 3930 (Sanctioning Guidelines defining "Charge Code" "Harming or Attempting to Harm Another"); *see also* MSJ Br. 76 (chart comparing offenses).

[358] 512 U.S. 477 (1994).

conviction or sentence."[359] Williams' tortured argument that she is challenging the policy that prohibited her from cross-examining Petrulich, but not her conviction for assaulting Petrulich, is unavailing.[360] She does not have an unqualified right to cross-examine Petrulich. To the extent that she has such a right, it is to provide her the opportunity to challenge the charges against her. Having been criminally convicted of effectively the same offense, Williams cannot collaterally attack the UCB hearing, a proceeding with a lower standard of proof and less formal due process rights.[361]

In support of its argument that, even if Williams' suffered a due process violation regarding one of the charges, either is sufficient to provide for the recommended sanctions, Penn State cites the UCB's Rationale for the Sanctions:

> Once responsibility was established, the UCB was made aware of the various sanctions that had already been assigned to Ms. Williams for the same categories of the University's Code of Conduct, plus additional charges pertaining to use of marijuana. As such, the UCB unanimously concluded that both violations of the code were **major** violations. Once established the severity, [sic] the UCB unanimously decided that a separation was in order, while making sure that Ms. Williams continues to receive appropriate counseling. The length of separation was deemed to be the very minimum that should be assigned.[362]

The recommended punishment for "major" violations is "suspension to expulsion."[363] The Sanctioning Guidelines further note that these recommendations

---

[359] *Id.* at 487.

[360] *Cf.* Opp. 38.

[361] *See* Ex. 179, Doc. 80-54, at 4 (noting that the UCB applied the preponderance of the evidence standard).

[362] Ex. 179, Doc. 80-54 at 4.

[363] Ex. 24, Doc. 78-12, at 3930.

"assum[e] a student has no prior violations."[364] With regard to the Petrulich incident, Danny Shaha, the Assistant Vice President noted that, given Williams' history, "this one incident may warrant suspension."[365]

Though these facts strongly suggest that Williams may have been suspended for the Spring 2020 semester based on the Petrulich incident (and her history) alone, they do not compel that conclusion. The UCB's findings do not state that either violation on its own would warrant a semester long suspension. That the UCB noted a suspension for the Spring 2020 semester was the "very minimum," also suggests it is likely that the Petrulich incident alone could have supported the same suspension. But a reasonable jury could find otherwise.  Suspensions can range anywhere from a few days, as in *Goss v. Lopez*,[366] to years. If the Court were to uphold the suspension based on the Petrulich incident alone, it would be holding that either (1) the A.B. incident had no impact on the UCB's decision, or (2) Williams would not have received the "very minimum" suspension for the Petrulich incident had the UCB not found sanctions appropriate for the A.B. incident. The UCB's report precludes the first conclusion, and the Court cannot step into the shoes of the UCB and compel the second.

---

[364] *Id.* at 3928.
[365] Ex. 138, Doc. 79-27 at 1555.
[366] 419 U.S. 565 (1975).

### iii.        Harassment of A.B.

The Court must then determine whether Williams had the right to cross-examine A.B. and, if so, what form of cross-examination is appropriate. As noted above, a reasonable juror could find that the charge of harassment against A.B. is a "crime of violence" under the Code of Conduct, and therefore the hearing on that charge is subject to the Special Protocols for Crimes of Violence, which provide that "[q]uestions by . . . the respondent . . . may be posed to the [complainant]."[367] It is undisputed that Williams did not pose questions to A.B. in this manner. She argues that this is a deviation from the policy.[368] She also argues that she should have been allowed to ask questions of witnesses who "participated" in the hearing by submitting written statements in accordance with the Special Protocols.[369]

For the alleged deviation from the policy to constitute a due process violation, Williams would first need to show that she relied on the policy and suffered because of Penn State's violation.[370] Langford sent Williams a link to the policies, and Williams clearly reviewed them because she cited other provisions in subsequent objections.[371] Yet in her numerous requests and queries of Langford regarding the hearing, Williams never inquired about submitting written questions to the UCB for

---

[367] Ex. 23, Doc. 78-11, at 28.
[368] Opp. 33.
[369] *Id.* at 34-35; *see also* Ex. 23, Doc. 78-11, at 28 ("The respondent . . . will be allowed to ask questions of all witnesses who choose to participate in the hearing process.").
[370] *Park*, 757 F. App'x at 107.
[371] Ex. 165, Doc. 80-47 at 3469-70.

A.B. or any other witnesses, or if A.B. would attend the hearing.[372] She did send Langford a statement in which she responded to various allegations made by A.B. in the incident report A.B. filed on October 17, 2019.[373] She had the opportunity during the hearing to respond to the allegations in A.B.'s report, as well as a report Williams' friend filed against A.B..[374] She submitted rebuttal evidence that was considered by the UCB.[375] Williams does not cite any, nor has the Court found any evidence that Williams "relied" on the Special Protocols to her detriment, nor has she argued how adherence to the Special Protocols would have yielded a different outcome.

So, the question becomes whether Williams had any right to cross-examine A.B. independent of University policy. Penn State argues that Williams had "the opportunity to, and did, challenge A.B.'s incident report and written statement with [her] own testimony and exhibits."[376] Williams responds that the opportunity to "'question' the various pieces of paper used against her" is not sufficient to satisfy her right to "question her accusers."[377]

---

[372] *See generally* Ex. 160, Doc. 79-43.

[373] *See* Ex. 181, Doc. 80-56.

[374] *See generally* Ex. 184, Doc. 80-57, at 27:00-1:00:00; *see also* Ex. 176, Doc. 80-52, at 2418-19 (Williams' friend B.K. discussing statement with Langford).

[375] SOF ¶¶ 296-298; RSOF ¶¶ 296-298; Ex. 180, Doc. 80-55.

[376] MSJ Br. 85.

[377] Opp. 29-30.

In *Mathews v. Eldridge*,[378] the Supreme Court set out a three-factor balancing test to determine what process is due: "1) the private interests at stake; 2) the governmental interests at stake, including the governmental function involved and the fiscal and administrative burdens entailed by additional or substitute requirements; and 3) the fairness and reliability of the existing procedures and the probable value, if any, of any additional or substitute procedural safeguards."[379] As to the first factor, the Court has already found that Williams' private interests are significant. The consequences of a suspension that results in a lost semester's grades, credits, and tuition, and the attendant reputational harm and loss of educational and occupational opportunities are far more dire than a short-term suspension which would allow a student to complete the term.[380] However, even "major" harassment of a roommate is less serious a charge than one of physical or sexual assault. These factors weigh in favor of more formal due process protections, but not as formal as in cases of more serious allegations. The interests of universities under the second factor are well established: "maintaining safety on its campus and within its student

---

[378]  424 U.S. 319 (1976)

[379]  *Furey*, 884 F. Supp. 2d at 247 (citing *Mathews*, 424 U.S. at 334-35).
Williams suggests that the Court should conduct a *Mathews* analysis regarding each alleged due process violation. *See* Opp. 19. The Court notes that it is unnecessary to do so where prior courts have already addressed substantially similar issues and provide sufficient guidance.

[380]  Penn State has argued that the harassment charge could have supported the punishment that Williams received independently. Though the Court has found that it did not, there is no evidence in the record that shows how the punishment may have been allocated between the two offenses.

body [as well as] a strong interest in allocating resources to best achieve its educational mission and the educational component of its disciplinary process."[381]

As to the third factor, the Court considers the alleged violation—the lack of live cross-examination—in the context of the process that was used and the available alternatives.[382] The Court begins by noting that the Third Circuit has not required live cross-examination, even in the most serious of cases.[383] The Court finds that several factors of the process in Williams' case further militate against the need for more formal cross-examination.

*First*, while A.B.'s credibility was material, her testimony was not the sole evidence against Williams.[384] *Second*, the Office of Student Conduct had already found that there was sufficient evidence to issue a no-contact order against Williams.[385] *Third*, Williams was provided with A.B.'s statement, and had the opportunity to respond directly, as well as provide her own evidence and witnesses. *Fourth*, Langford did make a good faith effort to secure A.B.'s attendance at the hearing.[386] *Fifth*, the UCB found Williams herself to be not credible based on her own testimony, which was often contradicted by other, non-testimonial, evidence.[387]

---

[381] *Id.* (collecting cases).
[382] *Id.*
[383] *Nkrumah v. Univ. of Pittsburgh - of Commonwealth Sys. of Higher Educ.*, 2022 WL 1062303, at *10 (W.D. Pa. Apr. 8, 2022) (collecting cases).
[384] Ex. 179, Doc. 80-54, at 3-4.
[385] Ex. 123, Doc. 80-31.
[386] *See* Ex. 168, Doc. 80-49.
[387] Ex. 179, Doc. 80-54, at 3-4.

*Sixth*, A.B. decided not to attend the hearing because she feared Williams would retaliate against her. This concern is well founded, considering that the evidence presented at the hearing *by Williams* supports A.B.'s claims that she continues to deal with fallout from Williams' use of her personal information and shows that Williams had attempted to pressure another individual who lived with both A.B. and Williams into making a statement on Williams' behalf.[388] The Court finds that it is appropriate for the UCB to admit and consider A.B.'s statements in such circumstances.

Further, the Court finds that the process afforded to Williams was more than sufficient considering the available alternatives. As discussed above, Penn State cannot force A.B. to attend the hearing. Nor did Williams attempt to submit questions for A.B. to answer in lieu of her absence.[389] Though there may be cases where the inability to provide for more formal cross-examination of witnesses precludes sanctioning a student, this is not such a case.

### 3.   Ability to Speak with Advisor

Williams alleges that she was not able to "quietly confer with" her advisor during her hearing, in contravention of Penn State policy.[390] She argues that Defendants' position—that right to counsel has generally not been deemed a

---

[388] Ex. 179, Doc. 80-54, at 3-4.
[389] The Court notes that Penn State also cannot force A.B. to answer these questions. But that issue is not implicated here because Williams failed to submit any questions, despite being aware of the Special Protocols.
[390] Opp. 35.

necessary element of due process in a university context—is non-responsive, because her claim is one for unfair deviation.[391] Again, though the Court must evaluate the record in the light most favorable to Williams, she still must put sufficient evidence into the record in support of the issues on which she bears the burden of proof.[392] Therefore, it is not Penn State's burden to show why a failure to allow her to quietly confer with her advisor was not an unfair deviation; it is Williams who must point to some evidence in the record (or other authority) that shows it was. She has not done so, therefore the Court cannot find that any failure to permit her to confer quietly with her advisor during the hearing constitutes a due process violation.

On the contrary, in her response to Defendants' Statement of Facts, Williams suggests it is immaterial whether she was permitted to review information with her advisor "even in a separate room" and that she declined that opportunity.[393] It cannot be the case that Williams "substantially suffered" because she was denied the opportunity to confer with her advisor if the fact of whether she was offered, and in fact denied that opportunity is immaterial. Further, Williams *did* have the opportunity to quietly confer with her advisor. At the outset of the hearing, it was explained to Williams' advisor that he could "[q]uietly advise Kayla in a manner that doesn't disrupt the normal flow of the hearing and consult with Kayla during

---

[391] *Id.*
[392] *Celotex*, 477 U.S. at 325.
[393] SMF ¶¶ 310-11; RSOF ¶¶ 310-11.

breaks."[394] The UCB also offered to allow Williams to take a break on multiple

occasions.[395] Williams cannot claim a due process violation for the failure to provide

her opportunities to speak to her advisor if those opportunities were in fact given and

she turned them down.

### 4.   Notice

On its own, the Conference Summary Form sent to Williams by Lauren

Langford on January 24, 2020 provides sufficient notice as it identifies the incidents,

the violations, and the potential sanctions.[396]   Williams argues that she was not

provided sufficient notice because the notice came too late after the incident giving

rise to the proceedings.[397] Williams says that she was told that there would be a no

conduct charge for the complaint filed by A.B. in October 2019,[398] and then learned

for the first time on January 15, 2020 that the Office of Student Conduct was

considering sanctions when Langford requested to meet with her.[399] This position is

---

[394] SMF ¶ 303; RSOF ¶ 303.

[395] *E.g.*, Ex. 184, Doc. 80-57 at 15:30, 46:30, 1:16:00; *see also* AMF ¶ 86 ("In the hearing, Williams was not allowed to speak quietly with her advisor, instead she could only communicate with him during breaks.") Williams does not cite to any evidence, nor has the Court found any on its own review, that she tried to speak to her advisor quietly during the hearing and was unable.

[396] Ex. 151, Doc. 79-36, at 547.

[397] Opp. 26.

[398] *Id.* at 26. In support of her position that Feldbaum told her there would not be a "conduct case" stemming from the A.B. incident, Williams cites notes from a call with Feldbaum. Opp. Ex., Doc. 96-53. These notes appear to be by Adair, as they match the format of her notes in other, better identified, exhibits and they refer to Williams in the third person. *Compare id. with* Ex. 59. There is no indication that Feldbaum told Williams that there would not be further proceedings stemming from this incident. Further, this does not implicate any proceedings arising out of the incident with the Lyft driver.

[399] Opp. 26. In doing so, Williams has conceded that the letter Langford sent on January 15 was sufficient notice.

belied by the evidence. Langford reached out to Williams on November 21, 2019, to schedule a meeting, and Williams understood that the incident with A.B. would be the subject of that meeting.[400] Williams' response indicates that she had also been having ongoing conversations with her prior case manager regarding the incident.[401] Assuming that the emails are not sufficient notice, Williams must still show that she has been prejudiced by not receiving notice until January.

Williams does not cite any authority, nor is the Court aware of any suggesting that a three-month delay is prejudicial,[402] nor does she explain why it was to her. The record shows that, from the start and through the month of January 2020, Williams repeatedly insisted that she had evidence that A.B. was lying about her.[403] A student may be prejudiced by an unnecessary delay that results in the loss of evidence, but that is not the case here.

---

[400] Ex. 134, Doc. 80-38 at 3506-3507.

[401] *See id.* at 3506 (Williams asking Langford if she had the information Williams had previously sent to a Mrs. Shupenko).

[402] In general, requiring notice on an accelerated timeline after an incident would likely result in due process violations, rather than provide due process, as it would preclude full investigations of accusations prior to the initiation of formal proceedings. Further, discussion with the accused, like the one Defendants repeatedly tried to schedule and Williams repeatedly refused to participate in, is often part of such investigations.

[403] *See, e.g.*, Ex. 134 at 3506 (Nov. 21), 3505 (Nov. 23); Ex. 149 (Jan. 21); Ex. 154 at 3521 (Jan. 31).

### 5.   Recusal

Williams argues that she was prejudiced by a lack of a recusal "policy."[404] "Allegations of 'prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'"[405] Williams asserts that it is improper for Langford, as a defendant in this litigation, to present the case against her in the Conduct Hearing. However, the record shows the opposite. This argument is undercut by the fact that Langford was not a Defendant until Williams amended her complaint on April 27, 2020, after the UCB hearing and her subsequent appeal.[406] Further, Langford merely presented the case against Williams during the hearing and was not part of the hearing body which ultimately sanctioned Williams.[407] As to those who were on the panel, there was an opportunity for those who believed they could not fairly hear Williams' case to recuse themselves, and for Williams to request any member be removed for the same reason.[408]

Williams also argues that it was improper for Dr. Gaudelius to consider Williams' appeal because Gaudelius had rejected Williams' Title IX appeal in 2018.[409] Like Langford, Gaudelius was not a defendant in this litigation at the time

---

[404]  Opp. 30-31.
[405]  *Furey*, 884 F. Supp. 2d at 255 (quoting *Gorman v. University of Rhode Island*, 837 F. 2d 7, 15 (1st Cir. 1988)).
[406]  *Compare* Compl. *with* Am. Compl.
[407]  *Doe v. The Citadel*, 2023 WL 3944370, at *2 (4th Cir. June 12, 2023) (dismissing claim of bias by a participant in hearing who was not part of Board and did not participate in decision to sanction student).
[408]  UCB Report, Ex. 179 at 2449.
[409]  Ex. 190, Doc. 79-58.

she considered Williams' appeal.[410] Nor does due process require Gaudelius to recuse herself because of her rejection of Williams' appeal in 2018.[411] In the absence of any evidence of bias, Williams has not overcome the presumption of impartiality of the Penn State hearing bodies.[412]

## VII.  Williams' First Amendment Claims

Williams brings her claims for First Amendment retaliation under 42 U.S.C. § 1983, Title VI, and Title IX.[413] To support a claim for First Amendment retaliation under each, a plaintiff must show "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."[414] The parties do not dispute that Williams engaged in protected conduct when she filed this lawsuit or when she criticized the University's handling of her sexual assault case on Twitter, or that she suffered an adverse action when she was suspended or when the UDP found that A.A. was not responsible for sexual misconduct. Penn State suggests that Williams has not shown that the adverse actions are sufficient to deter a person of ordinary firmness from

---

[410] *See* Compl.

[411] *See U.S. v. Enigwe*, 155 F. Supp. 2d 365, 371 (E.D. Pa. 2001) (observing that prior rulings are insufficient to require recusal of a judge).

[412] *Fraser*, 2023 WL 1805209, at *9 (citing *Park*, 757 F. App'x at 106; *Sill*, 462 F.2d at 469, *Osei*, 2011 WL 4549609, at *11).

[413] Am. Compl. Counts VII and VIII.

[414] *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)) (Section 1983); *see also Williams*, 782 F. App'x at 125 (Title VI); *Whitfield*, 412 F. App'x at 522 (Title VI).

exercising" her First Amendment rights.[415] The Court finds that a lengthy suspension or an adverse decision in a Title IX hearing regarding alleged sexual misconduct meet this standard.

Therefore, for both claims, the inquiry is whether Williams suffered those adverse decisions "but-for" or "because of" her protected First Amendment conduct.[416]

### A.   Retaliation for Initiating this Litigation

Williams claims that she was retaliated against by Defendants for filing this lawsuit.[417] She notes Penn State was served with the lawsuit on February 20, 2020, and that her UCB hearing which resulted in her suspension was the next day.[418] She suggests that this is a reversal from Penn State's position on February 14, 2020, when the University "was ready to rally behind Williams and get her the 'critical professional mental health intervention' she needed."[419] In October 2019, Karen Feldbaum told Dr. Adair that Williams had been "doing well academically" until she started "really spiraling" and that it would be preferred to "have her take a leave to get help rather than suspend her."[420]

---

[415] MSJ Br. 107 n.37.

[416] *Mirabella*, 853 F.3d at 651 (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (Section 1983); *see also Ke*, 645 F. App'x at 165 (observing a plaintiff alleging Title VI or IX retaliation must show they were retaliated against "because of" their protected activity).

[417] Am. Compl. Count VII.

[418] *Id.* ¶¶ 243-145.

[419] Opp. 29. (quoting RSOF Ex., Doc. 94-26 at 1249); *see also* Ex. 110, Doc. 79-10, at 1243 (complete email thread).

[420] RSOF Ex., Doc. 94-54 at 3286.

Williams overstates the extent that Penn State was ready and willing to "rally behind her." There still existed the "challenge" of "getting [Williams] to the Centre County Crisis Center or some other similar source of assistance."[421] This discussion was prompted by an incident in Dr. Yarwood's Psych 425 class and Williams threatening a faculty member.[422] There was agreement among the faculty involved that Williams needed "help and support" but that it was also necessary to be "responsible and transparent about potential threat[s] to faculty, staff, and students that interact with Kayla."[423] Though there may have been a consensus that Williams needed mental health counseling, there was no agreement about Penn State's role in that process. Further, absent from the discussion was any mention of the charges at issue in Williams' hearing or any of the individuals included in the email thread were among those on the UCB who heard Williams' case. This conversation is insufficient to show that the University had established a position that it could have reversed from, let alone that Penn State did so because Williams filed this lawsuit. Such a position would have conflicted with the stance that the University took on January 31, 2020, when it was prepared to suspend Williams prior the initiation of this litigation.

---

[421] Ex. 110, Doc. 79-10, at 1249.

[422] *Id.* at 1251.

[423] *See id.* at 1248.

Case 4:20-cv-00298-MWB   Document 105   Filed 10/11/23   Page 79 of 84

Williams also argues that retaliation can be inferred because of the "unduly suggestive proximity" to her lawsuit and her suspension.[424] Though "very close" temporal proximity can be sufficient to survive summary judgment in "some cases," this is not such a case.[425] There is nothing unduly suggestive about the hearing taking place as scheduled and the UCB subsequently issuing a decision. "It is causation, not temporal proximity itself that is an element" of Williams' claim, and she has not shown that she was suspended because she filed this lawsuit.[426] Nor is there anything else in the record from which a reasonable jury could find that Williams was retaliated against for filing this suit. Her allegations of a "pattern of antagonism" largely depend on acts that occurred before she sued Defendants, and therefore are insufficient to give rise to an inference of causation.[427]

## B.      Retaliation for Criticism of University

Williams claims that she was retaliated against by Penn State for her criticism of the University's "handling of her rape case under Title IX."[428] She accuses the University of "ignor[ing] numerous pieces of evidence, including but not limited to

---

[424] Opp. 49 (citing *Moody v. Atlantic City Bd. of Ed.*, 870 F.3d 206, 221 (3d Cir. 2017)).

[425] *Cf. LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Clark Cnty Sch. Dist.* 532 U.S. 268, 273-74 (2001)).

[426] *Cf. Roberts v. American Airlines*, 599 F. Supp. 3d 222, 230 (E.D. Pa. 2022) (observing that "temporal proximity merely provides an evidentiary basis from which to prove an element of causation") (quoting *Kachmar v. SunGard Data Sys. Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).

[427] *Cf. Kachmar*, 109 F.3d at 177 ("[W]here there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' *following the protected conduct* can also give rise to the inference.") (quoting *Robinson v. Southeastern Pa. Tramsp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993) (emphasis added).

[428] Am. Compl. ¶¶ 252-54.

confessions, medical evidence, text messages, and one rapists' refusal to answer questions" and, instead, "communicated to Ms. Williams, as well as its student body and the public at large that criticism of Penn State and its Title IX investigations would not be tolerated" when it decided not to sanction A.A..[429] Penn State takes issue with each of the charged deficiencies in the Title IX process, arguing that Decision Panel did consider Williams' medical records, could not consider text messages Williams failed to preserve, and should not have penalized A.A. for invoking his Constitutional right against self-incrimination.[430]

Penn State also argues that there is no evidence in the record that the Panel was aware of Williams' criticism, and therefore could not have retaliated against her for it.[431] In response, Williams argues that the Panel's conclusion was contrary to the evidence it heard, that Penn State has no obligation to respect A.A.'s right against self-incrimination, and that Williams had produced her text messages to the local police.[432] Further, she cites evidence that individuals at the University were in fact aware of her criticism of the University on Twitter.[433] Penn State replies that, while "a small handful of individuals at Penn State became aware of Plaintiff's April 5,

---

[429] *Id.* ¶¶ 254.
[430] Opp. 113.
[431] *Id.* at 112.
[432] Opp. 52.
[433] *Id.*

2018 Twitter posts, there remains no evidence that anyone on the Title IX decision panel had knowledge of Plaintiff's tweets."[434]

In its Report, the UDP states that it considered the investigative packet. The packet, over 100 pages long, included certain records from the Ferguson Township Police,[435] medical records,[436] text messages,[437] and notes from interviews with ten witnesses.[438] It did not include text messages and other information supplied to the Ferguson Township Police, who refused to turn over certain records to OSMPR.[439] Williams suggests that Penn State should have obtained the records withheld by the Police, but she does not address Penn State's argument that the University tried to do so and was rebuffed by FPD.[440] Penn State's failure to obtain records that it did in fact request cannot form the basis for a retaliation claim.

Williams' argument that the UDP's findings were contrary to the evidence, which showed she was too intoxicated to consent to sex, does have some support in the record. D.W. admitted to having sex with Williams, despite appearing to acknowledge that she, quite literally, could not handle her liquor—A.A. had to hand her a drink because Williams was "too drunk."[441] The responding officer noted that

---

[434] Reply 21.
[435] Ex. 7, Doc. 80-5 Attach. A.
[436] *Id.* Attach. B..
[437] *Id.* Attach. D.
[438] *Id.* 8-31.
[439] *Id.* at 125.
[440] Opp. 52.
[441] AMF ¶ 8; *see also* Ex. 7, Doc. 80-5, at 2024 (notes from interview with FPD Detective who relayed D.W.'s statement that A.A. handed Williams a drink when she was "too[] drunk and going to throw up"). The Court assumes this is the "confession" Williams refers to.

Williams "still seemed drunk" later that morning and that she was "shocked" when she heard A.A. said they had consensual sex.[442] Williams' Blood Alcohol Content at 8:45 A.M. was 0.192%.[443]

Other witnesses said that Williams "looked out of it,"[444] and "was really drunk . . . walking really slow, saying stuff that did not make sense and slurring her words."[445] D.W. could not explain why, if the sex was consensual, A.A. would need to "signal" D.W. with a toilet flush to let D.W. know A.A. and Williams were finished having sex and it was D.W.'s "turn."[446]

The UDP "concluded that by the time she arrived at [A.A.'s] apartment, [Williams] was very intoxicated."[447] However, observing that only one of the witnesses "had been with [Williams] earlier in the evening," the UDP also "could not conclude that [A.A.] could have known how much Ms. Williams had drunk" or that "there was a preponderance of evidence that [A.A.] reasonably should have known that Ms. Williams was incapacitated."[448] Though the UDP determined that A.A. was not responsible for "Nonconsensual Intercourse" and "Sexual Misconduct involving an Incapacitated Person," it suggested that he may be charged with a Code

---

[442] Ex. 7, Doc. 80-5, at 2015, 2025.
[443] *Id.* at 2007.
[444] *Id.* at 2021.
[445] *Id.* at 2025.
[446] *Id.*
[447] Ex. 17, Doc. 80-12 at 2133.
[448] *Id.*

of Conduct violation for Sexual Exploitation.[449] The Sanctioning Guidelines define Sexual Exploitation as sexual harassment or misconduct that "causes emotional or physical duress."[450] It is unclear how, on the facts before it, the UDP thought A.A. may have been liable for Sexual Exploitation if he had consensual sex with Williams.

As to A.A.'s refusal to answer questions, neither party cites any authority in support of their position. Courts have held that respondents do have the right to not participate, and thus refuse to answer questions, during Title IX proceedings.[451] However, it is not clear universities are precluded from drawing adverse inferences from a respondent's invocation of their Fifth Amendment right.[452] Rather, the purpose for permitting a student to assert their right against self-incrimination in a Title IX proceeding is so that they are not forced to give statements that may be used against them in a subsequent criminal proceeding.[453]

For these reasons, a reasonable juror could find that the UDP reached the wrong conclusion. However, Williams' claim is not simply that Penn State got it wrong, but that they did so for the purpose of sending Williams a message. Williams offers no evidence of causation, or that anybody at Penn State was even unhappy

---

[449] *Id.* at 2132-33.

[450] Ex. 24, Doc. 78-12 at 3932-33.

[451] *Cf. Baum*, 903 F.3d at 580 (Gilman, J. dissenting and observing where due process rights had traditionally been more limited, such as limiting the right to counsel "only to protect [respondent's] Fifth Amendment right against self-incrimination).

[452] *Tsuruta v. Augustana Univ.*, 2015 WL 5838602, at *7-8 (D.S.D. Oct. 7, 2015).

[453] *See Gabrilowitz v. Newman*, 582 F. 2d 100, 105-06 (1st Cir. 1978) (observing that respondent who "chooses not to risk self-incrimination . . . risks loss of his college degree").

with Williams for criticizing the University. Rather, Lisa Powers, Senior Director, Office of Strategic Communications, inquired whether there was an active investigation, which suggests that the concern was making sure that Williams' claims were being addressed.[454] In the absence of any evidence of retaliation, Penn State is entitled to summary judgment on Count VIII.

## VIII. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[454] RSOF Ex., Doc. 94-30.